1  JEFFER MANGELS BUTLER & MITCHELL LLP
   THOMAS M. GEHER (Bar No. 130588)
2  *tgeher@jmbm.com*
   1900 Avenue of the Stars, 7th Floor
3  Los Angeles, California 90067-4308
   Telephone:    (310) 203-8080
4  Facsimile:    (310) 203-0567

5  Attorneys for Creditor and Equity Holder Paige
   Gesualdo and Creditor Ralph Gesualdo
6

7                    UNITED STATES BANKRUPTCY COURT

8          CENTRAL DISTRICT OF CALIFORNIA, NORTHERN DIVISION

9

10 | In re                          | Case No. 9:24-bk-10044 RC

11 | FRINJ COFFEE, INCORPORATED,     | Chapter 11

12 |                                 |
   |              Debtor.            | **AMENDED[1] OBJECTION OF PAIGE
13 |                                 | GESUALDO AND RALPH GESUALDO
   |                                 | TO AMENDED PLAN OF
14 |                                 | REORGANIZATION FOR SMALL
   |                                 | BUSINESS UNDER CHAPTER 11; AND
15 |                                 | DECLARATION OF THOMAS M.
   |                                 | GEHER**
16 |
17 |                                 | Date:     July 10, 2024
   |                                 | Time:     1:00 p.m.
   |                                 | Crtrm.:   201
18

19        **TO THE ABOVE ENTITLED COURT, DEBTOR, ALL INTERESTED PARTIES

20 AND THEIR COUNSEL OF RECORD:**

21        Creditor and Equity Holder Paige Gesualdo ("Paige") and Creditor Ralph Gesualdo

22 ("Ralph," and together with Paige, "Gesualdo") hereby object to the "Amended Plan of

23 Reorganization for Small Business Under Chapter 11" [Docket No. 112] (the "Amended Plan")

24 filed by Frinj Coffee, Incorporated, debtor and debtor in possession ("Debtor"), on June 10, 2024.

25

26

27  ─────────────────────

28 [1] The sole change in this Amended Objection, as compared to the original Objection [docket no.
   129], is the correction of the year in the hearing date in the above caption.

72377976v1

**INTRODUCTION**

On January 16, 2024 ("Petition Date"), Debtor, after burning through millions of dollars of investor money and never making a profit, commenced its subchapter V chapter 11 case.

On April 15, 2024, Debtor, in an effort to attempt to comply with the requirements of Bankruptcy Code § 1189(b), filed a "Plan of Reorganization for Small Business Under Chapter 11" [Docket No. 68] (the "Original Plan"). The Original Plan was, for numerous reasons, patently unconfirmable.

At a Status Conference held on May 8, 2024, Debtor informed the Court that it was negotiating a proposed agreement with an investor that would make an equity investment in Debtor sufficient to pay all creditors in full and would file an amended plan of reorganization. Thus, rather than dismiss Debtor's bankruptcy case, the Court continued the Status Conference to May 22, 2024, to allow Debtor to complete its negotiations with proposed investor, but established a confirmation schedule with respect to the Original Plan and set a confirmation hearing for July 10, 2024.

At the May 22, 2024, Status Conference, Debtor informed the Court that it had reached an agreement in principle with a proposed equity investor for a $3,000,000 equity infusion which would fund a plan of reorganization and allow Debtor to pay all creditors in full. Thus, Debtor requested that the Court not dismiss Debtor's case and continue the matter to allow Debtor to complete an agreement for an equity investment in Debtor. Based on Debtor's representations concerning a proposed equity investment that would pay all creditors in full, the Court continued the Status Conference to June 5, 2024.

On May 31, 2024, Debtor filed an "Updated Status Report" [Docket No. 103] which attached thereto a "Series A Preferred Stock Investment Agreement" (the "Original Investment Agreement") whereby investors Kent Bakke and Moira Kennelly (collectively, "Bakke") would make a $3,000,000 equity investment in Debtor, provided that, among other things, Paige agree to various conditions. Debtor and Bakke never discussed the Original Investment Agreement with Paige at any time and did not have Paige's consent or agreement to the conditions to the proposed investment.

72377976v1

At the June 5, 2024 Status Conference, Debtor and Bakke informed the Court that it would modify the Original Investment Agreement and proceed to file an amended plan.  At Debtor's request, the Court continued the Status Conference to July 10, 2024, to allow Debtor to attempt to file and confirm an amended plan.

As set forth in detail below, the Amended Plan cannot be confirmed for a number of reasons, including that the Amended Plan is not "fair and equitable" because the Amended Plan does not provide that the value of all of Debtor's projected disposal income, after taking into account the $3,000,000 equity infusion from Bakke and the presumably improved financial performance as a result thereof, will be applied to payments under the Amended Plan.  See, Bankruptcy Code § 1191(c).  In fact, the Amended Plan does not provide any financial projections of Debtor for the three to five year period after plan confirmation taking into account the $3,000,000 of income received by Debtor for the sale of its preferred stock to Bakke and the improved financial performance resulting from such investment.  Thus, on this ground alone, as well as the others set forth below, confirmation of the Amended Plan must be denied.

## GESUALDO'S CLAIMS AND INTERESTS

On February 27, 2024, Ralph timely filed a Proof of Claim, designated as Claim No. 4, in the amount of $239,874.23 plus post-petition attorney's fees and costs based on a "Loan Agreement and Promissory Note (Balloon Payment)" which had fully matured on March 31, 2023.

On March 20, 2024, Paige timely filed a Proof of Claim, designated as Claim No. 9, in the amount of $7,067,261.46 based on certain claims made and pending against Debtor in that action entitled *Paige Gesualdo v. Frinj Coffee, Inc., et al.*, pending in the Superior Court of California for the County of Santa Barbara, designated as Case No. 23CV05305 (the "Paige Lawsuit").  The Paige Lawsuit also asserts claims against John ("Jay") Ruskey, Andy Mullins, and Kari Shafer, officers and directors of Debtor.[2]  Debtor has $4,000,000 of insurance coverage for the defense

---

[2] The Amended Plan cannot and does not affect, release or discharge any of Paige's claims against non-debtors, including Paige's pending litigation claims against John ("Jay") Ruskey, Andy Mullins, and Kari Shafer.  If the Amended Plan is ever confirmed, the Confirmation Order should explicitly recite that any discharge and release of Debtor does not discharge or release any of Paige's claims against non-debtors, including John ("Jay") Ruskey, Andy Mullins, and Kari Shafer.

1  and coverage of the claims asserted by Paige against Debtor in the Paige Lawsuit.  See, Amended

2  Plan, page 6, Article 5.01.

3       On March 20, 2024, Paige timely filed a Proof of Interest [Docket No. 54] setting forth that

4  Paige owns 2,355,513 shares of common stock of Debtor.

5                                    **THE AMENDED PLAN**

6       After inducing the Court to not dismiss Debtor's bankruptcy case by representing that

7  Debtor had a proposed equity investor (Bakke) that would pay Debtor $3,000,000 in exchange for

8  preferred stock in Debtor and that the entire $3,000,000 investment would be used for the payment

9  of claims of creditors, the Amended Plan does not utilize the entire $3,000,000 investment for the

10  payment of creditor claims.  Instead, in general, the Amended Plan allocates only $1,250,000 of

11  Bakke's $3,000,000 for creditors (including $150,000 for administrative claims and $161,681.42

12  for the full satisfaction of the secured claim of the SBA, notwithstanding that the SBA has no lien

13  on any of the $3,000,000 of investment funds), of which only $739,506.58 is projected for

14  unsecured creditors (see, Amended Plan, page 3, Article 1: Summary).

15       A.    <u>The Bakke Investment</u>.

16       Exhibit "G" to the Amended Plan is the "Amended and Restated Series A Preferred Stock

17  Investment Agreement" (the "Amended Investment Agreement") between Debtor and Bakke

18  concerning Bakke's equity investment in Debtor.

19       The material terms and conditions of the Amended Investment Agreement for Bakke's

20  proposed $3,000,000 equity investment are:

21       1.    Prior to the closing of Bakke's investment, Debtor "will adopt and file [Debtor's]

22  Amended and Restated Articles of Incorporation, in a form acceptable to [Bakke] … with the

23  Secretary of State …"  See, Amended Investment Agreement, section 1.1.1.

24       2.    On the "Initial Closing Date," and subject to the conditions for the "Initial Closing

25  Date" set forth in section 2.1.1 of the Amended Investment Agreement, Bakke shall pay Debtor

26  $2,000,000 and obtain 306,565 "Post Reverse Split shares of Series A Preferred Stock."  See,

27  Amended Investment Agreement, section 1.2.2.

28       3.    On the "Second Closing Date," which is June 1, 2025, and subject to the conditions

72377976v1

4

1   for the "Second Closing Date" set forth in section 2.1.2 of the Amended Investment Agreement,

2   Bakke shall pay Debtor $1,000,000 and obtain 153,283 "Post Reverse Split shares of Series A

3   Preferred Stock."  See, Amended Investment Agreement, section 1.2.2.

4       4.      The conditions for the "Initial Closing Date" and Bakke's initial investment of

5   $2,000,000 for 306,565 "Post Reverse Split shares of Series A Preferred Stock" are: (a) the

6   Amended Plan shall be confirmed, (b) the Amended Plan, as confirmed, "shall provide for

7   discharge of all claims of creditors," (c) only $1,250,000 of Bakke's initial investment may be

8   used for the payment of all administrative claims, secured claims, priority claims and unsecured

9   claims, (d) all holders of "SAFE" agreements convert their interests under the SAFE agreements

10  to Series A Preferred Stock, (e) the Reverse Stock Split is completed and (f) Debtor's Amended

11  and Restated Articles of Incorporation, acceptable to Bakke, are filed with the California Secretary

12  of State.  See, Amended Investment Agreement, section 2.1.1.

13      5.      So long as Debtor's representations and warranties are true and correct and Debtor

14  is not in default of the Amended Investment Agreement, Bakke will fund the final $1,000,000

15  investment installment on June 1, 2025, the Second Closing Date.  See, Amended Investment

16  Agreement, section 2.1.2.

17      6.      Section 5.2 of the Amended Investment Agreement sets forth a covenant of Debtor

18  that Bakke's $3,000,000 investment shall be used "solely as follows": (a) an amount "up to (but

19  not exceeding) $1,250,000" for payment of (i) all administrative expenses in an amount not to

20  exceed $150,000, (ii) payment of the secured claim of the SBA "in the approximate sum of

21  $161,000,"  (iii) payment of priority claims, and (iv) "a pot to allowed unsecured claims on a pro

22  rata basis," and (b) "the balance shall be used for [Debtor's] ordinary course working capital

23  needs; provided, however, that not [*sic*] amount of the Investment proceeds may be used to defend

24  the Paige Lawsuit or pay any settlement of the same."

25      7.      Section 5.5 of the Amended Investment Agreement requires that "[Debtor] will

26  obtain at or within thirty (30) days after the Closing, and will maintain, a right of first refusal with

27  respect to transfers of shares of Common Stock by each holder thereof, subject to certain standard

28  exceptions."  Paige, who owns and holds 2,355,513 shares of common stock of Debtor, will not

JMBM | Jeffer Mangels Butler & Mitchell LLP

72377976v1

5

1    agree to do so because such a grant will chill the value of her common stock.

2         8.    Section 6.1 of the Amended Investment Agreement provides that all holders of

3    Series A Preferred Stock, including Bakke, shall be entitled to dividends on the purchase price of

4    such preferred stock at the rate of 8% per annum.

5         9.    Section 7.1 of the Amended Investment Agreement provides that before any money

6    is paid to the holders of common stock, the holders of Series A Preferred Stock must receive the

7    greater of (a) 1.2 times the purchase price for such stock plus all accrued and unpaid dividends or

8    (ii) the amount the holders of the Series A Preferred Stock would have received if such stock was

9    converted to common stock.

10        B.    The Amended Plan.

11        The Amended Plan intends to use $1,250,000 of Bakke's equity investment to pay all pre-

12   confirmation creditor claims, with the balance of $1,750,000 to be used for Debtor's operations.

13   Debtor's Amended Plan does not provide any financial projections at all.  Debtor's Amended Plan

14   does not provide any information to project how Debtor will perform after it utilizes Bakke's

15   $3,000,000 equity investment.  Presumably, after Debtor receives Bakke's $3,000,000 equity

16   infusion, Debtor will become a profitable company.  Yet, Debtor fails to disclose this information.

17   Surely, Bakke is not investing $3,000,000 to keep Debtor as a failing, unprofitable business.  In

18   order to induce Bakke to invest $3,000,000 in Debtor, Debtor must have provided Bakke with

19   projections of operations showing that Debtor will be profitable after the $3,000,000 equity

20   investment.

21        Notwithstanding Debtor's failure to provide any financial projections concerning its

22   operations after receiving Bakke's equity investment, the Amended Plan provides for the

23   following unclassified and classified claims:

24        1.    Administrative Claims:  In addition to the fees and costs of Debtor's professionals,

25   The Ruskey Living Trust, Debtor's landlord who has not received any payment of rent from and

26   after the Petition Date, holds an administrative claim.  As Debtor has failed to obtain a bar date for

27   the filing of administrative claims (other than for professional fees), the total amount of

28   administrative claims is unknown and could exceed the sum of $150,000, the maximum amount of

Jeffer Mangels
Butler & Mitchell LLP

JMBM

1  Bakke's investment funds which can be used to pay administrative claims.  The Amended Plan

2  proposes to pay Administrative Claims in full from the $1,250,000 allocated from Bakke's

3  investment funds.  See Amended Plan, Article 3.02.

4       2.    Unclassified Priority Tax Claims:    Unclassified priority tax claims consist of the

5  claims of (i) California Franchise Tax Board - $800 (Claim No. 8), (ii) Internal Revenue Service -

6  $182,862.31 (Claim No. 6) and (iii) Mark Szczberba - $15,150 (priority wage claim).[3]  Debtor

7  proposes to object to the claim of the IRS and pay the remaining claims in full on the Effective

8  Date of the Amended Plan.  See Amended Plan, Article 3.03.

9       3.    Class 1 Priority claims:  Notwithstanding the priority claim of Mr. Szczberba,

10  Debtor contends that it does not have any priority claims.  See Amended Plan, Article 4.01.

11       4.    Class 2 Secured Claim of the SBA:  Notwithstanding that Debtor is current on its

12  post-petition obligations to the SBA and has been timely making its required monthly payments,

13  the Amended Plan proposes to pay the full amount of the secured claim of the SBA in the

14  estimated amount of $161,681.42 from Bakke's investment funds on the Effective Date of the

15  Amended Plan.  See Amended Plan, Article 4.01.

16       5.    Class 3 Nonpriority Unsecured Claims:   After paying all unclassified claims,

17  priority claims and the secured claim of the SBA from the allocated $1,250,000 from Bakke's

18  investment funds, Debtor intends to pay the allowed general unsecured claims pro-rata from the

19  approximate remaining balance of $739,506.58.  The claim of Paige, which is based upon the

20  claims made in the pending, but stayed, Paige Lawsuit, is included in Class 3.  Further, the

21  treatment section of Class 3 claims does not provide any treatment for Paige to continue with the

22  Paige Lawsuit against Debtor with a recovery against the proceeds of the relevant insurance

23  policy, in addition to receiving a distribution under the Amended Plan.  See Amended Plan,

24  Article 4.01.  Yet, in Article 5.1 of the Amended Plan entitled "Disputed Claims," Debtor asserts

25  that Paige's allowed claim will "receive distribution through this Amended Plan … [and Paige]

26  may pursue any applicable insurance for an additional recovery against the Debtor up to the policy

27  

28  [3] For some reason, Debtor classified Mr. Szczerba's as an unclassified tax claim.  Mr. Szczerba's claim is a priority wage claim, not a priority tax claim.  Mr. Szczerba's claim must be reclassified.

72377976v1

coverage amount as well as the non-debtor defendants." See, Amended Plan, Article 5.01. As Paige, due to Debtor's insurance and the pending Paige Lawsuit, has different rights and potential recoveries than all other unsecured creditors, Paige's unsecured claim should be separately classified. Further, the treatment provisions of the Amended Plan with respect to Paige's allowed unsecured claim must provide explicit, clear language that Paige is allowed to prosecute, after the Effective Date of the Amended Plan, the Paige Lawsuit against Debtor and the non-debtor defendants and be entitled to recover on any judgment against Debtor from Debtor's insurance policy.

6.      Class 4 Equity Security Holders of the Debtor and SAFE Holders: It appears that Class 4 improperly consists of the following three different classes of alleged equity holders: (i) holders of common stock, such as Paige, (ii) holders of preferred stock, and (iii) holders of SAFE Agreements.[4]  The Amended Plan, with respect to Class 4, provides: "See the attached Exhibit B-4 for list for the equity security holders and SAFE holders and their treatment under this Amended Plan." Exhibit B-4 to the Amended Plan identifies 66 individuals and entities as members of Class 4. Other than Julie Klaus, Mark Cassani, Paige, and Steven Hollstien, the treatment for the remaining 62 Class 4 members is: "Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, Kent Bakke and Moira Kennelly." However, Debtor's Schedules [Docket No. 35] lists, in Schedule G (Executory Contracts and Unexpired Leases), only the following seven (7) individuals and entities as holders of SAFE Agreements: (i) Brent Herald, (ii) Gato Fuerte LLC, (iii) Hood Family Trust, (iv) Jason Mraz, (v) Lance Frautschi, (vi) Madden Family Trust, and (vii)

---

[4] Attached hereto as Exhibit "A" and incorporated herein by this reference is the form of the SAFE Agreement used by Debtor and which redacts the name of the "investor" to the SAFE Agreement. This SAFE Agreement was provided to Paige's counsel by the Subchapter V Trustee, Mark Sharf.

1   Pacific Premier Trust Custodian c/o Carl H. Steffens IRA.[5]  Additionally, Debtor's "List of Equity

2   Security Holders" included in its Schedules identifies 68 holders of "fully vested" "common

3   shares" of Frinj, including certain of the holders of SAFE Agreements identified in Debtor's

4   Schedules.  This one class for three different alleged equity security holders is improper.

5          7.       Class 5 Insiders of the Debtor:  Class 5 consists of claims of "insiders" and insiders

6   will not receive any distribution under the Amended Plan.

7          The Amended Plan also contains the following material provisions:

8          1.       Assumption of Executory Contracts:  Article 6.01 of the Amended Plan provides

9   that Debtor is a party to eleven (11) SAFE Agreements and seeks to assume them.  As set forth

10  above (see, Class 4 discussion and footnotes 3 and 4 above), the SAFE Agreements are not

11  executory contracts.  Further, even if the SAFE Agreements were executory contracts, as they

12  cannot be assigned, they cannot be assumed.  The holders of the SAFE Agreements are simply

13  unsecured creditors and have no right to preferred stock in Debtor.

14         2.       Corporate Governance:  Article 8.07 of the Amended Plan identifies Debtor's

15  "current" officers and directors and further provides that Bakke will have the right to "assign one

16  board member."  The Amended Plan does not identify Debtor's post-confirmation management

17  team/officers/directors or their proposed compensation.

18         3.       Default Provision:  Article 10(d) of the Amended Plan provides that Debtor will be

19  in material default of the Amended Plan by "missing 3 consecutive payments and [not] cur[ing]

20  the default within fifteen (15) days after receipt of written notice" and only then can the creditor

21  seek to pursue remedies.  As Debtor will make only one payment to each creditor, this provision is

22

---

23  [5] The SAFE Agreements are not executory contracts because there are no material obligations left
    to perform by the "investor" to the SAFE Agreement, the breach of which would excuse Debtor
24  from performing under the SAFE Agreements.  See, *In re Texscan Corporation*, 976 F.2d 1269,
    1272 (9th Cir. 1992) and *In re International Fibercom, Inc.*, 503 F.3d 933, 941 (9th Cir. 2007).  It
25  appears that the SAFE holders are included in Class 4 due to the assumption and assignment of the
    SAFE Agreements per Article 6.01 of the Amended Plan (which assumes the SAFE Agreements
26  pursuant to Bankruptcy Code § 365).  However, as the SAFE Agreements (i) are not executory
    contracts (as the investor has no material obligations to perform) and (ii) cannot be assigned
27  because only Debtor can perform the obligations of issuing stock in Debtor (see, *In re Catapult
    Entertainment, Inc.*, 165 F.3d 747, 754-755 (9th Cir. 1999)(Debtor cannot assume an executory
28  contract it cannot assign), the SAFE Agreements are not "assumable."  The holders of the SAFE
    Agreements are simply unsecured creditors and not equity holders.

72377976v1

*(Left margin: JMBM | Jeffer Mangels Butler & Mitchell LLP)*

1  illusory and affords creditors no relief if Debtor breaches its obligations under the Amended Plan.

2  **THE AMENDED PLAN SHOULD NOT BE CONFIRMED**

3  A.    <u>Plan Confirmation Standards For Subchapter V Case</u>

4  The Debtor bears the burden of proof of demonstrating by a preponderance of the evidence

5  that every plan confirmation requirement is met and the Bankruptcy Court has an independent

6  duty to ensure that the plan confirmation requirements are satisfied.  See, *In re Arnold and Baker*

7  *Farms*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994) and *In re Gbadebo*, 431 B.R. 222, 227, fn 5

8  (Bankr. N.D. Cal. 2010).

9  In a subchapter V case, a plan of reorganization can be confirmed under Bankruptcy Code

10  § 1191(a) "only if all of the requirements of section 1129(a), other than paragraph (15) of that

11  section, of this title are met."  Confirmation under Bankruptcy Code § 1191(a) would be

12  consensual.

13  Notwithstanding Bankruptcy Code § 1191(a), Bankruptcy Code § 1191(b) provides, in

14  relevant part, that "if all of the applicable requirements of section 1129(a) of this title, other than

15  paragraphs (8), (10), and (15) of that section, are met with respect to a plan, the court, on request

16  of the debtor, shall confirm the plan notwithstanding the requirements of such paragraphs if the

17  plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims

18  or interests that is impaired under, and has not accepted, the plan."

19  A subchapter V plan is "fair and equitable" if:

20  As of the effective date of the plan—
(A) the plan provides that all of the projected disposable income of the
21  debtor to be received in the 3-year period, or such longer period not to
exceed 5 years as the court may fix, beginning on the date that the first
22  payment is due under the plan will be applied to make payments under the
plan; or
23  (B) the value of the property to be distributed under the plan in the 3-year
period, or such longer period not to exceed 5 years as the court may fix,
24  beginning on the date on which the first distribution is due under the plan is
not less than the projected disposable income of the debtor.
25

26  11 U.S.C. § 1191(c)(2).

27  Here, as (i) the Amended Plan makes one payment to all classes of creditors from Bakke's

28  payment of $3,000,000 to Debtor in exchange for Debtor's issuance of preferred stock to Bakke,

1    (ii) Paige's claim must be separately classified, and (iii) Paige (and Ralph) will vote to reject the

2    Amended Plan, in order for the Amended Plan to be "fair and equitable," "the value of the

3    property to be distributed under the plan in the 3-year period … [must be] not less than the

4    projected disposable income of the debtor."  See, Bankruptcy Code section 1191(c)(2)(B).

5        Section 1191(d) of the Bankruptcy Code defines "disposable income" as "the income that

6    is received by the debtor and that is not reasonably necessary to be expended … for the payment

7    of expenditures necessary for the continuation, preservation, or operation of the business of the

8    debtor."

9        B.    The Amended Plan Does Not Satisfy the Requirements for Confirmation Under

10    Section 1129 of the Bankruptcy Code.

11        Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply

12    with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative

13    history of section 1129(a)(1) explains that this provision incorporates the requirements of sections

14    1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of a plan,

15    respectively. See, H.R. Rep. No. 95-595 at 412 (1977); S. Rep. No. 95-989 at 126 (1978); see also

16    *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) (same); *In re S&W*

17    *Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of

18    [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most

19    directly aimed at were Sections 1122 and 1123.").

20        1.    The Amended Plan Does Not Comply With Bankruptcy Code Section 1122.

21        Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or interest

22    in a particular class only if such claim or interest is substantially similar to the other claims or

23    interests of such class." 11 U.S.C. § 1122(a).

24        For a classification structure to satisfy section 1122 of the Bankruptcy Code, it is not

25    necessary that all substantially similar claims or interests be designated to the same class, but only

26    that all claims or interests designated to a particular class be substantially similar to each other. *In*

27    *re Armstrong World Indus., Inc.*, 348 B.R. 111, 159 (D. Del. 2006).

28        First, the classification of Paige's creditor claim in Class 4 does not comply with

JMBM  Jeffer Mangels
Butler & Mitchell LLP

72377976v1

11

1    Bankruptcy Code's classification requirements.  As (i) Paige has, by the Paige Lawsuit, pending

2    litigation, (ii) Paige's claims are, as admitted by the Amended Plan, subject to insurance coverage

3    and (iii) the Amended Plan provides in Article 5.01 that Paige "may pursue any applicable

4    insurance for an additional recovery against the Debtor up to the policy coverage amount as well

5    as the non-debtor defendants,"[6] Paige has different rights and priorities than all other unsecured

6    creditors.  Due to the pending Paige Lawsuit and insurance coverage for such claim, Paige's claim

7    must be classified in a different class.

8         Second, Class 5, the equity holder class, consists of three different alleged equity interests,

9    common stock holders, preferred stock holders and holders of SAFE contracts (which are not

10   equity holders of Debtor – the holders of SAFE Agreements are unsecured creditors), all of which

11   have different rights and priorities.  Preferred equity holders are entitled to dividends and priority

12   in payment over holders of common stock.  Thus, the holders common stock should be one class

13   and the holders of preferred stock should be another class.  The holders of SAFE Agreements

14   should be classified in the class of unsecured creditors.

15        The Amended Plan does not comply with Bankruptcy Code section 1122.

16             2.    The Amended Plan Does Not Comply With Bankruptcy Code Section

17   1123(a)(4).

18        Section 1123(a)(4) requires that a plan provide the same treatment for each claim or

19   interest within a particular class unless any claim or interest holder agrees to receive less favorable

20   treatment than other class members.

21        The Amended Plan violates section 1123(a)(4) with respect to Class 4 and Class 5.  With

22   respect to Class 4, as set forth above, the treatment of Paige's Class 4 unsecured creditor claim is

23   different than all other Class 4 members because Paige has right to continue the Paige Lawsuit

24   against Debtor to the extent of Debtor's insurance and continue to prosecute her claims against

25   non-debtors.  As no other Class 4 members have these rights or treatment, the inclusion of Paige's

26   _____

27   [6] Notwithstanding this language from Article 5.01 of the Amended Plan, this language is not
     present in the treatment of the Class 4 claims (which is where Paige's creditor claim is presently
28   classified).  This treatment language concerning the creditor claim of Paige must be included in
     the treatment section for Paige's creditor claim.

1    unsecured creditor claim in Class 4 is improper.

2    Concerning Class 5, as set forth above, this class improperly lumps together the holders of

3    preferred stock with the holders of the common stock.  As the preferred stock holders are entitled

4    to dividends and priority in payment, such holders have different rights and priorities from the

5    holders of the common stock.  Additionally, holders of SAFE Agreements are not equity holders,

6    they are unsecured creditors.  Thus, the classification of different stock classes into one class for

7    plan purposes is improper.

8    Accordingly, the Amended Plan does not satisfy the requirements of section 1123(a)(4) of

9    the Bankruptcy Code.

10    3.    The Amended Plan Does Not Comply With Bankruptcy Code Section

11    1123(a)(6).

12    Bankruptcy Code section 1123(a)(6) provides, in relevant part, that

13    a plan shall provide for the inclusion in the charter of the debtor, if the debtor
       is a corporation … of a provision prohibiting the issuance of nonvoting
14    equity securities, and providing, as to the several classes of securities
       possessing voting power, an appropriate distribution of such power among
15    such classes, including, in the case of any class of equity securities having
       a preference over another class of equity securities with respect to
16    dividends, adequate provisions for the election of directors representing
       such preferred class in the event of default in the payment of such dividends.
17

18    The Amended Plan (and the Amended Investment Agreement) provide that Debtor shall

19    amend its charter, i.e., Articles of Incorporation, as approved by Bakke.  Yet, no amended Articles

20    of Incorporation are included in the Amended Plan.  Any amended Articles of Incorporation must

21    comply with Bankruptcy Code section 1123(a)(6), not just Bakke's approval.  The Amended Plan

22    presently does not comply with Bankruptcy Code section 1123(a)(6).

23    4.    The Amended Plan Does Not Comply With Bankruptcy Code Section

24    1123(b)(2).

25    Bankruptcy Code section 1123(b)(2) provides that "a plan may, subject to section 365 of

26    this title, provide for the assumption, rejection, or assignment of any executory contract or

27    unexpired lease of the debtor not previously rejected under such section." Article 6 of the

28    Amended Plan seeks to assume the eleven (11) outstanding SAFE Agreements.  However, the

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  SAFE Agreements do not qualify as executory contracts.  See, above discussion on pages 8 - 9 re

2  Class 4 and footnotes 3 and 4.  As the SAFE Agreements are not executory contracts, but

3  represent unsecured debt, the Plan violates Bankruptcy Code section 1123(b)(2).

4          5.        The Amended Plan Does Not Comply With Bankruptcy Code Section

5  1129(a)(5).

6      Bankruptcy Code section 1129(a)(5) requires that the Amended Plan "has disclosed the

7  identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a

8  director, officer, or voting trustee of the debtor" and "the identity of any insider that will be

9  employed or retained by the reorganized debtor, and the nature of any compensation for such

10  insider."

11      The Amended Plan only discloses the "current management," officers and directors and

12  that some unknown person appointed by Bakke will become a board member.  See, Amended

13  Plan, Article 8.07.  The Amended Plan does not disclose the post-confirmation officers and

14  directors of Debtor and does disclose the compensation to be paid to insiders, such as Mr. Ruskey,

15  Mr. Mullins and Ms. Shafer, who are employed and/or retained by Debtor.  The Amended Plan

16  does not comply with Bankruptcy Code section 1129(a)(5).

17          6.        The Amended Plan Does Not Comply With Bankruptcy Code Section

18  1129(a)(7).

19      Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test"

20  or the "liquidation test," and provides:

21          With respect to each impaired class of claims or interests –
            (A)      each holder of a claim or interest of such class –
22          (i)       has accepted the plan; or
            (ii)      will receive or retain under the plan on account of such claim or
23          interest property of a value, as of the effective date of the plan, that is not
            less than the amount that such holder would so receive or retain if the debtor
24          were liquidated under chapter 7 of this title [U.S.C. §§ 701 et. seq.] on such
            date . . . .
25

26  11 U.S.C. § 1129(a)(7).

27      The best interests test focuses on individual dissenting creditors or interest holders rather

28  than classes of claims or interests. See, *Bank of Am. Nat'l Tr. & Savs. Ass'n v. 203 N. LaSalle St.*

JMBM | Jeffer Mangels
       Butler & Mitchell LLP

72377976v1

14

1   *P'ship*, 526 U.S. 434, 441 (1999).  Under the best interests test, each non-accepting creditor or

2   interest holder must "receive . . . on account of such claim . . . property of a value, as of the

3   effective date of the plan, that is not less than the amount that such holder would so receive . . . if

4   the debtor were liquidated under chapter 7 . . . on such date."  Id. at 442 n. 13; *U.S. v. Reorganized*

5   *CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996).  The best interests test is generally

6   satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under

7   the plan than under a chapter 7 liquidation.  See, *In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C.

8   2006), appeal dismissed, No. 1:07CV30, 2007 WL 1087575 (M.D.N.C. 2007) ("In order to show

9   that a payment under a plan is equal to the value that the creditor would receive if the debtor were

10  liquidated, there must be a liquidation analysis of some type that is based on evidence and not

11  mere assumptions or assertions.") (citations omitted).

12          Here, Debtor's liquidation analysis (Exhibit "E" to the Amended Plan) is incomplete.  The

13  liquidation analysis does not take into account any avoidance power claims which Debtor may

14  have.  It appears that Debtor's professionals have not conducted any analysis of (i) any litigation

15  claims or (ii) Debtor's books and records to determine if any avoidance power claims are present.

16  Without this analysis, the liquidation analysis is incomplete and worthless.

17                  7.      The Amended Plan Does Not Include Any Evidence of Feasibility.

18          Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to confirmation,

19  the bankruptcy court determine that a plan is feasible. Specifically, the bankruptcy court must

20  determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the

21  need for further financial reorganization, of the debtor or any successor to the debtor under the

22  plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

23          First, no evidence is attached to the Amended Plan or filed in support of confirmation

24  concerning Bakke's ability to pay any money to Debtor.  Debtor must provide evidence that

25  Bakke has the ability to pay Debtor the $3,000,000 investment amount required by the Amended

26  Investment Agreement.  Thus, Debtor has not met its burden to show that the Amended Plan is

27  feasible.

28          Second, Debtor has not attached any projections in support of the Amended Plan to prove

72377976v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  that confirmation of the Amended Plan will not be followed by a liquidation or the need for further

2  financial reorganization.

3      Debtor has not satisfied the requirement that the Amended Plan is feasible.

4          8.     The Amended Plan Is Not "Fair and Equitable".

5      As the Amended Plan must be modified to separately classify the creditor claim of Paige

6  and Paige will vote to reject the Amended Plan, Bankruptcy Code section 1191(b) requires that for

7  confirmation of the Amended Plan, the Amended Plan must be "fair and equitable."

8      For the Amended Plan to be fair and equitable with respect to unsecured claims and

9  Paige's claim/class, the Amended Plan must provide that, as of the Effective Date of the Amended

10  Plan, "the value of the property to be distributed under the plan in the 3-year period, or such longer

11  period not to exceed 5 years as the court may fix, beginning on the date on which the first

12  distribution is due under the plan is not less than the projected disposable income of the debtor."

13      Thus, in order for this Court to determine that the Amended Plan is fair and equitable, the

14  Court must find that the value of the property to be distributed under the Amended Plan, which is

15  $1,250,000, "is not less than the projected disposable income of the debtor."  In order for the

16  Court to make this finding, the Court must determine Debtor's disposable income over the three

17  year period following confirmation.  Here, Debtor has not attached any projections to the

18  Amended Plan.  There is no evidence for this Court to determine whether or not the sum of

19  $1,250,000 is not less than Debtor's disposable income over the three years following

20  confirmation.[7]

21      The Amended Plan is not fair and equitable.  The Amended Plan cannot be confirmed.

22      As Debtor has not complied with the plan confirmation requirements of the Bankruptcy

23  Code, the Amended Plan cannot be confirmed.

24

25

26

27

28

---

[7] Didn't Debtor provide projections to Bakke to induce the $3,000,000 investment.  Further, the $3,000,000 investment by Bakke is income which should be included in a disposable income analysis in any projections.  Presumably, the $3,000,000 equity investment payment by Bakke to Debtor will improve Debtor's business fortunes and profitability and any calculation of disposable income should account for an upturn in Debtor's business.

72377976v1

1

## CONCLUSION

2

For all of the reasons set forth above, confirmation of the Amended Plan should be denied.

3

4    Dated: June 25, 2024                    By:    ___/s/ Thomas M. Geher_____

5                                                   THOMAS M. GEHER
                                                    Attorneys for Creditor and Equity Holder Paige
6                                                   Gesualdo and Creditor Ralph Gesualdo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72377976v1

### DECLARATION OF THOMAS M. GEHER

I, Thomas M. Geher, declare:

1.     I am an attorney licensed to practice law in the State of California and before this Court and am a partner in Jeffer Mangels Butler & Mitchell LLP, counsel of record for creditor and interest holder Paige Gesualdo ("Paige") and creditor Ralph Gesualdo ("Ralph") in this chapter 11 case.  All facts stated herein are known by me to be true through my own personal knowledge and I would and could competently testify thereto in a court of law if called upon to do so.

2.     On June 12, 2024, in response to my request, Mark Sharf, Subchapter V Trustee, sent to me, by email, the SAFE Agreement attached hereto as Exhibit "A."

Executed on June 25, 2024, at Los Angeles, California.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____/s/ Thomas M. Geher_____
THOMAS M. GEHER

72377976v1

18

# EXHIBIT A

THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

## FRINJ COFFEE INC.

### SAFE
### (Simple Agreement for Future Equity)

THIS CERTIFIES THAT in exchange for the payment by ▮▮▮▮▮▮▮ (the "**Investor**") of **$100,000** (the "**Purchase Amount**") on or about December 15, 2023, FRINJ Coffee Inc., a California corporation (the "**Company**"), issues to the Investor the right to certain shares of the Company's Capital Stock, subject to the terms described below.

The "**Post-Money Valuation Cap**" is $38,000,000.  See **Section 2** for certain additional defined terms.

**1.  *Events***

(a)  **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.

In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(b)  **Option for Conversion Event on June 30, 2025.**  If there is No qualifying Equity Financing before end of business day June 30, 2025 then starting on July 1, 2025, the Investor will have the option for 30 days - until end of business day on July 30, 2025 - to convert this purchase amount of $100,000 into the number of shares of Common Stock equal to the Purchase Amount divided by the lowest price per share of the Common Stock.

In connection with the optional conversion of this Safe into shares of Common Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Common Stock, with appropriate variations if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor.

(c)  **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, this Safe will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**").  If any of the Company's securityholders are given a choice as to the form and amount of Proceeds to be received in a Liquidity Event, the Investor will be given the same choice, *provided* that the Investor may not choose to receive a form of consideration that the Investor would be ineligible to receive as a result of the Investor's failure to satisfy any requirement or limitation generally applicable to the Company's securityholders, or under any applicable laws.

Notwithstanding the foregoing, in connection with a Change of Control intended to qualify as a tax-free reorganization, the Company may reduce the cash portion of Proceeds payable to the Investor by the amount determined by its board of directors in good faith for such Change of Control to qualify as a tax-free reorganization for U.S. federal income

tax purposes, provided that such reduction (A) does not reduce the total Proceeds payable to such Investor and (B) is applied in the same manner and on a pro rata basis to all securityholders who have equal priority to the Investor under Section 1(d).

(d) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event.

(e) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:

(i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock) and Series F Preferred Stock liquidation preference;

(ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and

(iii) Senior to payments for Common Stock.

The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences).

(f) **Termination**. This Safe will automatically terminate (without relieving the Company of any obligations arising from a prior breach of or non-compliance with this Safe) immediately following the earliest to occur of: (i) the issuance of Capital Stock to the Investor pursuant to the automatic conversion of this Safe under Section 1(a); (ii) the payment, or setting aside for payment, of amounts due the Investor pursuant to Section 1(b) or Section 1(c), or (iii) .

## 2. *Definitions*

"**Capital Stock**" means the capital stock of the Company, including, without limitation, the "**Common Stock**" and the "**Preferred Stock**."

"**Change of Control**" means (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) a sale, lease or other disposition of all or substantially all of the assets of the Company.

"**Company Capitalization**" is calculated as of immediately prior to the Equity Financing and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all Converting Securities;
- Includes all (i) issued and outstanding Options and (ii) Promised Options; and
- Includes the Unissued Option Pool, except that any increase to the Unissued Option Pool in connection with the Equity Financing shall only be included to the extent that the number of Promised Options exceeds the Unissued Option Pool prior to such increase.

"**Converting Securities**" includes this Safe and other convertible securities issued by the Company, including but not limited to: (i) other Safes; (ii) convertible promissory notes and other convertible debt instruments; and (iii) convertible securities that have the right to convert into shares of Capital Stock.

"**Direct Listing**" means the Company's initial listing of its Common Stock (other than shares of Common Stock not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange by means of an effective registration statement on Form S-1 filed by the Company with the SEC that registers shares of existing capital stock of the Company for resale, as approved by the Company's board of directors. For the avoidance of doubt, a Direct Listing shall not be deemed to be an underwritten offering and shall not involve any underwriting services.

"**Dissolution Event**" means (i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (**excluding** a Liquidity Event), whether voluntary or involuntary.

"**Dividend Amount**" means, with respect to any date on which the Company pays a dividend on its outstanding Common Stock, the amount of such dividend that is paid per share of Common Stock multiplied by (x) the Purchase Amount divided by (y) the Liquidity Price (treating the dividend date as a Liquidity Event solely for purposes of calculating such Liquidity Price).

"**Equity Financing**" means a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

"**Initial Public Offering**" means the closing of the Company's first firm commitment underwritten initial public offering of Common Stock pursuant to a registration statement filed under the Securities Act.

"**Liquidity Capitalization**" is calculated as of immediately prior to the Liquidity Event, and (without double-counting, in each case calculated on an as-converted to Common Stock basis):

- Includes all shares of Capital Stock issued and outstanding;
- Includes all (i) issued and outstanding Options and (ii) to the extent receiving Proceeds, Promised Options;
- Includes all Converting Securities, **other than** any Safes and other convertible securities (including without limitation shares of Preferred Stock) where the holders of such securities are receiving Cash-Out Amounts or similar liquidation preference payments in lieu of Conversion Amounts or similar "as-converted" payments; and
- Excludes the Unissued Option Pool.

"**Liquidity Event**" means a Change of Control, a Direct Listing or an Initial Public Offering.

"**Liquidity Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Liquidity Capitalization.

"**Options**" includes options, restricted stock awards or purchases, RSUs, SARs, warrants or similar securities, vested or unvested.

"**Proceeds**" means cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution.

"**Promised Options**" means promised but ungranted Options that are the greater of those (i) promised pursuant to agreements or understandings made prior to the execution of, or in connection with, the term sheet or letter of intent for the Equity Financing or Liquidity Event, as applicable (or the initial closing of the Equity Financing or consummation of the Liquidity Event, if there is no term sheet or letter of intent), (ii) in the case of an Equity Financing, treated as outstanding Options in the calculation of the Standard Preferred Stock's price per share, or (iii) in the case of a Liquidity Event, treated as outstanding Options in the calculation of the distribution of the Proceeds.

Exhibit A - 22

"**Safe**" means an instrument containing a future right to shares of Capital Stock, similar in form and content to this instrument, purchased by investors for the purpose of funding the Company's business operations.  References to "this Safe" mean this specific instrument.

"**Safe Preferred Stock**" means the shares of the series of Preferred Stock issued to the Investor in an Equity Financing, having the identical rights, privileges, preferences and restrictions as the shares of Standard Preferred Stock, other than with respect to: (i) the per share liquidation preference and the initial conversion price for purposes of price-based anti-dilution protection, which will equal the Safe Price; and (ii) the basis for any dividend rights, which will be based on the Safe Price.

"**Safe Price**" means the price per share equal to the Post-Money Valuation Cap divided by the Company Capitalization.

"**Standard Preferred Stock**" means the shares of the series of Preferred Stock issued to the investors investing new money in the Company in connection with the initial closing of the Equity Financing.

"**Unissued Option Pool**" means all shares of Capital Stock that are reserved, available for future grant and not subject to any outstanding Options or Promised Options (but in the case of a Liquidity Event, only to the extent Proceeds are payable on such Promised Options) under any equity incentive or similar Company plan.

3.  *Company Representations*

(a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of its state of incorporation, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

(b)  The execution, delivery and performance by the Company of this Safe is within the power of the Company and has been duly authorized by all necessary actions on the part of the Company (subject to section 3(d)). This Safe constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the enforcement of creditors' rights generally and general principles of equity.  To its knowledge, the Company is not in violation of (i) its current certificate of incorporation or bylaws, (ii) any material statute, rule or regulation applicable to the Company or (iii) any material debt or contract to which the Company is a party or by which it is bound, where, in each case, such violation or default, individually, or together with all such violations or defaults, could reasonably be expected to have a material adverse effect on the Company.

(c)  The performance and consummation of the transactions contemplated by this Safe do not and will not: (i) violate any material judgment, statute, rule or regulation applicable to the Company; (ii) result in the acceleration of any material debt or contract to which the Company is a party or by which it is bound; or (iii) result in the creation or imposition of any lien on any property, asset or revenue of the Company or the suspension, forfeiture, or nonrenewal of any material permit, license or authorization applicable to the Company, its business or operations.

(d)  No consents or approvals are required in connection with the performance of this Safe, other than: (i) the Company's corporate approvals; (ii) any qualifications or filings under applicable securities laws; and (iii) necessary corporate approvals for the authorization of Capital Stock issuable pursuant to Section 1.

(e)  To its knowledge, the Company owns or possesses (or can obtain on commercially reasonable terms) sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses, information, processes and other intellectual property rights necessary for its business as now conducted and as currently proposed to be conducted, without any conflict with, or infringement of the rights of, others.

4.  *Investor Representations*

(a)  The Investor has full legal capacity, power and authority to execute and deliver this Safe and to perform its obligations hereunder. This Safe constitutes valid and binding obligation of the Investor, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to or affecting the

enforcement of creditors' rights generally and general principles of equity.

(b)  The Investor is an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless they are registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this Safe and the securities to be acquired by the Investor hereunder for its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.

5.  *Miscellaneous*

(a)  Any provision of this Safe may be amended, waived or modified by written consent of the Company and either (i) the Investor or (ii) the majority-in-interest of all then-outstanding Safes with the same "Post-Money Valuation Cap" and "Discount Rate" as this Safe (and Safes lacking one or both of such terms will be considered to be the same with respect to such term(s)), *provided that* with respect to clause (ii): (A) the Purchase Amount may not be amended, waived or modified in this manner, (B) the consent of the Investor and each holder of such Safes must be solicited (even if not obtained), and (C) such amendment, waiver or modification treats all such holders in the same manner. "Majority-in-interest" refers to the holders of the applicable group of Safes whose Safes have a total Purchase Amount greater than 50% of the total Purchase Amount of all of such applicable group of Safes.

(b)  Any notice required or permitted by this Safe will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

(c)  The Investor is not entitled, as a holder of this Safe, to vote or be deemed a holder of Capital Stock for any purpose other than tax purposes, nor will anything in this Safe be construed to confer on the Investor, as such, any rights of a Company stockholder or rights to vote for the election of directors or on any matter submitted to Company stockholders, or to give or withhold consent to any corporate action or to receive notice of meetings, until shares have been issued on the terms described in Section 1.  However, if the Company pays a dividend on outstanding shares of Common Stock (that is not payable in shares of Common Stock) while this Safe is outstanding, the Company will pay the Dividend Amount to the Investor at the same time.

(d)  Neither this Safe nor the rights in this Safe are transferable or assignable, by operation of law or otherwise, by either party without the prior written consent of the other; *provided, however*, that this Safe and/or its rights may be assigned without the Company's consent by the Investor (i) to the Investor's estate, heirs, executors, administrators, guardians and/or successors in the event of Investor's death or disability, or (ii) to any other entity who directly or indirectly, controls, is controlled by or is under common control with the Investor, including, without limitation, any general partner, managing member, officer or director of the Investor, or any venture capital fund now or hereafter existing which is controlled by one or more general partners or managing members of, or shares the same management company with, the Investor; and *provided, further*, that the Company may assign this Safe in whole, without the consent of the Investor, in connection with a reincorporation to change the Company's domicile.

(e)  In the event any one or more of the provisions of this Safe is for any reason held to be invalid, illegal or unenforceable, in whole or in part or in any respect, or in the event that any one or more of the provisions of this Safe operate or would prospectively operate to invalidate this Safe, then and in any such event, such provision(s) only will be deemed null and void and will not affect any other provision of this Safe and the remaining provisions of this Safe will remain operative and in full force and effect and will not be affected, prejudiced, or disturbed thereby.

Exhibit A - 24

(f)  All rights and obligations hereunder will be governed by the laws of the State of [Governing Law Jurisdiction], without regard to the conflicts of law provisions of such jurisdiction.

(g)  The parties acknowledge and agree that for United States federal and state income tax purposes this Safe is, and at all times has been, intended to be characterized as stock, and more particularly as common stock for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intent for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements).

*(Signature page follows)*

Exhibit A - 25

IN WITNESS WHEREOF, the undersigned have caused this Safe to be duly executed and delivered.

**FRINJ COFFEE INC.**

By:

**JAY RUSKEY, CEO**

Date:

**INVESTOR:**

By:

█████████

Date:

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067

A true and correct copy of the foregoing document entitled (*specify*):    **AMENDED OBJECTION OF PAIGE GESUALDO AND RALPH GESUALDO TO AMENDED PLAN OF REORGANIZATION FOR SMALL BUSINESS UNDER CHAPTER 11; AND DECLARATION OF THOMAS M. GEHER**, will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On June 26, 2024, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **William C Beall**    will@beallandburkhardt.com, carissa@beallandburkhardt.com
- **Michael Jay Berger** michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- **Michael B Brown**    michael.brown@stoel.com, docketclerk@stoel.com;dawn.forgeur@stoel.com;john.kaplan@stoel.com
- **Brian David Fittipaldi**    brian.fittipaldi@usdoj.gov
- **Thomas M Geher**    tmg@jmbm.com, bt@jmbm.com;tmg@ecf.courtdrive.com

- **Karen L Grant**    kgrant@silcom.com
- **Anne C Manalili**    Anne.Manalili@sba.gov
- **Andrew Ramos**    scif.legal.bk@scif.com
- **Mark M Sharf (TR)**    mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- **United States Trustee (ND)** ustpregion16.nd.ecf@usdoj.gov
- **Larry D Webb**    Webblaw@gmail.com, larry@webblaw.onmicrosoft.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 26, 2024, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

VIA OVERNIGHT MAIL
The Honorable Judge Ronald A. Clifford III
United States Bankruptcy Court
Central District of California
1415 State Street, Suite 233
Santa Barbara, California 93101-2511

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 26, 2024 | Billie Terry | *(signature)* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.