| Fill in this information to identify the case: | |
|---|---|
| Debtor name | **Frinj Coffee, Incorporated** |
| United States Bankruptcy Court for the: | CENTRAL DISTRICT OF CALIFORNIA |
| Case number (if known) | 9:24-bk-10044-RC |

☒ Check if this is an amended filing

## Official Form 425A
# Amended Plan of Reorganization for Small Business Under Chapter 11
**02/20**

### Frinj Coffee, Incorporated's Amended Plan of Reorganization, Dated November 1, 2024

[If this Amended Plan is for a small business debtor under Subchapter V, 11 U.S.C. § 1190 requires that it include "(A) a brief history of the business operations of the debtor; (B) a liquidation analysis; and (C) projections with respect to the ability of the debtor to make payments under the proposed Amended Plan of reorganization." The Background section below may be used for that purpose. Otherwise, the Background section can be deleted from the form, and the Amended Plan can start with "Article 1: Summary"]

**Background for Cases Filed Under Subchapter V**

**A. Description and History of the Debtor's Business**

The Debtor is a Corporation that was formed in May 2017 by John A. Ruskey III ("Jay") and his co-founding partners Andrew Mullins, Juan Medrano, and Lindsey Mesta. Since May 2017, the Debtor has been in the business of processing the coffee cherry and making high-quality coffee. Jay is a farmer and the CEO of the Debtor. He has years of experience cultivating rare tropical fruits and working on Amended Plan trials with researchers at the University of California Cooperative Extension and the California Rare Fruit Growers. His knowledge enabled him to evolve coffee Amended Plants that not only survive but also thrive in the climate of Southern California. In 2014, FRINJ coffee was submitted for evaluation by Coffee Review, which is a recognized world coffee rating organization. The Catture 2014 crop was the first California-grown coffee to ever be tested and was rated 27th in the world with a score of 92, which is considered "exceptional."

As Jay gained success growing coffee, he started sharing his knowledge with other farmers in Southern California.   The farmers who collaborate with the Debtor receive over half of the sales value.   Debtor provides farmers with coffee trees, cultivation education, and general guidance to enable them to produce successful corps.   Once the coffee cherries are ready to harvest 3 to 5 years after Amended Planting, the Debtor buys the ripe cherries from farmers and carries out the post-harvest steps, which include wet fermentation, a slow drying process, and temperature-controlled curing process.

The Debtor sells coffee, coffee related products and merchandise, such as coffee trees, caps, hoodies, kettles, coffee drippers, French press, kits, coffee filters, and grinders, and offers tours to visitors.   The Debtor also sells exotic fruits. The Debtor sells the fruits, the coffee, and the merchandize under the brank "Good Land Organics" through its website: www.https://www.goodlandorganics.com/.

The principal location of the Debtor and its headquarters on the petition date was at 1362 Farren Road, Goleta, CA 93117 (the "Property"). This was the location of the farm, the processing, and the office.   The Debtor has been leasing the property from his parents and the lease expired on December 31, 2023.  The owner and the landlord of the Property is the Ruskey Living Trust which is owned by Jay's parents, Nicole and John A. Ruskey.   Since the filing of the case, Jay has been negotiating new lease terms for a new property in Ventura, which has now been finalized. A Motion to Enter Into New Lease was filed on June 20, 2024 [docket no. 121] and approved by this Court on July 25, 2024 [docket no.: 168]. The Debtor has been at the Ventura location the past few months,

Debtor also has a second location for a small operational facility in San Diego County on West Lilac Land in the community called Bonsall.   This facility supports the farmers' harvest and processing and is called the "Wet Mill." It houses the equipment and is supported by remote farm advisors who live nearby.  The owners of Lilac Land are Jim and Ingrid Pardee, who are FRINJ shareholders and farmers in FRINJ.   The Debtor has negotiated a new lease with the landlord and on April 15, 2024, filed a Motion For Authority to Enter Into A New Lease Agreement [docket no.: 64]. Pursuant to the terms of the new lease agreement, the monthly rent payments are reduced from $800.00 to $400.00 per month and the landlord agrees to forego collection of the pre-petition $7,200.00 delinquent rent. On July 25, 2024, the Court entered the order approving the Motion [docket no.: 169].

The Debtor commenced its subchapter v case on January 16, 2024. The United States Trustee appointed Mark Sharf as the subchapter v trustee (the "Trustee") on January 18, 2024 [Doc. No. 9].

The Debtor is the party proposing this Amended Plan of Reorganization (the "Amended Plan") and may be referred to herein as the "Amended Plan Proponent." The effective date ("Effective Date") of this Amended Plan is the first business day following the date that is 30 days after the entry of the order confirming this Amended Plan (the "Confirmation Order"). If, however, a stay of the Confirmation Order is in effect on that date, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated.

**B. Liquidation Analysis**

To confirm the Amended Plan, the Court must find that all creditors and equity interest holders who do not accept the Amended Plan will receive at least as much under the Amended Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A liquidation analysis is attached to the Amended Plan as Exhibit __E__.

**C. Ability to make future Amended Plan payments and operate without further reorganization**

The Proponent of the Amended Plan must also show that it will have enough cash over the life of the Amended Plan to make the required plan payments and operate the debtor's business.

The Proponent of the Amended Plan has provided projected financial information as Exhibit __C__.

The Amended Plan Proponent's financial projections show that the Debtor will have projected disposable income (as defined by § 1191(d) of the

Debtor   **Frinj Coffee, Incorporated**                                   Case number (*if known*)   **9:24-bk-10044-RC**
_____Name_____

Bankruptcy Code) for the period described in § 1191(c)(2) of _.

The final plan payment is expected to be paid on December 31, 2024 or such other date by which time the claim estimation/objection motions will be resolved at which time the distribution to creditors will be finalized.

## Debtor's Ability to Make the Plan Payments

The Amended Plan will be funded from the $3,000,000 investment the Debtor secured from Kent Bakke and Moira Kennelly (the "Investor") on May 31, 2024.  Mr. Bakke is an accredited investor with decades of experience in the coffee industry, He is a partner in La Marzocco Intl., an international manufacturer of commercial and residential espresso machines; the founder of the Bakke Coffee Museum in Seattle, and has been following Frinj Coffee's progress since its inception. The Investor has agreed to invest three million dollars ($3,000,000) into Frinj Coffee in exchange for a third percent (30%) equity interest in the company. The terms of this investment are memorialized in a Purchase and Sale of Series A Preferred Stock Agreement ("Investment Agreement" aka "Agreement"), a true and correct copy of which is attached hereto as **EXHIBIT – G.**

## The basic terms of the Investment Agreement are as follows:

1. Subject to the terms and conditions of the Agreement, the closing date (the "*Initial Closing Date*") for payment of $2,000,000 of the Major Investor's investment and the issuance of 306,565 Post Reverse Split shares of Series A Preferred Stock to the Major Investor on the books and records of the Company shall be within three (3) business days of the occurrence of the last of the conditions listed in Section 2.1.1 of the Agreement Terms (such investment and issuance being the "*Initial Closing*"). On the Initial Closing Date, each SAFE Purchaser shall deliver to the Company any SAFE issued to such SAFE Purchaser for conversion into the aggregate number of shares of Series A Preferred Stock set forth opposite such SAFE Purchaser's name on Schedule 1 and the Company shall issue such number of shares to such SAFE Purchaser.

2. Subject to the terms and conditions of the Agreement (including Section 2.1.2), the closing date (the "*Second Closing Date*") for payment of the final $1,000,000 of Major Investor's investment shall be June 1, 2025 (such investment and issuance being the "*Second Closing*" and together with the Initial Closing, each a "*Closing*") and the Company shall issue 153,283 Post Reverse Split shares of Series A Preferred Stock to the Major Investor, which will result in the Major Investor holding 459,848 Post Reverse Split shares of Series A Preferred Stock as of the Second Closing.

3. Subject to the terms and conditions of this Agreement, the Major Purchaser has agreed to advance the Company $250,000 (the "*Advance*"), which Advance will be evidenced and governed by a promissory note in substantially the form attached hereto as Exhibit C to be made by the Company in the stated principal amount of $250,000 made payable to the order of the Major Purchaser (the "*Note*"). Conditioned upon the Company executing and delivering the Note to the Major Purchaser, the Major Purchaser shall fund the Advance as follows promptly following the Court entering an order in the Bankruptcy pursuant to which the Advance is entitled to administrative expense priority under Section 364(b) of the US bankruptcy code:

   (a)   a sum of $50,000 has been deposited with or otherwise paid to the Company's counsel in the Bankruptcy by wire transfer of immediately available funds to an account designated by the Company; and

   (b)   a sum of $200,000 shall be deposited with or otherwise paid to the Company by wire transfer of immediately available funds to an account designated by the Company.

   (c)   Subject to the terms and conditions of the Note, at the Initial Closing the full amount of the Advance (plus all accrued but unpaid interest) shall be credited against the $2,000,000 payable by the Major Purchaser.

## Conditions to Closing:

Major Purchaser Conditions. The obligations of the Major Purchaser to purchase shares of Series A Preferred Stock at the Closings are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

1.1.1   Initial Closing. The obligation of the Major Purchaser to purchase shares of Series A Preferred Stock at the Initial Closing is subject to the or before the Initial Closing Date, of each of the following conditions, unless otherwise waived by the Major Purchaser:

   (a)   With respect to the Bankruptcy:

      (i)   The Amended Plan, in a form approved by the Major Purchaser, shall have been confirmed by Judge Ronald A. Clifford III or such other judge as is assigned to the Bankruptcy.

      (ii)   The Amended Plan shall provide for discharge of all claims of creditors against the Company.

      (iii)   The Company's total combined Amended Plan and administrative expenses obligations to be funded from the Major Investor's investment pursuant to this Agreement (the "*Investment*") (including (1) payment of administrative expenses, including the Company's attorneys' fees and subchapter V trustee fees in an amount not to exceed $150,000, including $50,000 of the Advance already paid to the Company's attorneys, (2) payment of the secured claim of the U.S. Small Business Administration in the approximate amount of $161,000, (3) payment of any other priority claims and (4) a pot to allowed unsecured claims on a pro rata basis) shall not exceed $1,250,000.00 (which amount includes the Advance).

   (b)   Either (i) each SAFE Purchaser shall have executed this Agreement and agreed to convert each outstanding SAFE into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached hereto or (ii) the Amended Plan (as confirmed pursuant to Section 2.1.1(a)(i) hereof) shall provide for each outstanding SAFE to convert into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached hereto.

   (c)   The Reverse Stock Split shall have been completed on terms and conditions acceptable to the Major Purchaser.

   (d)   The Restated Articles, in a form approved by the Major Purchaser, shall have been filed with the Secretary of State of the State of Incorporation.

Debtor    **Frinj Coffee, Incorporated**                                        Case number (*if known*)   **9:24-bk-10044-RC**
          Name

(e)      Each representation and warranty of the Company set forth in this Agreement shall be true and correct in all respects as of the Initial Closing Date.

(f)      The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Initial Closing Date.

1.1.2    Second Closing. The obligation of the Major Purchaser to purchase shares of Series A Preferred Stock at the Second Closing is subject to the fulfillment, on or before the Second Closing Date, of each of the following conditions, unless otherwise waived by the Major Purchaser:

(a)      Each representation and warranty of the Company set forth in this Agreement shall be true and correct in all respects as of the Initial Closing Date.

(b)      The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such the Second Closing Date.

## Article 1: Summary

This Amended Plan of Reorganization (the Amended *Plan*) under chapter 11 of the Bankruptcy Code (the *Code*) proposes to pay creditors of **Frinj Coffee, Incorporated** (the *Debtor*) from $1,250,000 investor contribution, and any other estate funds obtained by the Debtor, including but not limited to Employee Retention Credit from the Internal Revenue Service.

This Amended Plan provides for:   __1__   classes of priority claims;

    __1__   classes of secured claims;

    __1__   classes of non-priority unsecured claims; and

    __2__   classes of equity security holders.

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Amended Plan has valued at approximately **22.028 cents on a dollar.   Debtor is proposing a pot plan, with an estimated $1,028,986.69 available for distribution to allowed general unsecured creditors after paying the priority claims and allocated the sum needed toward Sun BZL's alleged administrative claim determination.**

All creditors and equity security holders should refer to Articles 3 through 6 of this Amended Plan for information regarding the precise treatment of their claim. A disclosure statement that provides more detailed information regarding this Amended Plan and the rights of creditors and equity security holders has been circulated with this Amended Plan.

Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

## Article 2: Classification of Claims and Interests

| | | |
|---|---|---|
| 2.01 | **Class 1**................................... | All allowed claims entitled to priority under § 507(a) of the Code (except administrative expense claims under § 507(a)(2), ["gap" period claims in an involuntary case under § 507(a)(3),] and priority tax claims under § 507(a)(8)). |
| | | **Debtor has one creditor in Class 1.   Mark Szczerba.** |
| 2.02 | **Class 2**................................... | The claim of __U.S. Small Business Administration (the "SBA") listed in Class 2A__ to the extent allowed as a secured claim under § 506 of the Code. |
| | | **See Exhibit B-1 for the list of the secured creditors and their treatment under this Amended Plan.** |
| 2.03 | **Class 3**................................... | All non-priority unsecured claims allowed under § 502 of the Code. |
| | | **See Exhibit B-3 for the list of general unsecured creditors and their treatment under this Amended Plan (Class 3).** |
| 2.04 | **Class 4**................................... | Equity interests of the Debtor.<br>**See Exhibit B-4 for the list of Equity Interest Holders.** |
| 2.05 | **Class 5**............................. | **Insiders of the Debtor (current management and relatives of current management of the Debtor). See Exhibit B-5 for the list of Insiders and their treatment under the Amended Plan.** |

## Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

3.01    **Unclassified claims**        Under section § 1123(a)(1), administrative expense claims, ["gap" period claims in an involuntary case allowed under § 502(f) of the Code,] and priority tax claims are not in classes.

| Debtor | Frinj Coffee, Incorporated | Case number (*if known*) 9:24-bk-10044-RC |
|---|---|---|
| | Name | |

| 3.02 | Administrative expense claims | Each holder of an administrative expense claim allowed under § 503 of the Code, [and a "gap" claim in an involuntary case allowed under § 502(f) of the Code,] will be paid in full on the effective date of this Amended Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. |
|---|---|---|

1. Law Offices of Michael Jay Berger ("Debtor's Bankruptcy Counsel") fees and costs are estimated at $125,000.00; are due upon the entry of the order approving the fee application. If not paid upon the entry of the order approving the fee application, the fees will be due in full by the Effective Date, provided an order approving fees is already obtained from the court. Debtor's Bankruptcy Court is currently holding $50,000.00 in his client trust account, received from the Investor, which will be used toward Debtor's Bankruptcy Counsel's and Subchapter V Trustee's final fees.

2. Subchapter V Trustee, Mark Sharf: fees are estimated at $25,000.00, subject to court approval and are due upon the entry of the order approving the fee application. If not paid upon the entry of the order approving the fee application, the fees will be due in full by the Effective Date, provided an order approving fees is already obtained from the court. Debtor's counsel is holding a $50,000.00 post-petition advance from the Investor to be used toward approved administrative fees and expenses of Debtor's Bankruptcy Counsel and Subchapter V Trustee.

3. Debtor's Proposed CPA (H&B) once a year for $5,250 for tax preparation, subject to Court's approval. Application to Employ H&B was filed on April 15, 2024 [docket no.: 66]. Order approving the Application to Employ H7B entered on June 6, 2024 [docket no.: 107]. The fees are due upon the entry of the order approving the fee application. If not paid upon the entry of the order approving the fee application, the fees will be due in full by the Effective Date, provided an order approving fees is already obtained from the court.

4. Debtor's Insurance Defense Litigation Counsel (Tadjedin Thomas & Engbloom): The fees will be covered by the insurance company. The Debtor may be responsible for a deductible in the amount of approximately $6,728.00, subject to Court's approval. The Application to Employ TT&E was filed on May 6, 2024 [docket no.: 81] and approved on July 25, 2025 [docket no.: 166]. The fees will be due upon the entry of the order approving the fee application. If not paid upon the entry of the order approving the fee application, the fees will be due in full by the Effective Date, provided an order approving fees is already obtained from the court.

5. Debtor's Corporate Counsel (Nina Yablok): The fees are estimated at $6,000.00 subject to Court's approval. The Debtor is in the process of finalizing the employment application to obtain the Court's approval. The fees will be due upon the entry of the order approving the fee application. If not paid upon the entry of the order approving the fee application, the fees will be due in full by the Effective Date, provided an order approving fees is already obtained from the court.

6. Ruskey Living Trust c/o Nicole Ruskey and John A. Ruskey, as co-Trustees: The Debtor was a party to a Farm Lease with the Ruskey Living Trust. The lease terminated on December 31, 2023 with no option to renew. The Debtor remained on the premises since the lease termination date. As of the petition date, the Trust was owed approximately $25,040.28 for three months pre-petition unpaid rent.   The Debtor continued to occupy the Farm post-petition and remained on the premises until June 30, 2024 and moved out once it was able to obtain a new lease in Ventura. The co-trustees of the Trust are the parents of the Debtor's Principal, John A. Ruskey III. They each have a 50/50 decision-making authority and have since the filing of this case disagreed as to whether or not the Trust should assert an administrative claim against the Debtor. On July 25, 2024, the Court entered an order Granting in Part and Denying in Part Debtor's Motion for Order Establishing August 30, 2024 as the Bar Date for Filing Administrative Claim by The Ruskey Living Trust [docket no.: 165]. The Ruskey Living Trust did not file an administrative claim by the court set deadline.

| 3.03 | Priority tax claims | Each holder of a priority tax claim will be paid [Specify terms of treatment consistent with § 1129(a)(9)(C) of the Code]. |
|---|---|---|

Debtor's schedules do not list any priority tax claims.   As of the claims bar date, the following two creditors filed priority tax claims:

(1) Franchise Tax Board [POC #8] for $800 for 2024 tax liability. The Debtor proposes to pay the $800 to FTB in full plus the applicable interest on the Effective Date.

(2) Internal Revenue Service ("IRS") [Amended POC #6] for $1,717.06 as a priority claim. The Debtor proposes to pay the $1,717.06 to IRS in full plus the applicable interest on the Effective Date.

| 3.04 | Statutory fees | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Amended Plan have been paid or will be paid on the effective date. |
|---|---|---|

| 3.05 | Prospective quarterly fees | N/A. There are no quarterly fees in subchapter v bankruptcy cases. |
|---|---|---|

### Article 4: Treatment of Claims and Interests Under the Amended Plan

4.01  Claims and interests shall be treated as follows under this Amended Plan:

Debtor  **Frinj Coffee, Incorporated**
Name
                                            Case number (*if known*)  **9:24-bk-10044-RC**

| Class | Impairment | Treatment |
|---|---|---|
| **Class 1 - Priority claims** excluding those in Article 3 | ☐ Impaired<br>☒ Unimpaired | Mark Szczerba [POC #14] for $15,150.00 as a priority wage claim. The Debtor proposes to pay $15,150.000 to Mr. Szczerba in full on the Effective Date. |
| **Class 2 – Secured claim of** <u>**U.S. Small Business Administration (Class 2A)**</u> | ☐ Impaired<br>☒ Unimpaired | U.S. Small Business Administration (the "SBA") holds a secured claim in connection with an Economic Injury Disaster Loan ("EIDL Loan") (UCC-1 Financing Statement filed on 7/20/2020, File #U200002733521) for the estimated amount of $161,681.42 [POC #1] secured by Debtor's assets. The EIDL loan was obtained on July 8, 2020 in the principal amount of $150,000.00.<br><br>Due to the issuance of the SBA Procedure Notice 5000-830558 (March 15, 2022), the monthly payments on the EIDL Loan were deferred to January 10, 2023, however interest continued to accrue during this deferment period.<br><br><u>Treatment:</u> Debtor proposes to pay SBA's $161,681.42 secured claim in full by tendering a one-time lump sum payment of $161,681.42 on the Effective Date less credit for the payments made by the Debtor post-petition to satisfy SBA's claim in full.<br><br>Note: Debtor has been making monthly $731.00 adequate protection payments to the SBA since February 1, 2024. |
| **Class 3 – Non-priority unsecured creditors** | ☒ Impaired<br>☐ Unimpaired | Treatment of Class 3: The Debtor's general unsecured creditors are identified on Exhibit B-3 and also include all other timely filed claims. Each holder of a class 3 allowed claim will, along with any class 3 allowed claim, receive a pro rata share of the investment funds allocated to fund the Amended Plan after the payment of all allowed administrative claims (capped at $150,000 from the investment funds, including the $50,000 advance made to Debtor's bankruptcy counsel for legal fees/costs) and payment of all allowed priority claims. Given that Sun BZL's $63,510.00 administrative claim is subject to dispute by the Debtor, pending the court's ruling on the claim objection motion, unless the objection is resolved before plan confirmation hearing, the sum of $63,510.00 will be segregated and held by Subchapter V Trustee in his account for distribution by Sub V Trustee later following the entry of an order by this court on Debtor's claim objection. If no funds are owed to SUN BZL, then the funds held by Sub V Trustee will be automatically paid to Class 3 unsecured creditors.<br><br>An estimated sum of $1,028,986.69 will be available in the "Pot" for distribution to allowed general unsecured class 3 creditors on the Effective Date, as defined in this Amended Plan. It will yield approximately a 22.028% distribution to holders of Class 3. |
| **Class 4 – Equity security holders of the Debtor and SAFE holders** | ☒ Impaired<br>☐ Unimpaired | SEE THE ATTACHED <u>EXHIBIT B-4</u> FOR LIST FOR THE EQUITY SECURITY HOLDERS AND SAFE HOLDERS AND THEIR TREATMENT UNDER THIS AMENDED PLAN.<br><br>Class 4 includes the holders of SAFE notes and the Common Stockholders. Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Reinstated Investment Agreement ("Investment Agreement") by and amount the Debtor, John A. Ruskey III, and Kent |

Debtor    **Frinj Coffee, Incorporated**
    Name

Case number (*if known*)  **9:24-bk-10044-RC**

Bakke and Moira Kennelly. Common Stockholders with no SAFE Notes will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment.

| Class 5 – Insiders of the Debtor | ☒ Impaired<br>☐ Unimpaired | SEE ALSO Exhibit B-5 FOR SEPARATELY CLASSIFIED INSIDERS OF THE DEBTOR THAT INCLUDES THE CURRENT MANAGEMENT AND THE RELATIVES OF THE CURRENT MANAGEMENT. |
|---|---|---|

## Article 5: Allowance and Disallowance of Claims

**5.01    Disputed Claim**

A *disputed claim* is a claim that has not been allowed or disallowed [by a final non-appealable order], and as to which either:

(i) a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or

(ii) no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated.

On October 22, 2024, Debtor filed an Objection to Sun BZL's administrative claim [docket nos.: 205 and 206]. The hearing is set for December 3, 2024 at 1:00 p.m. If Sun BZL's claim is not determined by this court prior to the confirmation hearing, then the sum of $63,510.00 will be segregated and held by Subchapter V Trustee in his account for distribution later following the entry of an order by this Court on the Debtor's objection to SUN BZL's claim. If no funds are owed to SUN BZL, then the funds held by Sub V Trustee will be automatically paid to Class 3 unsecured creditors.

Debtor has a pending Motion to Object to Paige Gesualdo's Claim [docket no.: 146] and a Motion to Estimate the Claim of Paige Gesualdo [docket no.: 119]. Given that the parties reached a settlement agreement resolving all disputes between the parties, the Debtor will be requesting the Court to take both matters off calendar at the continued January 15, 2025 hearing.

Debtor reserves the right to further review all filed claims to determine if objections to any other claims are warranted.

**5.02    Delay of distribution on a disputed claim**

No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order. If Sun BZL's claim is not determined by this court prior to the confirmation hearing, then the sum of $63,510.00 will be segregated and held by Subchapter V Trustee in his account for distribution later following the entry of an order by this Court on the Debtor's objection to SUN BZL's claim.

**5.03    Settlement of disputed claims**

The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure.

The Debtor has an Error and Omission ("E&O") insurance policy with a $4,000,000 coverage limit. Debtor attended a mediation session to resolve the dispute with creditors Paige Gesualdo and Ralph Gesualdo. Following the mediation, the parties reached a Settlement Agreement and Mutual General Release ("Settlement Agreement") to fully and finally resolve all claims of the Gesualdo parties, including the Ralph Gesualdo lawsuit, the Ralph Gesualdo proof of claim, the Paige lawsuit, the Paige's proof of claim, and Frinj's redemption and acquisition of all of Paige's common stock in Frinj as set forth more fully in sections 1(f) and 1(g) of the Settlement Agreement.

Pursuant to the terms of the Settlement Agreement, Paige Proof of Claim shall be allowed in the sum of $3,618,880.71 ("Allowed Claim") and the pro-rata distribution on the Allowed Claim shall be paid on the Effective Date. The Debtor, John A. Ruskey III, Kari Shafer, and Andy Mullins (collectively, the "Frinj Parties") agree to pay the total sum of One Million One Hundred Thousand Dollars ($1,100,000) (the "Settlement Amount") payable on the Amended Plan's Effective Date as follows: (i) $250,000 paid to Paige by Frinj's insurance company that is providing a defense to the Frinj Parties in the Paige Lawsuit (the "Carrier"), (ii) the distribution amount by Frinj to Ralph and Paige on account of the Ralph Proof of Claim and Paige's Allowed Claim, which amount shall be no more than $850,000, to be determined based on the Carrier's final distribution, and (iii) the balance owing on the Settlement Amount, if any, by Ruskey, Shafer, and Mullins, jointly and severally. Upon payment of the full Settlement Amount to Ralph and Paige, and upon the Settlement Amount having cleared the Gesualdo Parties' banks, all shares of Frinj common stock currently owned by Paige will be deemed redeemed and repurchased by Frinj.   A true and correct copy of the Settlement Agreement is attached hereto as Exhibit-I.

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| Debtor | Frinj Coffee, Incorporated | Case number (*if known*) 9:24-bk-10044-RC |
|---|---|---|
| | Name | |

| 6.01 | Assumed executory contracts and unexpired leases | (a) | The Debtor assumes, and if applicable assigns, the following executory contracts and unexpired leases as of the effective date: |
|---|---|---|---|

**(1) The Debtor is a party to 11 Simple Agreement For Future Equity ("Safe Agreement") which are itemized on Schedule G, a true and correct copy of which is attached hereto as <u>Exhibit-F.</u>**

**Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly.**

**(2) The Debtor is a party to a Basic Rental Agreement with West Lilac Farms II, LLC for premises located at 32542 Aquaduct Road, Bonsall, CA.   Post-petition the Debtor negotiated new lease agreement with West Lilac Farms II, LLC and on April 15, 2024, the Debtor filed a Motion for Authority to Enter Into New Lease [docket no.: 64] which was approved by this Court on July 25, 2024. Pursuant to the terms of the new lease agreement, the Debtor's monthly rent obligation are $400.00 and the pre-petition outstanding rent of $7,200.00 has been waived by the landlord.**

(b)   Except for executory contracts and unexpired leases that have been assumed, and if applicable assigned, before the effective date or under section 6.01(a) of this Amended Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than __30__ days after the date of the order confirming this Amended Plan. This Amended Plan serves as a notice to any member of rejected executory contract and unexpired lease of the deadline to file a proof of claim.

## Article 7: Means for Implementation of the Amended Plan

The Amended Plan will be funded with $1,250,000 of the $3,000,000 investment the Debtor secured from Kent Bakke and Moira Kennelly (the "Investor") on May 31, 2024.  Mr. Bakke is an accredited investor with decades of experience in the coffee industry, He is a partner in La Marzocco Intl., an international manufacturer of commercial and residential espresso machines; the founder of the Bakke Coffee Museum in Seattle, and has been following Frinj Coffee's progress since its inception. The Investor has agreed to invest three million dollars ($3,000,000) into Frinj Coffee in exchange for a third percent (30%) equity interest in the company. The terms of this investment are memorialized in a Purchase and Sale of Series A Preferred Stock Agreement ("Investment Agreement" aka "Agreement"),

### The basic terms of the Investment Agreement are as follows:

1.   Subject to the terms and conditions of the Agreement, the closing date (the "*Initial Closing Date*") for payment of $2,000,000 of the Major Investor's investment and the issuance of 306,565 Post Reverse Split shares of Series A Preferred Stock to the Major Investor on the books and records of the Company shall be within three (3) business days of the occurrence of the last of the conditions listed in Section 2.1.1 of the Agreement Terms (such investment and issuance being the "*Initial Closing*"). On the Initial Closing Date, each SAFE Purchaser shall deliver to the Company any SAFE issued to such SAFE Purchaser for conversion into the aggregate number of shares of Series A Preferred Stock set forth opposite such SAFE Purchaser's name on Schedule 1 and the Company shall issue such number of shares to such SAFE Purchaser.
2.   Subject to the terms and conditions of the Agreement (including Section 2.1.2), the closing date (the "*Second Closing Date*") for payment of the final $1,000,000 of Major Investor's investment shall be June 1, 2025 (such investment and issuance being the "*Second Closing*" and together with the Initial Closing, each a "*Closing*") and the Company shall issue 153,283 Post Reverse Split shares of Series A Preferred Stock to the Major Investor, which will result in the Major Investor holding 459,848 Post Reverse Split shares of Series A Preferred Stock as of the Second Closing.

## Article 8: General Provision

| Debtor | **Frinj Coffee, Incorporated** | Case number *(if known)*  **9:24-bk-10044-RC** |
|---|---|---|
| | Name | |

| 8.01 | **Definitions and rules of construction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Amended Plan, and they are supplemented by the following definitions: |
|---|---|---|
| | | Equity Interests" means and includes (i) all of the outstanding shares of the Debtor's capital stock, (ii) any and all other outstanding equity interests in the Debtor, (iii) any and all outstanding options, restricted stock units, warrants and other rights exercisable for or convertible into any shares of the Debtor's capital stock or any other equity interests in the Debtor, and (iv) any and all contractual rights and other rights relating to any of the Equity Interests described in clauses (i), (ii) and/or (iii) above, including, without limitation, any and all rights under Debtor's Amended and Restated Certificate of Incorporation, Debtor's Amended and Restated Bylaws, any Right of First Refusal and Co-Sale Agreement, any Investors' Rights Agreement, any Voting Agreement, any Shareholders Agreement or other agreement among Debtor and any holder(s) of any Equity Interests, any Stock Option Agreement, any Restricted Stock Units Agreement and any Warrant.<br>"Reorganized Debtor" means the Debtor, as reorganized in accordance with the terms and provisions of the Amended Plan, on and after the effective date. Wherever in the Amended Plan and supporting documents the term "reorganized" precedes "Debtor," if shall mean the Debtor as reorganized on and after the effective date. |
| 8.02 | **Effective Date** | The effective date of this Amended Plan is the first business day following the date that is 30 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 | **Severability** | If any provision in this Amended Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Amended Plan. |
| 8.04 | **Binding Effect:** | The rights and obligations of any entity named or referred to in this Amended Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 | **Captions** | The headings contained in this Amended Plan are for convenience of reference only and do not affect the meaning or interpretation of this Amended Plan. |
| [8.06 | **Controlling Effect** | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of __California__ govern this Amended Plan and any agreements, documents, and instruments executed in connection with this Amended Plan, except as otherwise provided in this Amended Plan.] |
| [8.07 | **Corporate Governance** | The Debtor's current management includes John A Ruskey III as the Debtor's Chief Executive Officer and Director; Scott Kvancs as the Debtor's Secretary; Kari J. Shafer as Debtor's Chief Financial Officer; Andy Mullins as Debtor's Director and Co-Founder; and Lindsey Bolger as Debtor's director.<br><br>The investor's 30% interest will be a preferred series A stock and will give him the benefit of being the major shareholder with the right to assign one board member. |

Debtor    **Frinj Coffee, Incorporated**    Case number (*if known*)  **9:24-bk-10044-RC**
    Name

| [8.08 | **Retention of Jurisdiction** | The Bankruptcy Court, or other court of competent jurisdiction, will retain jurisdiction over the Debtor's Bankruptcy Case and any of the proceedings arising from, or relating to, the bankruptcy case pursuant to section 1142 of the Bankruptcy Code and 28 U.S.C. § 1334 to the fullest extent permitted by the Bankruptcy Code and other applicable law, including without limitation, such jurisdiction as is necessary to ensure that the purposes and intent of the Amended Plan are carried out. Such retention includes, among other things, jurisdiction (a) to hear and determine any and all disputes regarding the operation and interpretation of the Amended Plan and the Confirmation Order; (b) to hear and determine the allowance, classification, or priority of claims and interests upon objection by the Debtor, the Reorganized Debtor, or by other parties in interest with standing to bring such objection or proceeding; (c) to hear and determine any and all disputes relating to the sale, refinance, or other disposition of property or any other assets revesting in the Reorganized Debtor under the Amended Plan, including, but not limited to, the determination of the extent, validity, and priority of any lien asserted against such property and any disputes with respect to the transfer of title of any such property; (d) to construe anti take any action to enforce the Amended Plan, the Confirmation Order, and any other order of the Court; (e) to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Amended Plan, the confirmation order, and all matters referred to in the Amended Plan, and the confirmation order; (l) to determine all matters that may be pending before the Court in this case, or relate to property of the estate, on or before the effective date with respect to any person or entity related thereto; (g) to hear and determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date; (h) to hear and determine any request for payment of administrative expenses; (i) to hear and determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date; (1) to hear and determine such other matters and for such other purposes as may be provided in the Confirmation Order, (k) to modify the Amended Plan under section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Amended Plan or to reconcile any inconsistency in the Amended Plan so as to carry out its intent and purpose; (l) except as otherwise provided in the Amended Plan or the Confirmation Order, to issue injunctions to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Amended Plan or the Confirmation Order, or the execution or implementation by any person or entity of the Amended Plan or the confirmation order; (m) to issue such orders in aid of consummation of the Amended Plan or the confirmation order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and (n) to enter a final decree closing this case. If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Amended Plan, such abstention, refusal or failure of exercise shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter. |

▮▮▮    **Article 9: Discharge**

**[Discharge if the Debtor is a corporation under Subchapter V]**

If the Debtor's Amended Plan is confirmed under § 1191(a), on the effective date of the Amended Plan, the Debtor will be discharged from any debt that arose before confirmation of this Amended Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

    (i) imposed by this Amended Plan; or

    (ii) to the extent provided in § 1141(d)(6).

If the Debtor's Amended Plan is confirmed under § 1191(b), confirmation of this Amended Plan does not discharge any debt provided for in this Amended Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Amended Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

    (i) on which the last payment is due after the first 3 years of the Amended Plan, or as otherwise provided in § 1192;

    or

    (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Article 10: Other Provisions

(a) Within five (5) business days of the effective date, the Debtor shall file with the court a Notice of the Amended Plan's Effective Date

(b)  Pursuant to 11 U.S.C. § 1183(c)(2), within 14 days after the Amended Plan is substantially consummated, the Debtor shall file with the court and serve on the trustee, the United States trustee, and all parties in interest a notice of such substantial consummation.

(c)  The Debtor shall file with the court and serve on the United States Trustee and Subchapter V Trustee post-confirmation quarterly reports that shall include all of their respective disbursements for that quarter until the case is closed, converted, or dismissed

(d) Pursuant to LBR 3020-1(e), in the event of a conversion of Debtor's case to chapter 7, any assets of the Debtor that have not been disposed of, will be vested in the chapter 7 estate

(e)  Termination of the Subchapter V Trustee's Services. Unless otherwise ordered by the Court, if the Amended Plan is confirmed consensually (under section 1191(a)), the services of the Subchapter V Trustee will terminate when the Amended Plan has been substantially consummated (i.e. almost immediately upon the commencement of distributions).  If the confirmation of the Amended Plan is nonconsensual, the Subchapter V Trustee will remain as the Trustee until the case is closed and a final decree is entered. The Debtor will act as the disbursing agent for all payments due on the Effective Date and administrative claims while Subchapter V Trustee will act as the disbursing agent for SUN BZL's claim, provided that the Debtor's objection to SUN BZL's claim is not resolved prior to plan confirmation and based on this Court's ruling on Debtor's objection

(f) Any claim of indemnification from officers and directors based on pre-bankruptcy conduct are treated as pre-petition claims to be discharged under the Amended Plan

(g) The payments due on the Effective Date and the payments of administrative claims, with the except of payment of SUN BZL, if and only if the Debtor's Objection to SUN BZL's claim is not resolved prior to plan confirmation,  will be made by the Debtor [The Subchapter V Trustee will act as the disbursing agent for payment due to SUN BZL, depending on the outcome of this Court's ruling on the Debtor's objection. The compensation to Subchapter V Trustee for services rendered as a disbursing agent post-confirmation shall be at the rate specified in Subchapter V Trustee's Verified Statement on file in this case.

Respectfully submitted,

X _____        John A. Ruskey III
[Signature of the Amended Plan Proponent]    [Printed name]

X  /s/ Michael Jay Berger                     Michael Jay Berger
[Signature of the Attorney for the Amended Plan    [Printed name]
Proponent]

**EXHIBIT-A**

**(Assets of Debtor and Valuation as of Plan Confirmation)**

# EXHIBIT - A
# LIST OF ALL PROPERTY OF THE ESTATE AND VALUATIONS AS OF THE PLAN CONFIRMATION DATE

| Property Description | Valuation As of Plan Confirmation | Liquidation Value |
|---|---|---|
| Estimated DIP account balance as of Plan Confirmation Date | $254,629.00 | $254,629.00 |
| Estimated Receivables per September 2024 filed MOR | $13,621.00 | $13,621.00 |
| Windbreak trees and coffee plants (experimental) | $20,000.00 | $20,000.00 |
| Debtor sells the coffee and fruits under the brand name "Good Land Organics" which has its own website: www.goodlandorganics.com | No liquidation value | No liquidation value |
| Coffee processing equipment (fermentation buckets with lids, plastic harvest bins, drying racks; stainless steel racks).  SEE THE ATTACHED LIST. | $89,117.00 | $89,117.00 |
| Frinj branded shirts, sweaters, hats, and mugs. | $1,000.00 | $1,000.00 |
| Brew equipment (brewers, glasses for educational tours). | $300.00 | $300.00 |
| Three six-foot tables and 40 plastic chairs | $2,000.00 | $2,000.00 |
| Office printers, old computers, miscellaneous pens and paper. | $1,000.00 | $1,000.00 |
| A Carson Trailer | $30,000.00 | $30,000.00 |
| F 250 Truck | $2,500.00 | $2,500.00 |
| F 150 Truck | $1,500.00 | $1,500.00 |
| Domain Names (SEE ATTACHED LIST). | $25,760.00 | $25,760.00 |
| Seller's Permit | No liquidation value | No liquidation value |
| *Total Value for the Assets* | **$441,427.00** | **$441,427.00** |

Debtor will also receive the Investor Funding upon amended plan confirmation for distribution to creditors.

| FRINJ Other ASSETS | Estimated Value | Notes |
|---|---|---|
| Freeze Driers | $2,300 | Good Conditions |
| Dehydrators | $300 | Fair |
| Comercial Food Processor | $500 | Fair |
| Vacuum Sealer | $2,000 | Good coniditon |
| Tent Frames with tarps | $250 | Needs new tarps |
| Stainless Steel Wash Tubs | $100 | some are used and need repair |
| Plastic Buckets Numerious | $500 | Two years old |
| Plastic Chairs 40 chairs | $250 | Nice but light wieght |
| Plastic Umbrellas 8 | $300 | Light wieght |
| Wooden Dry racks | $7,000 | Redwood hand built about 20 |
| Micellanous Packing | $250 | Some over supply stamps ect |
| Misclianious Packing Supplies | $1,000 | Coffee Jars and packing |
| Printers | $1,000 | Office, Plant label and Jar label |
| Brewing Equipment | $500 | Used cups and brewers |
| Office Furniture | $1,000 | Shelves, old file cabinates used desks |

**PLANTS**

| 500 miscellanous Coffee plants | $15,000 | @$20 each vary quality located at Condo I |
| 200 Ingas and wind other breaks | $4,000 | @$30 each vary quality located at Condo I |

$36,250

# FRINJ Coffee Inc
## Transaction Report
### All Dates



| Name | Memo/Description | Current Estimated Value | Notes |
|---|---|---|---|
| | | | |
| Apple | | 250.00 | Slow and old |
| Apple | | 250.00 | dllow and old |
| Prima Coffee Equipment | | 1,000.00 | Still in use |
| Penagos Hermanos Y Compania | | 1,810.00 | Hard to find |
| Penagos Hermanos Y Compania | | 1,810.00 | hard to Find |
| Kaylia O'Dell | | 0.00 | retired |
| San Diego Restaurant Supply | | 2,000.00 | |
| San Diego Restaurant Supply | | 2,000.00 | |
| LDO Market LLC | | 8,350.00 | Brely used |
| J M Estaria S.A | | 4,000.00 | Barely used but works |
| IKAWA Ltd | | 2,500.00 | still in use but older m |
| Mazda Computer | | 4,000.00 | older and used |
| Apple | | Not sure | |
| LDO Market LLC | shipping discount | | |
| LDO Market LLC | received cheaper unit | 4,067.00 | Barely used |
| LDO Market LLC | Silo dryer including shipping | | |
| LDO Market LLC | sh pping discount | | |
| LDO Market LLC | received cheaper unit | | |
| LDO Market LLC | sh pping discount | | |
| LDO Market LLC | received cheaper unit | | |
| LDO Market LLC | Silo dryer including shipping | | |
| Meter Group Inc | | | |
| LDO Market LLC | received cheaper unit | | 0 not working |



| Company | Description | Amount |
|---|---|---|
| LDO Market LLC | shipping discount | |
| LDO Market LLC | S to dryer including shipping | 1,000.00 very well used some t |
| A-Roo Company LLC | tax, shipping and tariff | |
| A-Roo Company LLC | shipping discount | |
| LDO Market LLC | Silo dryer including shipping | |
| LDO Market LLC | received cheaper unit | 365.00 not used |
| LDO Market LLC | received cheaper unit | |
| LDO Market LLC | shipping discount | |
| LDO Market LLC | Silo dryer including shipping | |
| LDO Market LLC | shipping discount | 365.00 not used |
| LDO Market LLC | received cheaper unit | |
| LDO Market LLC | Silo dryer including shipping | |
| | To expense carts purchased for less than capitalization policy | |
| Water Store | | |
| Penagos Hermanos Y Compania | | 250.00 very well used |
| Penagos Hermanos Y Compania | | 400.00 used and has been mc |
| Penagos Hermanos Y Compania | | 900.00 used and has been mc |
| Penagos Hermanos Y Compania | | 900.00 used and has been mc |
| Intersago | Shipping from Colombia of Mir | 400.00 used and has been mc |
| Intersago | | |
| Penagos Hermanos Y Compania | Pre-classification & elevation system | 2,400.00 well used |
| Penagos Hermanos Y Compania | Pre-classification & elevation system | 1,000.00 installed and modified |
| The San Franciscan Roaster | | 1,000.00 installed and modified |
| Intersago | | 5,000.00 installed using and mc |
| Intersago | Shipping from Colombia of Mil | |
| American Colloid Company Inc | | 850.00 used |
| Oliver Manufacturing Company Inc | | 5,000.00 On a pallet |
| Old Frontier Family Inc | | 1,000.00 on a pallet |
| | | $ 52,867.00 |

**Domain Name Estimated Value**
**Frinj Coffee**

| | |
|---|---:|
| | $1,442 |
| | $190 |
| | $1,234 |
| | $1,389 |
| | $114 |
| | $1,409 |
| | $402 |
| | $1,196 |
| | $181 |
| | $1,164 |
| | $1,299 |
| | $1,594 |
| | $1,290 |
| | $1,350 |
| | $1,387 |
| | $1,810 |
| | $144 |
| | $581 |
| | $1,350 |
| | $1,387 |
| | $1,810 |
| | $144 |
| | $581 |
| | $1,704 |
| | $130 |
| | $478 |
| | **$25,760** |

≡  ⊘                                    See what's new    ⑦    🔔    ⠿         🛒

# Domain Portfolio

Search or copy/paste domains    [  ]                    📁 Folders    🐙 Profiles    ▥ Columns

Type    Auto-renew    Lock    Domain Privacy    Extensions    Expiration    Nameservers    More

1-36 of 36 domains

| ☑ | Domain Name ↑ | | Expiration | Auto-renew | △ Estimated Value ‹ › |
|---|---|---|---|---|---|
| | cacoffeegrowers.com | ••• | Feb 19, 2024 | On | $1,442 |
| | cacoffeegrowers.org | ••• | Feb 19, 2024 | On | $190 |
| | cagrowncoffee.com | ••• | Nov 15, 2024 | On | $1,234 |
| | calcoffeegrowers.com | ••• | Feb 10, 2024 | On | $1,389 |
| | calcoffeegrowers.net | ••• | Feb 10, 2024 | On | $114 |
| | calgrown.coffee | ••• | Mar 23, 2024 | On | Less than $100 |
| | calgrowncoffee.com | ••• | Mar 23, 2024 | On | $1,409 |
| | calgrowncoffee.us | ••• | Mar 22, 2024 | On | Less than $100 |
| | californiacaviarlimes.com | ••• | Sep 10, 2024 | On | $402 |
| | californiacoffeegrowers.com | ••• | Feb 19, 2024 | On | $1,196 |
| | californiacoffeegrowers.org | ••• | Feb 19, 2024 | On | $181 |
| | californiagrowncoffee.com | ••• | Nov 15, 2024 | On | $1,164 |
| | calimoya.com | ••• | Nov 24, 2024 | On | $1,200 |



# Domain Portfolio

Search or copy/paste domains

📁 Folders    🗄 Profiles    ▥ Columns

Type    Auto-renew    Lock    Domain Privacy    Extensions    Expiration    Nameservers    More

1-36 of 36 domains

| Domain Name ↑ | | Expiration | Auto-renew | Estimated Value | Domain Privacy | |
|---|---|---|---|---|---|---|
| calimoya.com | ••• | | | $1,299 | | |
| cocktaillime.com | ••• | | | $1,594 | | |
| cocktaillime.us | ••• | | | Less than $100 | | |
| frinje.coffee | ••• | | | $1,290 | | |
| fringecoffee.com | ••• | | | $1,350 | | |
| frinj.co | ••• | | | Less than $100 | | |
| frinj.coffee | ••• | | | Less than $100 | | |
| frinj.org | ••• | | | $1,387 | | |
| frinj.us | ••• | | | Less than $100 | | |
| frinjcoffee.com | ••• | | | $1,810 | | |
| frinjcoffee.info | ••• | | | Less than $100 | | |
| frinjcoffee.net | ••• | | | $144 | | |
| frinjcoffee.org | ••• | | | $581 | | |
| frinjfarming.com | ••• | | | $1,704 | | |
| frinjfarming.info | ••• | | | Less than $100 | | |
| frinjfarming.net | ••• | | | $130 | | |
| frinjfarming.org | ••• | | | $478 | | |
| goodlandcoffee.com | ••• | | | $1,223 | | |
| goodlandorganics.com | ••• | | | $1,486 | | |



# Domain Portfolio

Search or copy/paste domains  ☐ Folders  Profiles  Columns

Type  Auto-renew  Lock  Domain Privacy  Extensions  Expiration  Nameservers  More

1-36 of 36 domains

| Domain Name ↑ | | Expiration | Auto-renew | Estimated Value | Domain Privacy |
|---|---|---|---|---|---|
| fringecoffee.com | ••• | Oct 3 2023 | | $1,350 | |
| frinj.co | ••• | Oct 31 2023 | Up | Less than $100 | |
| frinj.coffee | ••• | Jul 18 2024 | | Less than $100 | |
| frinj.org | ••• | Feb 27 2024 | | $1,387 | |
| frinj.us | ••• | Feb 27 2024 | | Less than $100 | |
| frinjcoffee.com | ••• | Feb 14 2024 | | $1,810 | |
| frinjcoffee.info | ••• | Nov 14 2024 | | Less than $100 | |
| frinjcoffee.net | ••• | Oct 14 2024 | | $144 | |
| frinjcoffee.org | ••• | Nov 14 2024 | | $581 | |
| frinjfarming.com | ••• | Nov 14 2024 | | $1,704 | |
| frinjfarming.info | ••• | Nov 14 2024 | | Less than $100 | |
| frinjfarming.net | ••• | Nov 14 2024 | | $130 | |
| frinjfarming.org | ••• | Nov 14 2024 | | $478 | |
| goodlandcoffee.com | ••• | Oct 1 2024 | | $1,223 | |
| goodlandorganics.com | ••• | Oct 26 2023 | | $1,486 | |
| goodlandorganics.net | ••• | Jun 25 2024 | | $101 | |
| organiccherimoya.com | ••• | Sep 7 2024 | | $539 | |
| organiccherimoyas.com | ••• | Aug 7 2025 | | $368 | |
| santabarbaracoffeegrowers.com | ••• | Feb 17 2024 | | $141 | |
| uscaviartimes.com | ••• | Aug 7 2025 | | $644 | |

**EXHIBIT-B**

**EXHIBIT B-1**

**(Secured Claims)**

## EXHIBIT B-1
## SECURED CLAIMS
### FRINJ COFFEE, INC. / CASE NO.: 9:24-bk-10044-RC

| Secured Creditors | Class | Scheduled Amount | Proof of Claim Amount | Pre-Petition Arrearages | Disputed Yes/No | Total Allowed Secured Claim | Amount Paid on the Effective Date (Estimated to be January 2025) | Amount Paid After the Effective Date | Comments |
|---|---|---|---|---|---|---|---|---|---|
| U.S. Small Business Administration/Denver Finance Center 721 19th Street, Denver, CO. 80202 POC#01 | 2A | $161,681.42 | $161,681.42 | N/A | No | $161,681.42 | $161,681.42 | n/a | Debtor is funding its Amended Plan from an investment contribution and intends to pay off SBA's claim in full by tendering one-time payment for the full amount on the Effective Date. |
| *Total Liabilities* | | $161,681.42 | $161,681.42 | $0.00 | | $161,681.42 | $161,681.42 | $0.00 | |

**EXHIBIT B-2**

**(Priority Unsecured Claims)**

**EXHIBIT B-2**

**PRIORITY UNSECURED TAX CLAIMS AND CLAIMS CLASSIFIED IN CLASS #1**

**FRINJ COFFEE, INC. / CASE NO.: 9:24-bk-10044-RC**

| Priority Creditors | Class | Scheduled Amount | Proof of Claim Amount | Disputed Yes/No | Total Amount of Allowed Priority Unsecured Claim | Amount Paid on the Effective Date (Estimated to be January 2025) | Amount Paid After the Effective Date | Comments |
|---|---|---|---|---|---|---|---|---|
| Franchise Tax Board, Bankruptcy Section MS A340, PO Box 2952, Sacramento, CA 95812-2952 POC#08 | n/a | Not Scheduled | $800.00 | No | $800.00 | $800.00 | n/a | Paid in full on the Effective Date. |
| Mark Szczerba, 107 Chambersburg Way, Folsom, CA 95630 POC#14 | 1 | Not scheduled as priority | $15,150.00 | Yes | $15,150.00 | $15,150.00 | N/A | Paid in full on the Effective Date. |
| Dept of Treasury - Internal Revenue Service, 2850 NE Independence Ave., Suite 101, M/S 5334-LSM, Lee's Summit, MO 64064-2327 POC#06 | n/a | Not Scheduled | $1,717.06 | Yes | $1,717.06 | $1,717.06 | N/A | Paid in full on the Effective Date. |
| *Total Liabilities* | | $0.00 | $17,667.06 | | $17,667.06 | $17,667.06 | | |

**EXHIBIT B-3**

**(General Unsecured Claims)**

## EXHIBIT B-3
## GENERAL UNSECURED CLAIMS
### FRINJ COFFEE, INC. / CASE NO.: 9:24-bk-10044-RC

| General Unsecured Creditors | Class | Scheduled Amount | Proof of Claim Amount | Disputed Yes/No | Total Amount of Allowed Unsecured Claim | Amount Paid on the Effective Date (Estimated to be January 2025) | Amount Paid After the Effective Date | Comments |
|---|---|---|---|---|---|---|---|---|
| Uline 12575 Uline Drive, Pleasant Prairie, WI 53158 POC#02 | 3 | n/a | $703.22 | No | $703.22 | $154.90 | | |
| Zurich American Insurance Co., Attn: Jessica Melesio, PO Box 68549, Schaumburg, IL 60196 POC#03 | 3 | n/a | $1.00 | No | $1.00 | $0.22 | | |
| Ralph Gesualdo Thomas M. Geher c/o JMBM 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067 POC#04 | 3 | Unknown | $239,874.23 | Yes | $239,874.23 | $52,836.00 | | Notice of Settlement filed on 10/9/24; docket no.: 198. |
| American Express National Bank, Becket and Lee, LLP, PO Box 3001, Malvern, PA 19355-0701 POC#05 | 3 | $18,195.00 | $18,523.85 | No | $18,523.85 | $4,080.43 | | |
| Dept of Treasury - Internal Revenue Service, 2850 NE Independence Ave., Suite 101, M/S 5334-LSM, Lee's Summit, MO 64064-2327 POC#06 | 3 | Not Scheduled | $2,849.72 | Yes | $2,849.72 | $627.73 | | |

| Creditor | | Scheduled | POC | | | | | Notes |
|---|---|---|---|---|---|---|---|---|
| Paige Gesualdo Thomas M. Geher c/o JMBM 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067 POC#09 | 3 | Unknown | $7,067,261.46 | Yes | $3,618,880.71 | $797,164.00 | | Notice of Settlement filed on 10/9/24; docket no.: 198. |
| Richard Masino, 220 W Pine Ave., El Segundo, CA 90245 POC#10 | 3 | $56,551.41 | $58,262.39 | No | $58,262.39 | $12,834.03 | | |
| Michael & Barbara Masino JTWROS, 7035 Gobernador Canyon Rd., Carpenteria, CA 93013 POC#11 | 3 | $113,212.28 | $115,927.78 | No | $115,927.78 | $25,536.57 | | |
| Law Office of Nina Yablok, PO Box 703, Nemo, TX 76070 POC#12 | 3 | $15,349.50 | $15,349.50 | No | $15,349.50 | $3,381.18 | | |
| Nancy Pedneault, 231 Greenbrook Dr., Danville, CA 94526 POC#13 | 3 | $127,488.58 | $129,583.33 | No | $129,583.33 | $28,544.61 | | |
| Mark Szcerba, 107 Chambersburg Way, Folsom, CA 95630 POC#14 | 3 | $42,626.22 | $99,147.18 | Yes | $83,997.18 | $18,502.89 | | Mark Szcerba's claim consists of $15,150 priority claim listed on Exhibit B-2 and $83,997.18 general unsecured claim shown here. Priority claim will be paid in full on the Effective Date,. The general unsecured claim will be paid after the IRS' and Paige Gesualdo's claims are resolved. |
| Agricultural Commissioner's Office Weights and Measures 263 Camino del Remedio, Santa Barbara, CA 93110 | 3 | $1,100.00 | POC not filed | No | $1,100.00 | $242.31 | | |
| Por La Mar Nursery 905 S. Patterson Ave., Goleta, CA 93117 | 3 | $726,000.00 | POC not filed | Yes | Disallowed | Disallowed | Disallowed | The claim was scheduled as a contingent, unliquidated, and disputed claim, and Por La Mar did not file a claim by the bar date. Thus, its claim is disallowed. |
| Ron Caird, PO Box 60307, Santa Barbara, CA 93160 | 3 | $386,250.00 | POC not filed | No | $386,250.00 | $85,083.15 | | |

| Creditor | | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|
| West Lilac Farms II, LLC, 7311 Santa Barbara Street, Carlsbad, CA 92011 | 3 | $7,200.00 | POC not filed | No | $0.00 | $0.00 | $0.00 | Agreed to forego collection of the $7,200 pre-petition claim. See Motion To Enter Into New Lease [docket no .: 64]. |
| Steven Hollstein 1390 North Fairview Goleta, CA 93117 [POC #15] | 3 | $0.00 | $50,000.00 | Yes | Disallowed as untimely and also as a SAFE note holder | Disallowed | Disallowed | Debtor filed an objection to this claim for two reasons: (1) Claim was filed late on April 9, 2024, after March 26, 2024 bar date; (2) Mr. Hollstein invested funds in the Debtor for future equity and is not entitled to any monitory amount, even if his claim was filed timely. Per this Court's order [docket no.: 179, the Objection is sustained insofar as the Claim is subordinated in priority to payment pursuant to 11 U.S.C. Sections 502(b)(9) and |
| *Total Liabilities* | | $1,493,972.99 | $7,797,483.66 | | $4,671,302.91 | $1,028,988.02 | | |

# EXHIBIT B-4

## (List of Equity Interest Holders)

**EXHIBIT B-4**

**INTEREST HOLDERS**

**FRINJ COFFEE, INC. / CASE NO.: 9:24-bk-10044-RC**

| INTEREST HOLDERS | Class | Scheduled Amount | Claimed Amount | Disputed Yes/No | Total Amount of Allowed Unsecured Claim | Amount on Effective Date | Amount Paid After the Effective Date | Comments |
|---|---|---|---|---|---|---|---|---|
| Alison Differt, 50 Summer St. Gloucester MA 01930 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Allee Van Deynze 3333 Monte Vista Davis CA 95618-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Amy Koman 477 N. Lindberg Blvd. Ste. 300 Saint Louis MO 63141-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Andy Mullins 40225 Paredo Del Sol Dr. Temecula CA 92591-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment.<br><br>Mr. Mullins is an officer of the Debtor and is also listed on Exhibit B-5 (Insiders) |
| Ben Meyers 227 Ceres St. Encinitas CA 92024-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Bill Silva 15760 Ventura Bl. Ste. 1020 Encino CA 91436-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| Name / Address | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Bruce Vazzana<br>34 Gateview Rd.<br>Fallbrook CA 92028-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Bryan Hoffman<br>45591 Sandia Creek Dr.<br>Temecula CA 92590-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Calvin Zara<br>4100 Matilija Canyon Rd.<br>Ojai CA 93023-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Caravela Coffee LLC<br>601 W Rosemary St. Ste 215<br>Chapel Hill NC 27516-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Carl Steffens<br>PO Box 173859<br>Denver CO 80217-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly. |
| Cecillia Chi-Ham<br>18010 Ruddy St.<br>Woodland CA 95695-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Christopher Peck<br>19720 Winter Wren Loop<br>Bend OR 97702-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Connor McClelland<br>4820 Taravine Dr.<br>Oceanside CA 92057-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Dan Cox<br>480 Autumn Hill Ln<br>Shelburne VT 05482-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment.<br>Agreement #1. |
| Dan Cox<br>480 Autumn Hill Ln<br>Shelburne VT 05482-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment.<br>Agreement #2. |
| Dario Cantu<br>909 Masveqite Dr.<br>Davis CA 95617-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly |
| David Babenheim<br>PO Box 867<br>El Granada CA 94018-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly |
| David Smargon<br>6271 Westmoorland Pl<br>Goleta CA 93117-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Glenn Stinebaugh<br>2332 Sunrise Meadows Dr.<br>Las Vegas NV 89134-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| Name / Address | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Grant Ferrier<br>4452 Park Bl. Ste. 306<br>San Diego CA 92116-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Griffin Hall<br>1133 E. Cota St. Apt. C<br>Santa Barbara CA 93103-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Jack & Nickie Ruskey<br>2240 West Live Oak Dr.<br>Los Angeles CA 90068-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| James Fredette<br>PO Box 9806<br>Newport Beach CA 92658-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| James Pardee Jr. Trust<br>7311 Santa Barbara St<br>Carlsbad CA 92011-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Jason Mraz<br>11620 Wilshire Blvd., Ste. 580<br>Los Angeles CA 90025-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly. |
| Jeff Brown<br>1320 Barger Canyon Rd.<br>Sonnic CA 93066-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| Name/Address | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Joan Seavey 19015 Bayhill Lane Huntington Beach CA 92648-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| John A. Ruskey III 1362 Farren Road Goleta CA 93117-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. Mr. Ruskey is the principal of the Debtor, and is also listed on Exhibit B-5. |
| Juan Medrano PO Box 6884 Vacaville CA 95696-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Julie Klaus PO Box 634 Rancho Santa Fe CA 92067-0000 [POC #7] | 4 | Unknown | $142,377.91 | Yes | Unknown | Unknown | Unknown | Debtor intends to object to Ms. Klaus' POC #7 because- 1) there is no attachment to her claim, and 2) she is not entitled to a monetary claim. |
| Kari Shafer 925 N Hope Ave Santa Barbara CA 93110-0000 | 4 | Unknown | INSIDER | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. Ms. Shafer is an officer of the Debtor and is also listed on Exhibit B-5 (Insiders). |
| Kaytlin O'Dell 3877 Sheldon Ventura CA 93003-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Kristen Ruskey 1362 Farren Rd. Goleta CA 93117-0000 | 4 | Unknown | INSIDER | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Lance Frauschi 4900 Sand Canyon Rd. Somis CA 93066-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly. |
| Lindsey Bolger 1402 Maggie's Way Waterbury Center VT 05677-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. Lindsey Bolger has two separate agreements for listed equity in Debtor, an appears here twice. Ms. Bolger is an officer of the Debtor, and is also listed on Exhibit B-5 (Insiders). |
| Lindsey Bolger 1402 Maggie's Way Waterbury Center VT 05677-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Debtor is still researching and analyzing treatment of the claim. Lindsey Bolger has two separate agreements for listed equity in Debtor, an appears here twice. Ms. Bolger is an officer of the Debtor, and is also listed on Exhibit B-5 (Insiders). |
| Lindsey Mesta 105 E. Mt. Elden Lookout Rd Flagstaff AZ 86001-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Luis Bakker Guerra Calle Manuel Burbano S/N Pacmbo Quito Equador | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Luke McCormack 10601 Edinburg Dr. Spotsylvania VA 22553-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| Name / Address | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Marc Schaberg 1030 Arcanto Place Los Angeles CA 90049-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Mark Cassani 1907 Beechwood Ave Nashville TN 37212-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Mark Gaskell 671 N. Fifth St. Grover Beach CA 93433-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennely. |
| Marta Matvienko 2604 Lalamazoo Davis CA 95618-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Michael Dubin 13335 Maxella Ave Marina Del Rey CA 90292-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Michael Masino 7035 Gobernador Canyon Rd Carpinteria CA 93013-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Northern Farms SB c/o John & Kari Ellsworth 6250 S. Airpark Pl. Anchorage AK 99502-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| Omid Ashaghi<br>5718 Meadows Del Mar<br>San Diego CA 92130-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Paige Gesualdo<br>1155 Dulzura Dr.<br>Santa Barbara CA 93108-0000 | 4 | Unknown | $7,067,261.46 | Yes | Unknown | Unknown | Unknown | Paige Gesualdo is a former officer of the Debtor who has actions pending against Debtor in state court. Debtor intends to object to Ms. Gesualdo's claim, and Debtor also intends to file a motion for the Court to estimate the value of Ms. Gesualdo's claim. (Also listed on Exhibit B-3.) |
| Remilyn Ho<br>21 E. Los Olivos St.<br>Santa Barbara CA 93105-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Ricardo Kayser<br>Palo Alto Rd. 4039<br>4039 Boquete Chiriqui Rep<br>Panama | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Roger M. Lavery, III<br>700 The Strand<br>Manhattan Beach CA 90266-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Ron Caird<br>PO Box 60307<br>Santa Barbara CA 93160-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Sally Hood<br>100 Straford Court<br>Del Mar CA 92014-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruske, III, and Kent Baske and Moira Kennelly. |

| Name/Address | | | | | | | | Comments |
|---|---|---|---|---|---|---|---|---|
| Samuel Venezgas<br>423 S. Canada St. Apt. D<br>Santa Barbara CA 93103-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment |
| Scott Kvancz<br>1634 De La Vina St.<br>Santa Barbara CA 93101-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment.<br><br>Mr. Kvancz is an officer of the Debtor and is also listed on Exhibit B-5 (Insiders). |
| Sheryl Iles-Brunk<br>835 Sunshine Ct.<br>Santa Maria CA 93455-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Stephen Dory<br>7 Crest Rd. E.<br>Palos Verdes Peninsula CA 90274-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Upon the Effective Date of the Amended Plan, each outstanding SAFE issued by the Debtor shall be deemed converted into shares of Series A Preferred Stock in a manner consistent with Schedule 2-1 attached to that certain Amended and Restated Investment Agreement ("Investment Agreement") by and among the Debtor, John A. Ruskey III, and Kent Bakke and Moira Kennelly. |
| Steven Holtisen. 1390<br>North Fairview, Goleta,<br>CA 93117 POC#15 | 4 | See comments section. | $50,000.00 | Yes | See Comments for treatment. | n/a | n/a | Steven is a current common stock shareholder. He is not entitled to any monetary recovery. Additionally, he filed his claim after the March 26, 2024 bar date. |
| Subramanyeswara Aerklapudi<br>924 Truckee Valley Dr.<br>Reno NV 89511-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Suzanne Placinkis<br>211 Linden Rd.<br>Watsonville CA 95076-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |

| | | | | | | | Comments |
|---|---|---|---|---|---|---|---|
| Todd D' Alessio<br>1128 1/2 W Thorn St.<br>San Diego CA 92103-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Trevor Keith<br>PO Box 2170<br>Fallbrook CA 92088-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Trevor Vettman<br>PO Box 2170<br>Fallbrook CA 92088-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| Valley Heart Ranch<br>c/o Darrell Becker<br>PO Box 41459<br>Santa Barbara CA 93140-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| William Risteport<br>1631 Tamarack Lane<br>Davis CA 95616-0000 | 4 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | Common Stockholders with no SAFE will remain common stockholders under the Amended Plan. The impact from a Series Round A investment is that the common stockholders' interest will be diluted as a result of the new investment. |
| **Total Liabilities** | | Unknown | | | See Comments for Treatment | n/a | n/a | |

**EXHIBIT B-5**

**(Insiders of the Debtor)**

# EXHIBIT B-5
## INSIDERS
### FRINJ COFFEE, INC. / CASE NO.: 9:24-bk-10044-RC

| INTEREST HOLDERS | Class | Scheduled Amount | Claimed Amount | Disputed Yes/No | Total Amount of Allowed Unsecured Claim | Amount on Effective Date | Amount Paid After the Effective Date | Comments |
|---|---|---|---|---|---|---|---|---|
| Ruskey Living Trust c/o Nicole and John A Ruskey, Trustees, 2240 Live Oak Drive West, Los Angeles, CA 90068 | 5 | $25,040.28 | No POC | No | See Comments for treatment. | n/a | n/a | Creditors are the parents of Debtor's principal John A. Ruskey III. Since the Debtor is not proposing 100% payment to creditors in Class 3 under its Plan, the insiders of the Debtor will not receive any distribution under the Plan. |
| Andy Mullins 40225 Parado Del Sol Dr. Temecula CA 92592-0000 | 5 | Not Scheduled | No POC | No | See Comments for treatment. | n/a | n/a | No prepetition claim. Mr. Mullins is the director and co-founder of the Debtor. |
| John A. Ruskey III 1362 Farren Road Goleta CA 93117-0000 | 5 | Not Scheduled | No POC | No | See Comments for treatment. | n/a | n/a | No prepetition claim. Mr. Ruskey is the CEO and director of the Debtor. |
| Kari Shafer 925 N Hope Ave Santa Barbara CA 93110-0000 | 5 | Not Scheduled | No POC | No | See Comments for treatment. | n/a | n/a | No prepetition claim. Ms. Shafer is the CFO of the Debtor. |
| Lindsey Bolger 1402 Maggie's Way Waterbury Center VT 05677-0000 | 5 | Unknown | POC not filed | No | See Comments for treatment. | n/a | n/a | No prepetition claim. Ms. Bolger is a director of the Debtor. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mindful Outdoor Retreats c/o John A Ruskey III, 1362 Farren Rd, Goleta, CA 93117 Loan #2 | 5 | $8,574.84 | No POC | No | See Comments for treatment. | n/a | n/a | Loan #2 by Debtor's insiders John A. Ruskey III and his spouse.<br><br>Since the Debtor is not proposing 100% payment to creditors in Class 3 under its Plan, theinsiders of the Debtor will not receive any distribution under the Plan. |
| Mindful Outdoor Retreats c/o John A Ruskey III, 1362 Farren Rd, Goleta, CA 93117 Loan #3 | 5 | $57,014.14 | No POC | No | See Comments for treatment. | n/a | n/a | Loan # 3 by Debtor's insiders John A. Ruskey III and his spouse.<br><br>Since the Debtor is not proposing 100% payment to creditors in Class 3 under its Plan, theinsiders of the Debtor will not receive any distribution under the Plan. |
| Mindful Outdoor Retreats c/o John A Ruskey III, 1362 Farren Rd, Goleta, CA 93117 Loan #1 | 5 | $117,740.87 | No POC | No | See Comments for treatment. | n/a | n/a | Loan #1 by Debtor's insiders John A. Ruskey III and his spouse.<br><br>Since the Debtor is not proposing 100% payment to creditors in Class 3 under its Plan, the insiders of the Debtor will not receive any distribution under the Plan. |
| Scott Kvancz 1634 De La Vina St. Santa Barbara CA 93101-4000 | n/a | Not Scheduled | No POC | No | See Comments for treatment. | n/a | n/a | No prepetition claim. Mr. Kvancz is Secretary of the Debtor. |
| **Total Liabilities** | | $208,370.13 | | | **See Comments for treatment.** | $0.00 | $0.00 | |

**EXHIBIT-C**

**(Plan Distribution Calculation)**

**FRINJ - Distributions Under Plan**

| | |
|---|---|
| Investment | $1,250,000.00 |
| ERC | $195,823.17 |
| **Total Pot** | **$1,445,823.17** |

| Administrative Claims | |
|---|---|
| Michael Jay Berger (estimated) | $125,000.00 |
| Mark Sharf (estimated) | $25,000.00 |
| Tax Prep (estimated) | $5,250.00 |
| Insurance Deductible | $6,728.00 |
| Nina Yablok (estimated) | $6,000.00 |
| Feza Sangok | $6,000.00 |
| **Total Administrative:** | **$173,978.00** |

| Secured Claims | |
|---|---|
| US Small Business Administration | $161,681.42 |
| **Total Secured** | **$161,681.42** |

| Priority Claims | | |
|---|---|---|
| Chris McCausland/SUN BZL | $63,510.00 | Pending Objection to Claim. |
| FTB | $800.00 | |
| IRS | $1,717.06 | |
| Marc Szczerba | $15,150.00 | |
| **Total Priority** | **$81,177.06** | |

**Pot After Administrative, Secured,
and Priority Claims**                    **$1,028,986.69**

| General Unsecured Creditors | |
|---|---|
| Ruskey Trust | $0.00 |
| Uline | $703.22 |
| Zurich | $1.00 |
| IRS | $2,849.72 |
| AMEX | $18,523.85 |
| Richard Masino | $58,262.39 |
| Mike Masino | $115,927.78 |
| Nina Yablok | $15,349.50 |
| Nancy Padneault | $129,583.33 |
| AG Commissioner | $1,100.00 |
| Mark S | $83,997.18 |
| Ron Caird | $386,250.00 |
| West Lilac Farms | $0.00 |
| Ralph G | $239,874.23 |
| Paige G (estimated) | $3,618,880.71 |
| **Total Unsecured Claims** | **$4,671,302.91** |

Percent distribution from Pot to
General Unsecured Claims                    **22.028%**

**EXHIBIT-D**

**(Monthly Operating Report Summary)**

## Monthly Operating Report Summary

| MONTH | TOTAL CASH RECEIPTS | TOTAL CASH DISBURSEMENTS | NET CASH FLOW |
|---|---|---|---|
| January 2024 | $21,039.00 | $3,199.00 | $17,840.00 |
| February 2024 | $19,012.00 | $27,524.00 | ($8,512.00) |
| March 2024 | $38,855.00 | $31,640.00 | $7,215.00 |
| April 2024 | $36,994.00 | $37,743.00 | ($749.00) |
| May 2024 | $56,575.00 | $42,133.00 | $14,442.00 |
| June 2024 | $7,767.00 | $13,061.00 | ($5,294.00) |
| July 2024 | $27,363.00 | $25,061.00 | $2,302.00 |
| August 2024 | $5,105.00 | $28,434.00 | ($23,329.00) |
| September 2024 | $259,584.00 | $28,199.00 | $231,385.00 |
| *Total Cash Receipts / Total Cash Disbursements* | *$472,294.00* | *$236,994.00* | *$235,300.00* |
| | | | |
| **MONTHLY AVERAGES** | **$52,477.11** | **$26,332.66** | **$26,144.44** |

Note: the Debtor is not relying on the MOR figures to fund its Amended Plan. Instead, the means of implementation of the Amended Plan is from an investment the Debtor secured post-petition, which allocates $1,250,000 to fund the Amended Plan.

**EXHIBIT-E**

**(Liquidation Analysis)**

# EXHIBIT – E

## LIQUIDATION ANALYSIS

| Liquidation Analysis | Total Amount | Real Property | Personal Property |
|---|---|---|---|
| Total Property Value | $441,427.00* | $0.00 | $441,427.00 |
| Less: | | | |
| Secured Claims (per | | | |
| Exhibit B-1) | $161,681.42 | | $161,681.42 |
| | ---------------- | ---------------- | ---------------- |
| Interest in Nonexempt Property | $279,745.58 | $0.00 | $279,745.58 |
| Less: | | | |
| Estimated Ch 7 Admin Expenses | | $50,000.00 | |
| Estimated BK Counsel Fee, Sub V Trustee | | | |
| And Other Professionals (see Plan, Section 3.02 | | | |
| For Administrative Claims) Section 3.02) | | $173,978.00 (includes all 6 claims listed in | |
| Schedule E. Priority Claims (see Exhibit B-2) 3.03). Includes the disputed priority IRS claim. | | $17,667.06 (see Exhibit B-2 and Plan, Section | |
| | | ---------------- | |
| Available to General Unsecured (see Exhibit B-3) determined) | | $0.00 (estimated until the Priority Claims are | |
| Total General Unsecured (Class 3) | | $4,671,302.91 | |
| See Exhibit B-3 for more details. | | | |
| Percent Distribution Under Chapter 7 Liquidation | | 0% | |
| Percent Distribution Under Chapter 11 Plan | | **Debtor is proposing a Pot Plan. Estimated** | |

**available amount for distribution to general allowed unsecured creditors through Pot Plan is
$1,028,988.02 (approximately 22.028% percent)**

*NOTE: See **EXHIBIT A** for more details on Total Property Value

**EXHIBIT-F**

**(Executory Contracts and Unexpired Leases)**

Fill in this information to identify the case:

Debtor name **FRINJ Coffee, Incorporated**

United States Bankruptcy Court for the: CENTRAL DISTRICT OF CALIFORNIA

Case number (if known) **9:24-bk-10044-RC**

☐ Check if this is an
amended filing

## Official Form 206G
## Schedule G: Executory Contracts and Unexpired Leases                12/15

Be as complete and accurate as possible. If more space is needed, copy and attach the additional page, number the entries consecutively.

1.  **Does the debtor have any executory contracts or unexpired leases?**
    ☐ No. Check this box and file this form with the debtor's other schedules. There is nothing else to report on this form.
    ■ Yes. Fill in all of the information below even if the contacts of leases are listed on *Schedule A/B: Assets - Real and Personal    Property*
    (Official Form 206A/B).

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.1. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Brent Hearld ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on April 25, 2023, whereby Investor paid $50,000 in return for future right to certain shares of the Company's Capital Stock. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
| | State the term remaining | | |
| | List the contract number of any government contract | | **Brent Herald**<br>**12447 Tocchi Dr.**<br>**Fort Wayne, IN 46845** |

Debtor 1    **FRINJ Coffee, Incorporated**
       First Name         Middle Name         Last Name

Case number *(if known)*    **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

**2.2.**    State what the contract or lease is for and the nature of the debtor's interest

**Simple Agreement For Future Equity ("SAFE Agreement") between Brent Herald ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on February 3, 2023, whereby Investor paid $100,000 in return for future right to certain shares of the Company's Capital Stock.  If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.**

State the term remaining

List the contract number of any government contract

**Brent Herald**
**12447 Tocchi Dr.**
**Fort Wayne, IN 46845**

Debtor 1  **FRINJ Coffee, Incorporated**                                              Case number (if known)   **9:24-bk-10044-RC**
　　　　　First Name　　　Middle Name　　　　　Last Name

## Additional Page if You Have More Contracts or Leases

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.3. | State what the contract or lease is for and the nature of the debtor's interest | **Research and Development Agreement (RD Agreement) with Frinj Coffee. The term of RD Agreement is for the duration of 10 years. Agreement executed on or about July/August 2020. Debtor is the Supplier and Gato Fuerte LLC is the Recipient. Pursuant to the RD Agreement, the "Material" (defined as coffee plants) is transferred to Gato Fuerte LLC for the sole purpose of carrying out the performance, production, and quality properties of the plan material. The Material will remain the property of the Supplier.** | |
|---|---|---|---|
| | State the term remaining | | **Gato Fuerte LLC** |
| | | | **c/o Dr. Steven Hollstien, CEO** |
| | List the contract number of any government contract | | **1390 North Fariview** |
| | | | **Goleta, CA 93117** |

Debtor 1    **FRINJ Coffee, Incorporated**                                   Case number *(if known)*    **9:24-bk-10044-RC**
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    First Name          Middle Name          Last Name

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**        **State the name and mailing address for all other parties with
whom the debtor has an executory contract or unexpired
lease**

| 2.4. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Hood Family Trust ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on January 25, 2023, whereby Investor paid $250,000 in return for future right to certain shares of the Company's Capital Stock.  If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
|---|---|---|---|
| | State the term remaining | | **Hood Family Trust c/o Sally Hood 100 Stratford Court Del Mar, CA 92014** |
| | List the contract number of any government contract | | |

Debtor 1    **FRINJ Coffee, Incorporated**
     First Name       Middle Name       Last Name

Case number *(if known)*  **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.5. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Jason Mraz ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on August 9, 2022, whereby Investor paid $200,000 in return for future right to certain shares of the Company's Capital Stock. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** |  |
| | State the term remaining | | **Jason Mraz** |
| | List the contract number of any government contract | | **11620 Wilshire Blvd., Ste. 580 Los Angeles, CA 90025** |

Debtor 1    **FRINJ Coffee, Incorporated**                                        Case number *(if known)*    **9:24-bk-10044-RC**
_____
First Name        Middle Name              Last Name

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**                    State the name and mailing address for all other parties with
                                                                   whom the debtor has an executory contract or unexpired
                                                                   lease

| 2.6. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Jason Mraz ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on May 24, 2023, whereby Investor paid $120,000 in return for future right to certain shares of the Company's Capital Stock.  If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |

|      | State the term remaining | | |
|      | List the contract number of any government contract | | **Jason Mraz**<br>**11620 Wilshire Blvd., Ste. 580**<br>**Los Angeles, CA 90025** |

Debtor 1   **FRINJ Coffee, Incorporated**
_____          Case number (if known)   **9:24-bk-10044-RC**
First Name         Middle Name                Last Name

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**          State the name and mailing address for all other parties with
whom the debtor has an executory contract or unexpired
lease

| 2.7. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Jason Mraz ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on December 15, 2023, whereby Investor paid $100,000 in return for future right to certain shares of the Company's Capital Stock.  If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
| | State the term remaining | | |
| | List the contract number of any government contract | _____ | **Jason Mraz**<br>**11620 Wilshire Blvd., Ste. 580**<br>**Los Angeles, CA 90025** |

Debtor 1   **FRINJ Coffee, Incorporated**     Case number *(if known)*   **9:24-bk-10044-RC**
　　　　　First Name　　　　　Middle Name　　　　　Last Name

  **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**　　　　　**State the name and mailing address for all other parties with
whom the debtor has an executory contract or unexpired
lease**

2.8.　　State what the contract or　　**Simple Agreement For
lease is for and the nature of　　Future Equity ("SAFE
the debtor's interest　　　　　Agreement") between
　　　　　　　　　　　　　　Lance Frautschi
　　　　　　　　　　　　　　("Investor") and Frinj
　　　　　　　　　　　　　　Coffee, Incorporated
　　　　　　　　　　　　　　("Company") entered
　　　　　　　　　　　　　　into on October 24,
　　　　　　　　　　　　　　2022, whereby Investor
　　　　　　　　　　　　　　paid $250,000 in return
　　　　　　　　　　　　　　for future right to
　　　　　　　　　　　　　　certain shares of the
　　　　　　　　　　　　　　Company's Capital
　　　　　　　　　　　　　　Stock.  If there is an
　　　　　　　　　　　　　　Equity Financing
　　　　　　　　　　　　　　before the termination
　　　　　　　　　　　　　　of this Safe, on the
　　　　　　　　　　　　　　initial closing of such
　　　　　　　　　　　　　　Equity Financing, this
　　　　　　　　　　　　　　Safe will automatically
　　　　　　　　　　　　　　convert into the greater
　　　　　　　　　　　　　　of: (1) the number of
　　　　　　　　　　　　　　shares of Standard
　　　　　　　　　　　　　　Preferred Stock equal
　　　　　　　　　　　　　　to the Purchase
　　　　　　　　　　　　　　Amount divided by the
　　　　　　　　　　　　　　lowest price per share
　　　　　　　　　　　　　　of the Standard
　　　　　　　　　　　　　　Preferred Stock; or (2)
　　　　　　　　　　　　　　the number of shares
　　　　　　　　　　　　　　of Safe Preferred Stock
　　　　　　　　　　　　　　equal to the Purchase
　　　　　　　　　　　　　　Amount divided by the
　　　　　　　　　　　　　　Safe Price.

　　　State the term remaining

　　　　　　　　　　　　　　　　　　　　Lance Frautschi
　　　List the contract number of any　　　　　4900 Sand Canyon Rd.
　　　　　government contract　　_____　**Somis, CA 93066**

Debtor 1   **FRINJ Coffee, Incorporated**
    First Name      Middle Name      Last Name

Case number *(if known)*   **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

**2.9.**  State what the contract or lease is for and the nature of the debtor's interest

**Simple Agreement For Future Equity ("SAFE Agreement") between Madden Family Trust ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on December 8, 2022, whereby Investor paid $75,000 in return for future right to certain shares of the Company's Capital Stock.  If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.**

State the term remaining

List the contract number of any government contract

**Madden Family Trust
301 S. Pointsettia Ave
Manhattan Beach, CA 90266**

Debtor 1   **FRINJ Coffee, Incorporated**                                    Case number *(if known)*   **9:24-bk-10044-RC**
     First Name       Middle Name       Last Name

 **Additional Page if You Have More Contracts or Leases**

| 2. List all contracts and unexpired leases | State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease |
|---|---|

| 2.10. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Pacific Premier Trust Custodian FBO Carl H. Steffens IRA ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on June 2, 2023, whereby Investor paid $50,000 in return for future right to certain shares of the Company's Capital Stock. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
| | State the term remaining | | **Pacific Premier Trust Custodian** |
| | List the contract number of any government contract | | **c/o Carl H. Steffens IRS 1890 Santa Monica Rd. Carpinteria, CA 93013** |

Debtor 1    **FRINJ Coffee, Incorporated**
    First Name        Middle Name            Last Name

Case number *(if known)*    **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.11. | State what the contract or lease is for and the nature of the debtor's interest | **Farm Lease for Development of Coffee to be grown in Coastal Southern California between John A. and Nicole W. Ruskey (landlord) and Frink Coffee Inc (Tenant) for the property commonly known as 1362 Farren Road, Goleta, CA, also known as the Condor Ridge Ranch or Farm Lease.   The Trustees are the parents of John A. Ruskey III. The lease commenced on January 1, 2018 and ended on December 31, 2023 with no option to renew.  Debtor intends to relocate on or before April 30, 2024.** | |
| --- | --- | --- | --- |
| | State the term remaining | **December 31, 2023** | **Ruskey Living Trust c/o Nicole and John A. Ruskey, Trustees 2240 Live Oak Drive West Los Angeles, CA 90068** |
| | List the contract number of any government contract | | |

Debtor 1 **FRINJ Coffee, Incorporated**
    First Name         Middle Name         Last Name

Case number *(if known)*   **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

**2. List all contracts and unexpired leases**

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.12. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Stephen Doty ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on May 31, 2022, whereby Investor paid $250,000 in return for future right to certain shares of the Company's Capital Stock. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
| | State the term remaining | | **Stephen Doty** |
| | List the contract number of any government contract | | **7 Crest Rd. E.**<br>**Palos Verdes Peninsula, CA 90274** |

Debtor 1    **FRINJ Coffee, Incorporated**
   First Name      Middle Name      Last Name

Case number *(if known)*    **9:24-bk-10044-RC**

 **Additional Page if You Have More Contracts or Leases**

2. List all contracts and unexpired leases

State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease

| 2.13. | State what the contract or lease is for and the nature of the debtor's interest | **Simple Agreement For Future Equity ("SAFE Agreement") between Stephen Doty ("Investor") and Frinj Coffee, Incorporated ("Company") entered into on January 23, 2023, whereby Investor paid $50,000 in return for future right to certain shares of the Company's Capital Stock. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.** | |
|---|---|---|---|
| | State the term remaining | | **Stephen Doty** |
| | List the contract number of any government contract | | **7 Crest Rd. E.** |
| | | | **Palos Verdes Peninsula, CA 90274** |

Debtor 1   **FRINJ Coffee, Incorporated**

First Name        Middle Name        Last Name        Case number *(if known)*   **9:24-bk-10044-RC**

## Additional Page if You Have More Contracts or Leases

**2. List all contracts and unexpired leases**

**State the name and mailing address for all other parties with whom the debtor has an executory contract or unexpired lease**

| 2.14. | State what the contract or lease is for and the nature of the debtor's interest | **Basic Rental Agreement  for premises located at 32542 Aquaduct Road, Bonsall. Rent is due on the 1st day of each month. The agreement commenced on March 15, 2021 until December 31, 2021. Thereafter, it became a month to month tenancy.** | |
|---|---|---|---|
| | State the term remaining | **month-to-month** | **West Lilic Farms II, LLC** |
| | List the contract number of any government contract | | **7311 Santa Barbara Street** |
| | | | **Carlsbad, CA 92011** |

**EXHIBIT-G**

**(Amended and Reinstated Series A Preferred Stock Investment
Agreement)**

## FRINJ COFFEE, INCORPORATED.

## AMENDED AND RESTATED SERIES A PREFERRED STOCK INVESTMENT AGREEMENT

This Amended and Restated Series A Preferred Stock Investment Agreement (this "*Agreement*") is dated as of the Effective Date and is between the Company, the Purchasers or their Purchaser Designee, and the Key Holders.

### RECITALS

A.      The Company, the Major Purchaser and the Key Holder entered into that certain Series A Preferred Stock Investment Agreement effective May 31, 2024 (the "**Original Agreement**").

B.      The Court had certain questions and concerns with respect to the Original Agreement, and the parties to the Original Agreement desire to amend and restate the Original Agreement with this Agreement to address the Court's questions and concerns.

The parties agree as follows:

**1.**      **DEFINITIONS**. Capitalized terms used and not otherwise defined in this Agreement or the Exhibits and Schedules to this Agreement have the meanings set forth in **Exhibit A**.

**2.**      **INVESTMENT**. Subject to the terms and conditions of this Agreement, including the Agreement Terms set forth in **Exhibit B**, (i) Purchasers will purchase at the Closing and the Company will sell and issue to such Purchasers at the Closing that number of shares of Series A Preferred Stock set forth opposite such Purchasers' name on **Schedule 1**, at a price per share equal to the Purchase Price (subject to any applicable discounts where all or a portion of such Purchase Price is being paid by cancellation or conversion of indebtedness or other convertible securities of the Company issued primarily for capital raising purposes (e.g. simple agreement for future equity) to such Purchaser) and (ii) each Purchaser, the Company and each Key Holder agrees to be bound by the obligations set forth in this Agreement and to grant to the other parties to this Agreement the rights set forth in this Agreement.

**3.**      **ENTIRE AGREEMENT**. This Agreement (including the Exhibits and Schedules to this Agreement) together with the Restated Articles constitute the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties (including the Original Agreement) is expressly canceled.

**4.**      **RECITALS OF BACKGROUND AND TIMING**

**4.1**      The Company filed for bankruptcy protection under Chapter 11 in the United States Bankruptcy Court Central District of California Norther Division (the "*Court*") case number 9:24-bk-10044-RC on January 16, 2024 (the "*Bankruptcy*").

**4.2**      The Court has set a hearing date of July 10, 2024 to consider confirmation of a plan of reorganization (the "*Plan*").

DocuSign Envelope ID: 343E9BC0-2A1A-4741-87CD-0F88F6A632B9

**4.3**     The investment described in Section 2 above is critical to the Plan.

**4.4**     In order to balance the Company's desire to allow the Court to consider the Plan as a firm commitment from the Major Purchaser and the Major Purchaser's desire not to be committed to the investment if the Plan is not approved and other conditions are not met, the parties have agreed to certain conditions to Closing, which conditions are set forth in Section 2 of the Agreement Terms.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXHIBIT A

DEFINITIONS

## 1. OVERVIEW DEFINITIONS.

"*Company*" means Frinj Coffee, Incorporated, a California corporation.

"*Governing Law*" means the laws of the state of California.

"*Effective Date*" means June 10, 2024.

"*Person*" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

"*State of Incorporation*" means California.

"*Stock Plan*" means the Frinj Coffee 2018 Omnibus incentive plan.

## 2. BOARD COMPOSITION DEFINITIONS.

"*Board Designee*" means any member of the Board designated or elected by the holders of the Series A Preferred Stock pursuant to the Restated Articles.

"*Common Control Holders*" means the Key Holders.

## 3. AGREEMENT DEFINITIONS.

"*Major Purchaser*" means Kent Bakke and Moira Kennelly, a married couple, or their Purchaser Designee.

"*Paige Lawsuit*" means that certain lawsuit titled Paige Gesualdo v. John A. "Jay" Ruskey et. al. filed in Superior Court of California, County of Santa Barbara Case No. 23CV05305.

"*Purchase Price*" means $0.1304 per share, pre-reverse split under Section 5.1 of the Agreement Terms (subject to any applicable discounts where all or a portion of such Purchase Price is being paid by cancellation or conversion of indebtedness or other convertible securities of the Company issued primarily for capital raising purposes (e.g., simple agreement for future equity) to such Purchaser).

"*Purchaser*" means the Major Purchaser and each SAFE Purchaser.

"*Purchaser Designee*" means a person or entity identified by a Purchaser prior to Closing to hold Purchaser's Preferred Stock, is an entity owned and controlled by the Purchaser or is a Purchaser's immediate family member or trust for the benefit of an individual Purchaser or one or more of such

Exhibit A-1

Purchaser's immediate family members, <u>provided</u>, <u>however</u>, that such transferee is not a competitor of the Company in the Company's reasonable opinion.

"*Reverse Stock Split*" means the 50 to 1 Reverse Stock Split as described in Section 5.1.

"*SAFE*" means each SAFE (Simple Agreement for Future Equity) issued by the Company.

"*SAFE Purchaser*" means each Person that holds any outstanding SAFE.

"*Unallocated Post-Money Option Pool Percent*" means 3.1%.

## 4. RESULTING CAP TABLE DEFINITIONS.

"*Common Shares Issued and Outstanding Pre-Money*" means 42,191,071 prior to the Reverse Stock Split.

"*Total Post-Money Shares Reserved for Option Pool*" means 2,435,432 prior to the Reverse Stock Split.

"*Number of Issued And Outstanding Options*" means 0 prior to the Reverse Stock Split.

"*Unallocated Post-Money Option Pool Shares*" means 2,435,432 prior to the Reverse Stock Split.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

DocuSign Envelope ID: 343E9BC0-2A1A-4741-87CD-0F88F6A842B9

## SCHEDULE 1

## SCHEDULE OF PURCHASERS & KEY HOLDERS

### PURCHASERS:

| Name, Address and E-Mail of Purchaser | Series A Preferred Stock Shares Purchased Pre and Post Reverse Stock Split | Indebtedness or Other Convertible Securities Cancellation or Conversion | Cash Payment | Total Purchase Amount |
|---|---|---|---|---|
| Kent Bakke and Moira Kennelly 4800 Fremont Ave N, Apt 222 Seattle WA 98103 kentbakke@msn.co moirakennelly@yahoo.com | Pre: 22,992,409 Post: 459,848 | $0.00 | $3,000,000 | $3,000,000 |
| [SCHEDULE TO BE UPDATED WITH SAFEHOLDER INFORMATION IN A MANNER CONSISTENT WITH AND BASED ON THE INFORMATION CONTAINED IN SCHEDULE 2.1] | | | | |

### KEY HOLDERS:

| Name, Address and E-Mail of Key Holder | Shares of Common Stock Held |
|---|---|
| John A. Ruskey III 1362 Farren Road Goleta, CA 93117 jay@frinjcoffee.com | 19,235,000 |

123567631.2 0073000-00004

## EXHIBIT B

### AGREEMENT TERMS

### 1.    PURCHASE AND SALE OF SERIES A PREFERRED STOCK.

**1.1    Sale and Issuance of Series A Preferred Stock.**

1.1.1    Prior to the Closing, the Company will adopt and file the Company's Amended and Restated Articles of Incorporation, in a form acceptable to the Major Purchaser in its reasonable discretion (as the same may be amended, restated, supplemented or otherwise modified from time to time) (the "*Restated Articles*"), with the Secretary of State of the State of Incorporation on or before the Closing.

1.1.2    Subject to the terms and conditions of this Agreement, each Purchaser listed as a purchaser on **Schedule 1** (each, a "*Purchaser*") will purchase at the applicable Closing and the Company agrees to sell and issue to such Purchaser at such Closing that number of shares of Series A Preferred Stock of the Company ("*Series A Preferred Stock*" or "*Preferred Stock*") set forth opposite such Purchaser's name on **Schedule 1**, at a purchase price per share equal to the Purchase Price. All references to Series A Preferred Stock in this Agreement, unless specified otherwise, refer to pre-Reverse Split numbers and prices.

**1.2    Effective Date; Closing; Delivery.**

1.2.1    This Agreement is effective as of the Effective Date.

1.2.2    Subject to the terms and conditions of this Agreement, the closing date (the "*Initial Closing Date*") for payment of $2,000,000 of the Major Investor's investment and the issuance of 306,565 Post Reverse Split shares of Series A Preferred Stock to the Major Investor on the books and records of the Company shall be within three (3) business days of the occurrence of the last of the conditions listed in Section 2.1.1 of the Agreement Terms (such investment and issuance being the "*Initial Closing*"). On the Initial Closing Date, each SAFE Purchaser shall deliver to the Company any SAFE issued to such SAFE Purchaser for conversion into the aggregate number of shares of Series A Preferred Stock set forth opposite such SAFE Purchaser's name on **Schedule 1** and the Company shall issue such number of shares to such SAFE Purchaser.

1.2.3    Subject to the terms and conditions of this Agreement (including Section 2.1.2), the closing date (the "*Second Closing Date*") for payment of the final $1,000,000 of Major Investor's investment shall be June 1, 2025 (such investment and issuance being the "*Second Closing*" and together with the Initial Closing, each a "*Closing*") and the Company shall issue 153,283 Post Reverse Split shares of Series A Preferred Stock to the Major Investor, which will result in the Major Investor holding 459,848 Post Reverse Split shares of Series A Preferred Stock as of the Second Closing.

1.2.4    Each Closing will take place remotely via the exchange of documents and signatures via email or other electronic communication.

Exhibit B-

1.2.5    Promptly following each Closing, the Company shall execute and deliver to each Purchaser participating in the Closing a certificate representing the shares of Series A Preferred Stock being purchased by that Purchaser at that Closing against payment of the aggregate Purchase Price therefor (less the Advance with respect to the amount payable by the Major Purchaser at the Initial Closing) by check payable to the Company, by wire transfer to a bank account designated by the Company, by delivery of a fully executed convertible note, cancellation or conversion of indebtedness or other convertible securities of the Company issued primarily for capital raising purposes (e.g., SAFEs) to such Purchaser or by any combination of such methods.

**1.3    Advance**.

1.3.1    Subject to the terms and conditions of this Agreement, the Major Purchaser has agreed to advance the Company $250,000 (the "*Advance*"), which Advance will be evidenced and governed by a promissory note in substantially the form attached hereto as **Exhibit C** to be made by the Company in the stated principal amount of $250,000 made payable to the order of the Major Purchaser (the "*Note*"). Conditioned upon the Company executing and delivering the Note to the Major Purchaser, the Major Purchaser shall fund the Advance as follows promptly following the Court entering an order in the Bankruptcy pursuant to which the Advance is entitled to administrative expense priority under Section 364(b) of the US bankruptcy code:

(a)    a sum of $50,000 has been deposited with or otherwise paid to the Company's counsel in the Bankruptcy by wire transfer of immediately available funds to an account designated by the Company; and

(b)    a sum of $200,000 shall be deposited with or otherwise paid to the Company by wire transfer of immediately available funds to an account designated by the Company.

1.3.2    Subject to the terms and conditions of the Note, at the Initial Closing the full amount of the Advance (plus all accrued but unpaid interest) shall be credited against the $2,000,000 payable by the Major Purchaser.

**2.    CONDITIONS TO CLOSING**.

**2.1    Major Purchaser Conditions**. The obligations of the Major Purchaser to purchase shares of Series A Preferred Stock at the Closings are subject to the fulfillment, on or before such Closing, of each of the following conditions, unless otherwise waived:

2.1.1    **Initial Closing**. The obligation of the Major Purchaser to purchase shares of Series A Preferred Stock at the Initial Closing is subject to the fulfillment, on or before the Initial Closing Date, of each of the following conditions, unless otherwise waived by the Major Purchaser:

(a)    With respect to the Bankruptcy:

(i)    The Plan, in a form approved by the Major Purchaser, shall have been confirmed by Judge Ronald A. Clifford III or such other judge as is assigned to the Bankruptcy.

Exhibit B-

2

DocuSign Envelope ID: 343E9BC0-2A1A-4741-87CD-0F98F6A842B9

(ii)    The Plan shall provide for discharge of all claims of creditors against the Company.

(iii)    The Company's total combined Plan and administrative expenses obligations to be funded from the Major Investor's investment pursuant to this Agreement (the "*Investment*") (including (1) payment of administrative expenses, including the Company's attorneys' fees and subchapter V trustee fees in an amount not to exceed $150,000, including $50,000 of the Advance already paid to the Company's attorneys, (2) payment of the secured claim of the U.S. Small Business Administration in the approximate amount of $161,000, (3) payment of any other priority claims and (4) a pot to allowed unsecured claims on a pro rata basis) shall not exceed $1,250,000.00 (which amount includes the Advance).

(b)    Either (i) each SAFE Purchaser shall have executed this Agreement and agreed to convert each outstanding SAFE into shares of Series A Preferred Stock in a manner consistent with **Schedule 2-1** attached hereto or (ii) the Plan (as confirmed pursuant to Section 2.1.1(a)(i) hereof) shall provide for each outstanding SAFE to convert into shares of Series A Preferred Stock in a manner consistent with **Schedule 2-1** attached hereto.

(c)    The Reverse Stock Split shall have been completed on terms and conditions acceptable to the Major Purchaser.

(d)    The Restated Articles, in a form approved by the Major Purchaser, shall have been filed with the Secretary of State of the State of Incorporation.

(e)    Each representation and warranty of the Company set forth in this Agreement shall be true and correct in all respects as of the Initial Closing Date.

(f)    The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before the Initial Closing Date.

2.1.2    **Second Closing**. The obligation of the Major Purchaser to purchase shares of Series A Preferred Stock at the Second Closing is subject to the fulfillment, on or before the Second Closing Date, of each of the following conditions, unless otherwise waived by the Major Purchaser:

(a)    Each representation and warranty of the Company set forth in this Agreement shall be true and correct in all respects as of the Initial Closing Date.

(b)    The Company shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Company on or before such the Second Closing Date.

Exhibit B-

**2.2    Company's Conditions**. The obligations of the Company to sell the Series A Preferred Shares at the Initial Closing are subject to the fulfillment, on or before the Initial Closing, of each of the following conditions, unless otherwise waived:

2.2.1    **Generally**. Fulfillment of conditions listed in subsections 2.1.1(a) and (b).

2.2.2    **Performance**. The Major Purchaser shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Major Purchaser on or before the Initial Closing.

**3.    REPRESENTATIONS AND WARRANTIES OF THE COMPANY**. The Company represents and warrants to each Purchaser that, except as set forth on the Disclosure Schedule attached as **Exhibit D** to this Agreement (the "***Disclosure Schedule***"), if any, which exceptions are deemed to be part of the representations and warranties made in this Agreement, the following representations are true and complete as of the Effective Date, except as otherwise indicated.

**3.1    Organization, Good Standing, Corporate Power and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Incorporation and has all corporate power and corporate authority required (a) to carry on its business as presently conducted and as presently proposed to be conducted and (b) to execute, deliver and perform its obligations under this Agreement. The Company is duly qualified to transact business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the failure to so qualify or be in good standing would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of the Company.

**3.2    Capitalization**.

3.2.1    The authorized capital of the Company consists, immediately prior to the Closing (unless otherwise noted), of the following:

(a)    Common stock of the Company ("***Common Stock***"), of which (i) that number of shares of Common Stock equal to the Common Shares Issued and Outstanding Pre-Money are issued and outstanding as of immediately prior to the Closing, (ii) the number of shares of Common Stock that are issuable upon conversion of shares of Series A Preferred Stock have been reserved for issuance upon conversion of Series A Preferred Stock and (iii) the Total Post-Money Shares Reserved for Option Pool have been reserved for issuance pursuant to the Stock Plan, and of such Total Post-Money Shares Reserved for Option Pool, that number of shares of Common Stock equal to the Number of Issued And Outstanding Options are currently subject to outstanding options and that number of shares of Common Stock equal to the Unallocated Post-Money Option Pool Shares remain available for future issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The ratio determined by dividing (x) the Unallocated Post-Money Option Pool Shares by (y) the Fully Diluted Share Number (as defined below) is equal to the Unallocated Post-Money Option Pool Percent. All of the outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws. The Stock Plan has been duly adopted by the Board of Directors

Exhibit B-

of the Company (the "***Board***") and approved by the Company's stockholders. The term "***Fully Diluted Share Number***" means that number of shares of the Company's capital stock equal to the sum of (i) all shares of the Company's capital stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all options, warrants and other convertible securities and (ii) all shares of the Company's capital stock reserved and available for future grant under any equity incentive or similar plan.

(b)     The shares of preferred stock of the Company ("***Preferred Stock***"), all of which are designated as Series A Preferred Stock, none of which is issued and outstanding immediately prior to the Initial Closing.

3.2.2     There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, Preferred Stock or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock, except for (a) the conversion privileges of Series A Preferred Stock pursuant to the terms of the Restated Articles and (b) the SAFEs described on **Schedule 1**.

3.2.3     As of the Initial Closing, the Company's share capital (based on Fully Diluted Share Numbers) shall be as set forth on **Schedule 2-1**. As of the Second Closing, the Company's share capital (based on Fully Diluted Share Numbers) shall be as set forth on **Schedule 2-2**.

**3.3     Subsidiaries**. The Company does not own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

**3.4     Authorization**. All corporate action has been taken, or will be taken before the applicable Closing, on the part of the Board and stockholders that is necessary for the authorization, execution and delivery of this Agreement by the Company and the performance by the Company of the obligations to be performed by the Company as of the Effective Date. This Agreement, when executed and delivered by the Company, will constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms and conditions except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

**3.5     Valid Issuance of Shares**.

3.5.1     The shares of Series A Preferred Stock, when issued, sold and delivered in accordance with the terms and conditions and for the consideration set forth in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser. Based in part on the accuracy of the representations of the Purchasers in Section 4 and subject to filings pursuant to Regulation D of the Securities Act of 1933, as amended (the "***Securities Act***"), and applicable state securities laws, the offer, sale and issuance of the shares of Series A Preferred Stock to be issued pursuant to and in conformity with the terms and conditions of this Agreement and the issuance of Common Stock, if any, to be issued upon conversion thereof for no additional

Exhibit B-

consideration and pursuant to the Restated Articles, will comply with all applicable federal and state securities laws. Common Stock issuable upon conversion of the shares of Series A Preferred Stock has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Articles, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser. Based in part upon the representations of the Purchasers in Section 4, and subject to filings pursuant to Regulation D of the Securities Act and applicable state securities laws, Common Stock issuable upon conversion of the shares of Series A Preferred Stock will be issued in compliance with all applicable federal and state securities laws

   3.5.2   No "bad actor" disqualifying event described in Rule 506(d)(1)(i-viii) of the Securities Act (a "Disqualification Event") is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii-iv) or (d)(3) of the Securities Act is applicable. "*Company Covered Person*" means, with respect to the Company as an "issuer" for purposes of Rule 506 of the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1) of the Securities Act.

**3.6   Litigation**. There is no action, suit, proceeding, arbitration, mediation, complaint, claim, charge or investigation before any court, arbitrator, mediator or governmental body pending or, to the Company's knowledge, currently threatened in writing (a) against the Company or (b) against any consultant, officer, director or key employee of the Company arising out of such Person's consulting, employment or Board relationship with the Company or that could otherwise materially impact the Company.

**3.7   Intellectual Property**. The Company owns or possesses sufficient legal rights to all Intellectual Property (as defined below) that is necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted (the "*Company Intellectual Property*") without any violation or infringement (or in the case of third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Company) of the rights of others. No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any rights to any patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes (collectively, "*Intellectual Property*") of any other party, except that with respect to third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications the foregoing representation is made to the Company's knowledge only. Other than with respect to commercially available software products under standard end-user object code license agreements, there is no outstanding option, license, agreement, claim, encumbrance or shared ownership interest of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other Person. The Company has not received any written communications alleging that the Company has violated or, by conducting its business, would violate any of the Intellectual Property of any other Person.

**3.8   Employee and Consultant Matters**. Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary

Exhibit B-

information. No current or former employee or consultant has excluded any work or invention from such Person's assignment of inventions and, to the Company's knowledge, no such Person is in violation of such agreement. To the Company's knowledge, none of its employees is obligated under any judgment, decree, contract, covenant or agreement that would materially interfere with the employee's ability to promote the interest of the Company or that would interfere with such employee's ability to promote the interests of the Company or that would conflict with the Company's business. To the Company's knowledge, all individuals who have purchased unvested shares of Common Stock have timely filed elections under Section 83(b) of the Internal Revenue Code of 1986, as amended.

**3.9      Compliance with Other Instruments**. The Company is not in violation or default (a) of any provisions of the Restated Articles or the Company's bylaws, (b) of any judgment, order, writ or decree of any court or governmental entity, (c) under any agreement, instrument, contract, lease, note, indenture, mortgage or purchase order to which it is a party that is required to be listed on the Disclosure Schedule, or (d) to its knowledge, of any provision of federal or state statute, rule or regulation materially applicable to the Company. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any such violation or default, or constitute, with or without the passage of time or giving of notice, either (i) a default under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or purchase order or (ii) an event that results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

**3.10    Title to Property and Assets**. The Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and that do not affect material properties and assets of the Company. With respect to any property and assets it leases, the Company is in material compliance with each such lease.

**3.11    Agreements**. Except for this Agreement, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party that involve (a) obligations (contingent or otherwise) of, or payments to, the Company in excess of $25,000, (b) the license of any Intellectual Property to or from the Company other than licenses with respect to commercially available software products under standard end-user object code license agreements or standard customer terms of service and privacy policies for Internet sites, (c) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other Person, or that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (d) indemnification by the Company with respect to infringements of proprietary rights other than standard customer or channel agreements (each, a "***Material Agreement***"). The Company is not in material breach of any Material Agreement. Each Material Agreement is in full force and effect and is enforceable by the Company in accordance with its respective terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or others laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) the effect of rules of law governing the availability of equitable remedies.

Exhibit B-

**3.12    Liabilities**.  The Company has no liabilities or obligations, contingent or otherwise, in excess of $25,000 individually or $100,000 in the aggregate.

**4.    REPRESENTATIONS AND WARRANTIES AND COVENANTS OF THE PURCHASERS**.  Each Purchaser hereby represents and warrants to the Company, severally and not jointly with any other Purchaser, as follows.

**4.1    Authorization**.  The Purchaser has full power and authority to enter into this Agreement.  This Agreement, when executed and delivered by the Purchaser, will constitute a valid and legally binding obligation of the Purchaser, enforceable in accordance with its terms and conditions, except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

**4.2    Purchase Entirely for Own Account**.  The Purchaser is acquiring the shares of Series A Preferred Stock for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof.  The Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same.  The Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the shares of Series A Preferred Stock.  The Purchaser has not been formed for the specific purpose of acquiring the shares of Series A Preferred Stock.

**4.3    Disclosure of Information**.  The Purchaser has had an opportunity to discuss the Company's business, management, financial affairs and the terms and conditions of the offering of the shares of Series A Preferred Stock with the Company's management.  Nothing in this Section 4, including the foregoing sentence, limits or modifies the representations and warranties of the Company in Section 3 or the right of the Purchasers to rely thereon.

**4.4    Restricted Securities**.  The Purchaser understands that the shares of Series A Preferred Stock have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act that depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed in this Agreement. The Purchaser understands that the shares of Series A Preferred Stock are "restricted securities" under applicable United States federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the shares of Series A Preferred Stock indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities or an exemption from such registration and qualification requirements is available.  The Purchaser acknowledges that the Company has no obligation to register or qualify the shares of Series A Preferred Stock, or Common Stock into which it may be converted, for resale.  The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale and the holding period for the shares of Series A Preferred Stock, and on requirements relating to the Company that are outside of the Purchaser's control, and that the Company is under no obligation and may not be able to satisfy.

Exhibit B-

**4.5**    **No Public Market**. The Purchaser understands that no public market now exists for the shares of Series A Preferred Stock. The Company has made no assurances that a public market will ever exist for the shares of Series A Preferred Stock.

**4.6**    **Legends**. The Purchaser understands that the shares of Series A Preferred Stock and any securities issued in respect of or exchange for the shares of Series A Preferred Stock, may bear any one or more of the following legends: (a) any legend set forth in, or required by, this Agreement; (b) any legend required by the securities laws of any state to the extent such laws are applicable to the shares of Series A Preferred Stock represented by the certificate so legended; and (c) the following legend:

"THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

**4.7**    **Accredited and Sophisticated Purchaser**. The Purchaser is an accredited Purchaser as defined in Rule 501(a) of Regulation D of the Securities Act. The Purchaser is an Purchaser in securities of companies in the development stage. The Purchaser is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the shares of Series A Preferred Stock. If other than an individual, the Purchaser also represents it has not been organized for the purpose of acquiring the shares of Series A Preferred Stock.

**4.8**    **No General Solicitation**. Neither the Purchaser nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including through a broker or finder (a) engaged in any general solicitation with respect to the offer and sale of the shares of Series A Preferred Stock, or (b) published any advertisement in connection with the offer and sale of the shares of Series A Preferred Stock.

**4.9**    **Residence**. If the Purchaser is an individual, then the Purchaser resides in the state identified in the address of the Purchaser set forth on **Schedule 1**; if the Purchaser is other than an individual, then the office or offices of the Purchaser in which its principal place of business is identified in the address or addresses of the Purchaser set forth on **Schedule 1**. If the Purchaser is not a resident of the United States, the Purchaser will make such additional representations and warranties relating to such Purchaser's status as a non-United States resident as may reasonably be requested by the Company and will execute and deliver such documents or agreements as may reasonably be requested by the Company relating thereto as a condition to the purchase and sale of any shares of Series A Preferred Stock by such Purchaser.

**4.10**    **No "Bad Actor" Designees**. If the Purchaser has the right to designate or participate in the designation of a Board Designee, the Purchaser represents and warrants to the Company that, to the Purchaser's knowledge, no Disqualification Event is applicable to the Purchaser's initial designee named

Exhibit B-

above except, if applicable, for a Disqualification Event as to which Rule 506(d)(2)(ii-iv) or (d)(3) of the Securities Act is applicable. Any Board Designee to whom any Disqualification Event is applicable, except for a Disqualification Event as to which Rule 506(d)(2)(ii-iv) or (d)(3) of the Securities Act is applicable, is hereinafter referred to as a "***Disqualified Designee***". The Purchaser with the right to designate or participate in the designation of a Board Designee covenants and agrees (A) not to designate or participate in the designation of any Board Designee who, to the Purchaser's knowledge, is a Disqualified Designee and (B) that in the event the Purchaser becomes aware that any individual previously designated by the Purchaser is or has become a Disqualified Designee, the Purchaser will as promptly as practicable take such actions as are necessary to remove such Disqualified Designee from the Board and designate a replacement Board Designee who is not a Disqualified Designee.

### 5.    COVENANTS.

**5.1    Reverse Split.** The Company will obtain all requisite approval or authorization of any stockholder, the Board of Directors or others, in order to effectuate a reverse stock split of its shares of Common Stock on the basis of one (1) such share for each fifty (50) shares of issued and outstanding shares thereof (the "***Reverse Stock Split***"), such Reverse Stock Split to be effective prior to Closing; and include in the Restated and Amended Articles of Incorporation such terms as necessary to reflect such Reverse Stock Split.

**5.2    Use of Proceeds.** The Company shall use the proceeds of the Investment solely as follows:

5.2.1    First, an amount up to (but not exceeding) $1,250,000 (which amount includes the Advance) for the Company's total combined Plan and administrative expenses (including (1) payment of administrative expenses, including the Company's attorneys' fees and subchapter V trustee fees in an amount not to exceed $150,000, including $50,000 of the Advance already paid to the Company's attorneys, (2) payment of the secured claim of the U.S. Small Business Administration in the approximate amount of $161,000, (3) payment of any other priority claims and (4) a pot to allowed unsecured claims on a pro rata basis); and

5.2.2    Second, the balance shall be used for the Company's ordinary course working capital needs; provided, however, that not amount of the Investment proceeds may be used to defend the Paige Lawsuit or pay any settlement of the same.

**5.3    Information Rights.**

5.3.1    Basic Financial Information. The Company will furnish to the Major Purchaser when available (1) annual unaudited financial statements for each fiscal year of the Company, including an unaudited balance sheet as of the end of such fiscal year, an unaudited income statement and an unaudited statement of cash flows, all prepared in accordance with generally accepted accounting principles and practices; and (2) quarterly unaudited financial statements for each fiscal quarter of the Company (except the last quarter of the Company's fiscal year), including an unaudited balance sheet as of the end of such fiscal quarter, an unaudited income statement, and an unaudited statement of cash flows, all prepared in accordance with generally accepted accounting principles and practices, subject to changes resulting from normal year-end audit adjustments. If the Company has audited records of any of the foregoing, it will provide those in lieu of the unaudited versions. The rights set forth in this Section 6.3.1 shall be in addition

Exhibit B-

to and not in lieu of any other information rights available to any shareholder of the Company pursuant to Governing Law.

5.3.2    Confidentiality. Anything in this Agreement to the contrary notwithstanding, no Purchaser by reason of being a shareholder of the Company will have access to any trade secrets or confidential information of the Company. The Company will not be required to comply with any information rights of any shareholder whom the Company reasonably determines to be a competitor or an officer, employee, director or holder of 10% or more of a competitor. Each Purchaser will keep confidential and will not disclose, divulge or use for any purpose (other than to monitor its investment in the Company) any confidential information obtained from the Company pursuant to the terms and conditions of this Agreement other than to any of the Purchaser's attorneys, accountants, consultants and other professionals, to the extent necessary to obtain their services in connection with monitoring the Purchaser's investment in the Company.

5.3.3    Inspection Rights. The Company will permit the Major Purchaser to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times as may be requested by the Major Purchaser. The rights set forth in this Section 6.3.3 shall be in addition to and not in lieu of any other information rights available to any shareholder of the Company pursuant to Governing Law.

**5.4**    **Additional Rights and Obligations**. If the Company issues securities in its next equity financing after the date hereof (the "***Next Financing***") that (a) have rights, preferences or privileges that are more favorable than the terms of the shares of Series A Preferred Stock, such as price-based anti-dilution protection, or (b) provide all such future Purchasers other contractual terms such as registration rights, the Company will provide substantially equivalent rights to the Purchasers with respect to the shares of Series A Preferred Stock (with appropriate adjustment for economic terms or other contractual rights), subject to such Purchaser's execution of any documents, including, if applicable, Purchaser rights, co-sale, voting, and other agreements, executed by the Purchasers purchasing securities in the Next Financing (such documents, the "***Next Financing Documents***"). Notwithstanding anything in this Agreement to the contrary, subject to the provisions of Section 12.10, upon the execution and delivery of the Next Financing Documents by Purchasers, this Agreement (excluding any then-existing and outstanding obligations) will be amended and restated by and into such Next Financing Documents and will be terminated and of no further force or effect.

**5.5**    **Assignment of Company's Preemptive Rights**. The Company will obtain at or within thirty (30) days after the Closing, and will maintain, a right of first refusal with respect to transfers of shares of Common Stock by each holder thereof, subject to certain standard exceptions. If the Company elects not to exercise its right of first refusal with respect to a proposed transfer of the Company's outstanding securities by any Key Holder, the Company will assign such right of first refusal to Major Purchasers. In the event of such assignment, each Major Purchaser will have a right to purchase the securities proposed to be transferred by such Key Holder.

**5.6**    **Reservation of Common Stock**. The Company will at all times reserve and keep available, solely for issuance and delivery upon the conversion of Series A Preferred Stock, all Common Stock issuable from

Exhibit B-

time to time upon conversion of that number of shares of Series A Preferred Stock equal to the Total Shares Authorized for Sale, regardless of whether or not all such shares have been issued at such time.

### 6. **DIVIDEND RIGHTS**.

**6.1** **Dividends**. From and after the date of the issuance of any shares of Series A Preferred Stock, dividends at the rate per annum of 8% of the Purchase Price shall accrue on such shares of Series A Preferred Stock (subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization with respect to the Series A Preferred Stock) (the "*Accruing Dividends*"). Accruing Dividends shall accrue from day to day, whether or not declared, and shall be cumulative.

**6.2** **Payment**. The determination and payment of the Accruing Dividends will be governed by the Restated Articles and Governing Law.

### 7. **LIQUIDATION PREFERENCE**.

**7.1** **Payments to Holders of Preferred Stock**. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event (as defined in the Restated Articles), before any payment is made to the holders of Common Stock by reason of their ownership thereof, the holders of shares of Series A Preferred Stock then outstanding must be paid out of the funds and assets available for distribution to its stockholders, an amount per share equal to the greater of (a) 1.2 times the Purchase Price for such share of Preferred Stock, plus all Accruing Dividends that are unpaid thereon, or (b) such amount per share as would have been payable had all shares of Preferred Stock been converted into Common Stock pursuant to Section 8 immediately before such liquidation, dissolution or winding up or Deemed Liquidation Event.

**7.2** **Payments to Holders of Common Stock**. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of shares of Preferred Stock as provided in Section 7.1, the remaining funds and assets available for distribution to the stockholders will be distributed among the holders of shares of Common Stock and Series A Preferred Stock, pro rata based on the number of shares of Common Stock and the number of "as converted" shares of Series A Preferred Stock held by each such holder.

**7.3** The determination and payment of the liquidation preference described herein will be governed by the Restated Articles and Governing Law.

### 8. **CONVERSION RIGHTS**. Each share of Preferred Stock can be converted into fully paid and nonassessable shares of Common Stock by dividing the Original Issue Price by the Conversion Price on the terms and subject to the conditions set forth in the Restated Articles. The Conversion Price, initially equal to the Original Issue Price, can be adjusted as per the Restated Articles.

### 9. **VOTING RIGHTS**.

**9.1** **General**. On any matter presented to the stockholders for their action or consideration at any meeting of stockholders (or by written consent of stockholders in lieu of a meeting), each holder of outstanding shares of Preferred Stock may cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record

Exhibit B-

date for determining stockholders entitled to vote on such matter. Fractional votes will not be permitted and any fractional voting rights available on an as-converted basis (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) will be rounded to the nearest whole number (with one-half being rounded upward). Except as provided by law or by the other provisions of the Company's then current Articles of Incorporation, Purchase voting together with the holders of Common Stock as a single class on an as-converted basis, will have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and will be entitled, notwithstanding any provision of this Restated Articles, to notice of any stockholder meeting in accordance with the bylaws of the Company.

**9.2    Board Representation**. The holders of Series A Preferred Stock voting as a separate class shall be entitled to elect one member of the Board; provided, however, that for so long as the Major Purchaser holds at least 15% of the issued and outstanding share capital (based on Fully Diluted Share Numbers), the Major Purchaser shall be entitled to designate such member of the Board and all other Purchasers agree to vote their shares of Series A Preferred Stock in favor of any individual designated by the Major Purchaser.

**9.3    Preferred Stock Protective Provisions**. In addition to any other protective provisions set forth in the Restated Articles, for so long as the Major Purchaser holds at least 15% of the issued and outstanding share capital (based on Fully Diluted Share Numbers), the Company will not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by law or the Restated Articles) the written consent or affirmative vote of the Major Purchaser, given in writing or by vote at a meeting, consenting, or voting (as the case may be):

9.3.1    alter the rights, powers or privileges of the Preferred Stock set forth in the Restated Articles or Bylaws, as then in effect, in a way that adversely affects the Preferred Stock;

9.3.2    increase or decrease the authorized number of shares of any class or series of capital stock;

9.3.3    authorize or create (by reclassification or otherwise) any new class or series of capital stock having rights, powers, or privileges set forth in the certificate of incorporation of the Company, as then in effect, that are senior to or on a parity with any series of Preferred Stock;

9.3.4    redeem or repurchase any shares of Common Stock or Preferred Stock (other than pursuant to employee or consultant agreements giving the Company the right to repurchase shares upon the termination of services pursuant to the terms of the applicable agreement at no greater than original cost);

9.3.5    increase the number of shares available for issuance under the Stock Plan or create any new stock option plan or similar incentive equity arrangement that may be dilutive to the Major Purchaser's equity position in the Company;

9.3.6    increase or decrease the number of directors of the Company; or

9.3.7    liquidate, dissolve, or wind-up the business and affairs of the Company, effect any Deemed Liquidation Event, or consent, agree or commit to do any of the foregoing without conditioning such consent, agreement or commitment upon obtaining the approval required by this Section **9.3**.

**10.    RESTRICTIONS ON TRANSFER; DRAG ALONG**.

**10.1    Limitations on Disposition**. Each Person owning of record shares of Common Stock issued or issuable pursuant to the conversion of the shares of Series A Preferred Stock and any shares of Common

Exhibit B-

Stock issued as a dividend or other distribution with respect thereto or in exchange therefor or in replacement thereof (collectively, the "**Securities**") or any assignee of record of Securities (each such Person, a "**Holder**") will not make any disposition of all or any portion of any Securities unless:

(a)  there is then in effect a registration statement under the Securities Act, covering such proposed disposition and such disposition is made in accordance with such registration statement; or

(b)  such Holder has notified the Company of the proposed disposition and has furnished the Company with a statement of the circumstances surrounding the proposed disposition, and, at the expense of such Holder or its transferee, with an opinion of counsel, reasonably satisfactory to the Company, that such disposition will not require registration of such securities under the Securities Act.

(c)  Notwithstanding the provisions of Section 10.1(a) and Section 10.1(b), no such registration statement or opinion of counsel will be required: (i) for any transfer of any Securities in compliance with the Securities and Exchange Commission's Rule 144 or Rule 144A, or (ii) for any transfer of any Securities by a Holder that is a partnership, limited liability company, corporation or venture capital fund to (A) a partner of such partnership, member of such limited liability company or stockholder of such corporation, (B) an affiliate of such partnership, limited liability company or corporation (including, any affiliated investment fund of such Holder), (C) a retired partner of such partnership or a retired member of such limited liability company, or (D) the estate of any such partner, member, or stockholder, or (iii) for the transfer without additional consideration or at no greater than cost by gift, will, or intestate succession by any Holder to the Holder's spouse or lineal descendants or ancestors or any trust for any of the foregoing; provided that, in the case of clauses (ii) and (iii), the transferee agrees in writing to be subject to the terms and conditions of this Agreement to the same extent as if the transferee were an original Purchaser under this Agreement.

**10.2**  "**Market Stand-Off**" **Agreement**.  To the extent requested by the Company or an underwriter of securities of the Company, each Holder and Key Holder, and any transferee thereof (each, a "**Stockholder**"), will not, without the prior written consent of the managing underwriters in the IPO (as defined below), offer, sell, make any short sale of, grant or sell any option for the purchase of, lend, pledge, otherwise transfer or dispose of (directly or indirectly), enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership (whether any such transaction is described above or is to be settled by delivery of Securities or other securities, in cash, or otherwise), any Securities or other shares of stock of the Company then owned by such Stockholder, or enter into an agreement to do any of the foregoing, for up to 180 days following the effective date of the registration statement of the initial public offering of the Company (the "**IPO**") filed under the Securities Act. For purposes of this Section 10.2, "**Company**" includes any wholly owned subsidiary of the Company into which the Company merges or consolidates. The Company may place restrictive legends on the certificates representing the shares subject to this Section 10.2 and may impose stop transfer instructions with respect to the Securities and such other shares of stock of each Stockholder (and the shares or securities of every other Person subject to the foregoing restriction) until the end of such period. Each Stockholder will enter into any agreement reasonably required by the underwriters to the IPO to implement the foregoing within any reasonable timeframe so requested. The underwriters for any IPO are intended third-party beneficiaries

Exhibit B-

of this Section 10.2 and will have the right, power and authority to enforce the provisions of this Section 10.2 as though they were parties hereto.

**10.3**    **Drag Along Right**. If a Deemed Liquidation Event (as defined in the Restated Articles) is approved by each of (i) the holders of a majority of the shares of Common Stock then-outstanding (other than those issued or issuable upon conversion of the shares of Series A Preferred Stock), (ii) the holders of a majority of the shares of Common Stock then issued or issuable upon conversion of the shares of Series A Preferred Stock then-outstanding (including the Major Purchaser so long as the Major Purchaser holds at least 15% of the issued and outstanding share capital (based on Fully Diluted Share Numbers)) and (iii) the Board, then each Stockholder will vote (in person, by proxy or by action by written consent, as applicable) all shares of capital stock of the Company now or hereafter directly or indirectly owned of record or beneficially by such Stockholder (collectively, the "***Shares***") in favor of, and adopt, such Deemed Liquidation Event and to execute and deliver all related documentation and take such other action in support of the Deemed Liquidation Event as may reasonably be requested by the Company to carry out the terms and provision of this Section 10.3, including executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents. The obligation of any party to take the actions required by this Section 10.3 will not apply to a Deemed Liquidation Event if the other party involved in such Deemed Liquidation Event is an affiliate or stockholder of the Company holding more than 10% of the voting power of the Company.

**10.4**    **Exceptions to Drag Along Right**. Notwithstanding the foregoing, a Stockholder need not comply with Section 10.3 in connection with any proposed sale of the Company (the "***Proposed Sale***") unless:

(a)    any representations and warranties to be made by the Stockholder in connection with the Proposed Sale are limited to representations and warranties related to authority, ownership and the ability to convey title to such Shares, including representations and warranties that (i) the Stockholder holds all right, title and interest in and to the Shares the Stockholder purports to hold, free and clear of all liens and encumbrances, (ii) the obligations of the Stockholder in connection with the transaction have been duly authorized, if applicable, (iii) the documents to be entered into by the Stockholder have been duly executed by the Stockholder and delivered to the acquirer and are enforceable against the Stockholder in accordance with their respective terms and, (iv) neither the execution and delivery of documents to be entered into in connection with the transaction, nor the performance of the Stockholder's obligations thereunder, will cause a breach or violation of the terms of any agreement, law, or judgment, order, or decree of any court or governmental agency;

(b)    the Stockholder will not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties, and covenants of the Company as well as breach by any stockholder of any identical representations, warranties and covenants provided by all stockholders);

(c)    the liability for indemnification, if any, of the Stockholder in the Proposed Sale and for the inaccuracy of any representations and warranties made by the Company or its stockholders in

Exhibit B-

15
123567631.2 0073000-00004

connection with such Proposed Sale, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any stockholder of any identical representations, warranties, and covenants provided by all stockholders), and except as required to satisfy the liquidation preference of Series A Preferred Stock, if any, is pro rata in proportion to, and does not exceed, the amount of consideration paid to such Stockholder in connection with such Proposed Sale;

(d)      liability will be limited to the Stockholder's applicable share (determined based on the respective proceeds payable to each Stockholder in connection with the Proposed Sale in accordance with the provisions of the Restated Articles) of a negotiated aggregate indemnification amount that applies equally to all Stockholders but that in no event exceeds the amount of consideration otherwise payable to the Stockholder in connection with the Proposed Sale, except with respect to claims related to fraud by the Stockholder, the liability for which need not be limited as to the Stockholder;

(e)      upon the consummation of the Proposed Sale, (i) each holder of each class or series of the Company's stock will receive the same form of consideration for such holder's shares of such class or series as is received by other holders in respect of their shares of such same class or series of stock unless the holders of a majority of the shares of Series A Preferred Stock then outstanding elect otherwise, (ii) each holder of a series of Series A Preferred Stock will receive the same amount of consideration per share of such series of Series A Preferred Stock as is received by other holders in respect of their shares of such same series, (iii) each holder of Common Stock will receive the same amount of consideration per share of Common Stock as is received by other holders in respect of their shares of Common Stock, and (iv) unless the holders of a majority of the shares of Series A Preferred Stock then outstanding elect to receive a lesser amount, the aggregate consideration receivable by all holders of Preferred Stock and Common Stock will be allocated among the holders of Preferred Stock and Common Stock on the basis of the relative liquidation preferences to which the holders of each respective series of Preferred Stock and the holders of Common Stock are entitled in a Deemed Liquidation Event (assuming for this purpose that the Proposed Sale is a Deemed Liquidation Event) in accordance with the Restated Articles in effect immediately prior to the Proposed Sale.

**10.5     Additional Stockholders**. In the event that, after the Effective Date, the Company enters into an agreement with any Person to issue shares of capital stock of the Company to such Person, following which such Person will hold shares of capital stock of the Company constituting 3% or more of the Company's then outstanding capital stock (treating for this purpose all shares of Common Stock issuable upon exercise of or conversion of outstanding options, warrants or convertible securities, as if exercised and/or converted or exchanged), then the Company will cause such Person, as a condition precedent to entering into such agreement, to become a party to this Agreement by executing a counterpart signature page to this Agreement or an adoption agreement in a form reasonably satisfactory to the Company, agreeing to be bound by and subject to the terms of this Agreement as a Stockholder and thereafter such Person will be deemed a Stockholder for all purposes under this Agreement.

**11.     PARTICIPATION RIGHT**.

**11.1     General**. The Major Purchaser has the right of first refusal to purchase the Major Purchaser's Pro Rata Share of any New Securities (each as defined below) that the Company may from time to time issue

Exhibit B-

after the Effective Date; provided, however, the Major Purchaser will have no right to purchase any such New Securities if the Major Purchaser cannot demonstrate to the Company's reasonable satisfaction that Major Purchaser is at the time of the proposed issuance of such New Securities an "accredited Purchaser" as such term is defined in Regulation D of the Securities Act. A Major Purchaser's "*Pro Rata Share*" means the ratio of (a) the number of shares of Common Stock issued or issuable upon conversion of the shares of Series A Preferred Stock owned by such Major Purchaser, to (b) the Fully Diluted Share Number.

**11.2    New Securities**. "*New Securities*" means any Common Stock or Preferred Stock, whether now authorized or not, and rights, options or warrants to purchase Common Stock or Preferred Stock, and securities of any type whatsoever that are, or may become, convertible or exchangeable into Common Stock or Preferred Stock; provided, however, that "New Securities" does not include: (a) shares of Common Stock issued or issuable upon conversion of any outstanding shares of Preferred Stock; (b) shares of Common Stock or Preferred Stock issuable upon exercise of any options, warrants, or rights to purchase any securities of the Company outstanding as of the Effective Date and any securities issuable upon the conversion thereof; (c) shares of Common Stock or Preferred Stock issued in connection with any stock split, stock dividend or recapitalization; (d) shares of Common Stock (or options, warrants or rights therefor) granted or issued after the Effective Date to employees, officers, directors, contractors, consultants or advisers to, the Company or any subsidiary of the Company pursuant to incentive agreements, stock purchase or stock option plans, stock bonuses or awards, warrants, contracts or other arrangements that are approved by the Board and the Major Purchaser (if required under this Agreement); (e) shares of Series A Preferred Stock issued pursuant to this Agreement; and (f) shares of Common Stock issued or issuable by the Company to the public pursuant to a registration statement filed under the Securities Act.

**11.3    Procedures**. If the Company proposes to undertake an issuance of New Securities, it will give notice to each Major Purchaser of its intention to issue New Securities (the "*Notice*"), describing the type of New Securities and the price and the general terms upon which the Company proposes to issue the New Securities. Each Major Purchaser will have 10 days from the date of the Notice, to agree in writing to purchase such Major Purchaser's Pro Rata Share of such New Securities for the price and upon the general terms specified in the Notice by giving written notice to the Company and stating therein the quantity of New Securities to be purchased (not to exceed such Major Purchaser's Pro Rata Share).

**11.4    Failure to Exercise**. If a Major Purchaser fail to exercise in full the right of first refusal within the 10-day period, then the Company will have 120 days thereafter to sell the New Securities with respect to which the Major Purchaser's rights of first refusal hereunder were not exercised, at a price and upon general terms not materially more favorable to the purchaser thereof than specified in the Notice to the each Major Purchaser. If the Company has not issued and sold the New Securities within the 120-day period, then the Company will not thereafter issue or sell any New Securities without again first offering those New Securities to the Major Purchaser pursuant to this Section 11.

## 12.    GENERAL PROVISIONS.

**12.1    Successors and Assigns**. The terms and conditions of this Agreement will inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties to this Agreement or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this

Exhibit B-

Agreement, except as expressly provided in this Agreement. A Stockholder will not transfer Shares unless each transferee has agreed, to the reasonable satisfaction of the Company, to be bound by the terms and conditions of this Agreement.

**12.2**  **Governing Law**. This Agreement is governed by the Governing Law, regardless of the laws that might otherwise govern under applicable principles of choice of law.

**12.3**  **Counterparts; Manner of Delivery**. This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**12.4**  **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement. References to sections or subsections within this **Exhibit B** will be deemed to be references to the sections contained in this **Exhibit B**, unless otherwise specifically stated in this Agreement.

**12.5**  **Notices**. All notices and other communications given or made pursuant to this Agreement must be in writing and will be deemed to have been given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, or (c) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications must be sent to the respective parties at their address as set forth on the signature page or **Schedule 1**, or to such address, facsimile number or electronic mail address as subsequently modified by written notice given in accordance with this Section 12.5.

**12.6**  **No Finder's Fees**. Each party severally represents to the other parties that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Each Purchaser will indemnify, defend and hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees, or representatives is responsible. The Company will indemnify, defend, and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**12.7**  **Amendments and Waivers**. Except as provided by California Corporation Code or the Articles of Incorporation of the Company, any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Major Purchaser.

**12.8**  **Severability**. The invalidity or unenforceability of any provision of this Agreement will in no way affect the validity or enforceability of any other provision.

Exhibit B-

**12.9**  **Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, will impair any such right, power or remedy of such non-breaching or non-defaulting party nor will it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring.  No waiver of any single breach or default will be deemed a waiver of any other breach or default regardless of whether the other breach or default occurred before or after the waiver.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any terms or conditions of this Agreement, must be in writing and will be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, are cumulative and not alternative.

**12.10**  **Termination**.  Unless terminated earlier pursuant to the terms of this Agreement, (x) the rights, duties and obligations under Section 11 will terminate immediately prior to the closing of the IPO; (y) notwithstanding anything to the contrary in this Agreement, this Agreement (excluding any then-existing obligations) will terminate upon the closing of a Deemed Liquidation Event (as defined in the Restated Articles) and (z) notwithstanding anything to the contrary in this Agreement, Section 3, Section 4, and this Section 12 will survive any termination of this Agreement.

**12.11**  **Dispute Resolution**.

12.11.1    If a dispute arises from or relates to this contract or the breach thereof, and if the dispute cannot be settled through direct discussions, the parties agree to endeavor first to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration.

12.11.2    The parties further agree that any unresolved controversy or claim arising out of or relating to this contract, or breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with the Expedited Procedures of its Commercial Arbitration Rules, by one arbitrator and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

12.11.3    Claims shall be heard by a single arbitrator. The place of arbitration shall as determined by the parties or in the absence of agreement, in Santa Barbara, California. This Agreement shall be governed by, construed, interpreted and enforced under the laws of the state of California, without regard to the conflicts of laws principles thereof. The Expedited Procedures of the Commercial Rules shall apply and take priority in all procedural matters. Arbitrator will have the authority to allocate the costs of the arbitration process among the parties but will only have the authority to allocate attorneys' fees if a particular law permits them to do so. The arbitrator will have no authority to award punitive or other damages not measured by the prevailing party's actual damages, except as may be required by statute. The arbitrator shall not award consequential damages in any arbitration initiated under this section. Proceedings shall be conducted electronically to the extent reasonable as determined by the arbitrator.

**12.12**  **Termination**. If for any reason (a) the Court does not approve the Plan prior to August 31, 2024 or (b) the conditions described in Section 2.1 of the Agreement Terms are not satisfied or waived prior to

Exhibit B-

DocuSign Envelope ID: 343E9BC0-2A1A-4741-87CD-0F38F6A64289

the date that is six months after the Court approves the Plan, this Agreement shall terminate and be of no further force or effect, except that the Note shall remain in full force and effect.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit B-

123567631 2 0073000-00004

The parties to this Agreement have executed this Agreement as of the date and year first written above.

COMPANY:

FRINJ COFFEE, INCORPORATED.

By: _____

Name: John A. Ruskey III

Title: Chief Executive Officer

[SIGNATURE PAGE TO SERIES A INVESTMENT AGREEMENT]

123367631 2 007J000-00004

The parties to this Agreement have executed this Agreement as of the date and year first written above.

KEY HOLDER: John A. Ruskey III

The parties to this Agreement have executed this Agreement as of the date and year first written above.

### PURCHASER (if an individual):

Name of Purchaser:    Kent Bakke and Moira Kennelly

Signature:    *Kent Bakke*

Kent Bakke

Signature    *Moira Kennelly*

Moira Kennelly

E-mail:    kentbakke@msn.com

moirakennelly@yahoo.com

Address:    4800 Fremont Ave N

Apt 222

Seattle, WA 98103

[SIGNATURE PAGE TO SERIES A INVESTMENT AGREEMENT]

DocuSign Envelope ID: 343E9BC0-2A1A-4741-87CD-0E88F6A842B8

**EXHIBIT C**

**FORM OF NOTE**

Exhibit C-1

123567631 2 0073000-00004

THIS 12% CONVERTIBLE PROMISSORY NOTE NOR THE SECURITIES INTO WHICH IT IS CONVERTIBLE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SAID ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR THE HOLDER SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.

## 12% CONVERTIBLE PROMISSORY NOTE

Date:_____

**Santa Barbara, CA**

For value received FRINJ COFFEE INCORPORATED, a California corporation (the "***Company***"), promises to pay to Kent Bakke and Moira Kennelly or their assigns ("***Holder***") the principal sum of two hundred fifty thousand ($250,000.00) together with accrued and unpaid interest thereon, each due and payable on the date and in the manner set forth below.

**1.    Repayment.** All payments of interest and principal shall be in lawful money of the United States of America. All payments shall be applied first to accrued interest, then to any fees or costs owed hereunder and thereafter to principal. The outstanding principal amount of the Loan shall be due and payable on May 31, 2025 (the "***Maturity Date***").

**2.    Interest Rate.** The Company promises to pay simple interest on the outstanding principal amount hereof from the date hereof until payment in full, which interest shall be payable at the rate of twelve percent (12%) per annum or the maximum rate permissible by law, whichever is less. Interest shall be due and payable on the Maturity Date and shall be calculated on the basis of a 365-day year for the actual number of days elapsed.

**3.    Conversion; Repayment Premium Upon Sale of the Company.**

(a)    In the event the Company consummates, prior to the Maturity Date, an equity financing pursuant to which it sells shares of its preferred stock (the "***Preferred Stock***"), with an aggregate sales price of not less than three million dollars ($3,000,000.00), including the indebtedness under this 12% Convertible Promissory Note (this "***Note***") that is converted into Preferred Stock, and with the principal purpose of raising capital (a "***Qualified Financing***"), then all principal, together with all accrued but unpaid interest under this Note, will automatically convert into shares of the Preferred Stock at the price per share paid by the other purchasers of Preferred Stock in the Qualified Financing. Notwithstanding the above, the parties hereto agree that the interest paid under this Note, regardless of the actual date of conversion, shall not be less than nine (9) months' worth of interest.

If any Equity financing other than a Qualified Financing (a "*Non-Qualified Financing*") occurs prior to full repayment or conversion of this Note, and prior to the Maturity Date, the Holder will have the option, at their discretion, to convert this Note into a number of shares of capital stock issued in such Non-Qualifying Financing equal to (i) all principal, together with all accrued but unpaid interest under this Note divided by the price per share of the Preferred Stock sold in the Non-Qualifying Financing.

(b)     In the event that a Qualified Financing or Non-Qualified Financing is not consummated prior to the Maturity Date, then, at the election of the Holder, made at least five days prior to the Maturity Date, effective upon the Maturity Date, the outstanding principal balance and any unpaid accrued interest under this Note shall be converted into shares of Common Stock of the Company at a conversion price equal to the quotient of ten million dollars ($10,000,000.00) divided by the aggregate number of outstanding shares of the Company's Common Stock as of the Maturity Date (assuming full conversion or exercise of all convertible and exercisable securities then outstanding other than this Note).

(c)     If, after aggregation, the conversion of this Note would result in the issuance of a fractional share, the Company shall, in lieu of issuance of any fractional share, pay the Holder otherwise entitled to such fraction a sum in cash equal to the product resulting from multiplying the then current fair market value of one share of the class and series of capital stock into which this Note has converted by such fraction.

(d)     Notwithstanding any provision of this Note to the contrary, in the event that the Company consummates a Sale of the Company (as defined below) prior to the conversion or repayment in full of this Note, the Company will give the Holder a cash payment equal to the outstanding principal and unpaid accrued interest plus an additional payment equal to thirty percent (30%) of the principal amount of this Note.

(e)     For purposes of this Note:

(i)     "*Sale of the Company*" shall mean (i) any consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, other than any such consolidation, merger or reorganization in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, continue to hold at least a majority of the voting power of the surviving entity in substantially the same proportions (or, if the surviving entity is a wholly owned subsidiary, its parent) immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which the Company is a party in which in excess of 50% of the Company's voting power is transferred; *provided, however*, that a Sale of the Company shall not include any transaction or series of transactions principally for bona fide equity financing purposes in which cash is received by the Company or any successor or indebtedness of the Company is cancelled or converted or a combination thereof; or (iii) a sale, lease, exclusive license or other disposition of all or substantially all of the assets of the Company.

4.     **Maturity.** Unless this Note has been previously converted in accordance with the terms of Sections 3(a) through (c) above or satisfied in accordance with the terms of Section 3(d) above, the entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on the Maturity Date.

5.      **Expenses.** In the event of any default hereunder, the Company shall pay all reasonable attorneys' fees and court costs incurred by Holder in enforcing and collecting this Note.

6.      **Prepayment.** The Company may not prepay this Note prior to the Maturity Date without the consent of the Holder.

7.      **Default.** If there shall be any Event of Default hereunder, at the option and upon the declaration of the Holder and upon written notice to the Company (which election and notice shall not be required in the case of an Event of Default under Section 7(c) or 7(d)), this Note shall accelerate and all principal and unpaid accrued interest shall become due and payable. The occurrence of any one or more of the following shall constitute an Event of Default:

        (a)      The Company fails to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable;

        (b)      The Company (i) files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing after any dismissal of US Bankruptcy Court, Central District of California, Northern Division case no. 9:24-bk-10044-RC; or (ii) US Bankruptcy Court, Central District of California, Northern Division case no. 9:24-bk-10044-RC is converted into a Chapter 7 proceeding; or

        (c)      An involuntary petition is filed against the Company (unless such petition is dismissed or discharged within 60 days under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company.

8.      **Waiver.** The Company hereby waives demand, notice, presentment, protest and notice of dishonor.

9.      **Governing Law.** This Note shall be governed by and construed under the laws of the State of California, without giving effect to conflicts of laws principles.

10.      **Modification; Waiver.** Any term of this Note may be amended or waived with the written consent of the Company and the Holder.

11.      **Successors and Assignment.** This Note is binding upon, and shall inure to the benefit of the parties themselves, as well as their respective representatives, successors, permitted assigns, heirs and estates. This Note may be transferred (assigned) only upon its surrender to the Company for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, this Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid

solely to the registered holder of this Note. Such payment shall constitute full discharge of the Company's obligation to pay such interest and principal.

[SIGNATURE PAGE TO CONVERTIBLE PROMISSORY NOTE FOLLOWS]

[SIGNATURE PAGE TO CONVERTIBLE PROMISSORY NOTE OF FRINJ
COFFEE, INCORPORATED]

FRINJ COFFEE, INCORPORATED
1362 Farren Road
Goleta, CA 93117

By:_____
Name: Jay Ruskey
Title: Chairman and CEO

Holder (printed): Kent Bakke and Moira Kennelly

Signature:_____

Signature:_____

Address: 4800 Fremont Ave N, Apt 222
          Seattle WA 98103

Principal Amount of Note: $250,000.00

Date of Note:_____

*INVESTOR COPY*

## EXHIBIT D

## DISCLOSURE SCHEDULE

This Disclosure Schedule (this "*Disclosure Schedule*") is delivered by the Company in connection with the sale of shares of Series A Preferred Stock on or about the Effective Date by the Company. This Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections contained in **Exhibit B** of the Agreement, and the disclosures in any section of this Disclosure Schedule qualify other sections in **Exhibit B** of the Agreement to the extent it is reasonably apparent from a reading of the disclosure that such disclosure is applicable to such other sections. Where any representation or warranty is limited or qualified by the materiality of the matters to which the representation or warranty are given, the inclusion of any matter in this Disclosure Schedule does not constitute an admission by the Company that such matter is material. Unless otherwise defined in this Agreement, any capitalized terms in this Disclosure Schedule have the same meanings assigned to those terms in the Agreement. Nothing in this Disclosure Schedule constitutes an admission of any liability or obligation of the Company to any third party, or an admission against the Company's interests.

4.6 Litigation exceptions are fully disclosed in the Company's documents in the Bankruptcy

4.8 Hourly and part time workers who have not been privy to any confidential information have not signed such agreements.

4.10 Subject to any relevant claims in the Bankruptcy

4.11 The status of any unresolved Agreements are disclosed in the Bankruptcy.

4.12 The Company's liabilities are fully and correctly disclosed in the Bankruptcy.

Exhibit D-1

**SCHEDULE 2-1**

See attached

FRINJ COFFEE CAP TABLE POST SERIES A FIRST CLOSING

| Name | TOTAL Common Shares Fully vested 12/31/23 | Percent Ownership Fully Vested | SAFE $s | SAFE Shares | Series A $s | Series A Shares | TOTAL Shares Issued & Vested | Post Series A Percent Ownership Issued & p Fully | Omnibus Plan Shares Granted but NOT vested | Omnibus Plan Pool Available | Post Series A Total # of Shares Fully Diluted | Post Series A Percent Ownership p Fully Diluted | Post Series After 60 to 1 Split |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jay Ruskey | 19,235,008 | 45.55% | | | | | 19,235,008 | 27.89% | | | | 26.93% | 384,700 |
| Series A Investor K. | | | | | $2,000,000 | 15,328,273 | 15,328,273 | 22.22% | | | | 23.46% | 306,565 |
| J Piraz | 3,959,564 | 4.64% | $420,000 | 3,218,937 | | | 5,178,501 | 7.51% | | | | 7.25% | 103,570 |
| Stephen Doty | 3,536,122 | 3.64% | $300,000 | 2,299,241 | | | 3,835,363 | 5.56% | | | | 5.37% | 76,707 |
| Andy Mullins | 3,361,042 | 7.97% | | | | | 3,361,042 | 4.87% | | | | 4.71% | 67,221 |
| Juan Medrano | 3,065,700 | 7.27% | | | | | 3,065,700 | 4.44% | | | | 4.29% | 61,314 |
| Susan & Lance Frautschi | 764,890 | 1.81% | $250,000 | 1,916,034 | | | 2,680,924 | 3.89% | | | | 3.75% | 53,618 |
| John & Sally Hood | 533,402 | 1.26% | $250,000 | 1,916,034 | | | 2,449,436 | 3.55% | | | | 3.43% | 48,989 |
| Paige Gesualdo | 2,355,513 | 5.58% | | | | | 2,355,513 | 3.41% | | | | 3.30% | 47,110 |
| Lindsey Mesta | 1,225,000 | 2.90% | | | | | 1,225,000 | 1.78% | | | | 1.71% | 24,500 |
| Brent Herald | | | $150,000 | 1,149,620 | | | 1,149,620 | 1.67% | | | | 1.61% | 22,992 |
| Amy Koman | 768,197 | 1.82% | | | | | 768,197 | 1.11% | | | | 1.08% | 15,364 |
| Madden Family Trust | | | $75,000 | 574,810 | | | 574,810 | 0.83% | | | | 0.80% | 11,496 |
| Michael Masino | 505,128 | 1.20% | | | | | 505,128 | 0.73% | | | | 0.71% | 10,103 |
| Carl Steffens | 132,711 | 0.27% | $50,000 | 383,207 | | | 495,918 | 0.73% | | | | 0.69% | 9,918 |
| Julie Klaus | 429,746 | 1.02% | | | | | 429,746 | 0.62% | | | | 0.60% | 8,595 |
| Valley Heart Ranch | 395,268 | 0.94% | | | | | 395,268 | 0.57% | | | | 0.55% | 7,905 |
| Northern Farms S8 (John & Kari Ellsworth) | 373,630 | 0.89% | | | | | 373,630 | 0.54% | | | | 0.52% | 7,473 |
| Richard Masino | 353,697 | 0.84% | | | | | 353,697 | 0.51% | | | | 0.50% | 7,074 |
| Luke McCormack | 317,637 | 0.75% | | | | | 317,637 | 0.46% | | | | 0.44% | 6,353 |
| Dan Cox | 285,714 | 0.68% | | | | | 285,714 | 0.41% | | | | 0.40% | 5,714 |
| R Caird | 241,465 | 0.57% | | | | | 241,465 | 0.35% | | | | 0.34% | 4,829 |
| Linsdey Bolger | 239,413 | 0.57% | | | | | 239,413 | 0.35% | | | | 0.34% | 4,788 |
| L Guerra | 234,251 | 0.56% | | | | | 234,251 | 0.34% | | | | 0.33% | 4,685 |
| J & N Ruskey | 234,251 | 0.56% | | | | | 234,251 | 0.34% | | | | 0.33% | 4,685 |
| Omid Asbaghi | 223,994 | 0.53% | | | | | 223,994 | 0.32% | | | | 0.31% | 4,480 |
| Mark Szczerba | 216,668 | 0.51% | | | | | 216,668 | 0.31% | | | | 0.30% | 4,333 |
| Bill Silva | 210,054 | 0.50% | | | | | 210,054 | 0.30% | | | | 0.29% | 4,201 |
| Mark Cassani | 209,415 | 0.50% | | | | | 209,415 | 0.30% | | | | 0.29% | 4,188 |
| D Smargon | 175,068 | 0.41% | | | | | 175,068 | 0.25% | | | | 0.25% | 3,501 |
| James Pardee Jr Trust | 169,094 | 0.40% | | | | | 169,094 | 0.25% | | | | 0.24% | 3,382 |
| Bruce Vazzana | 161,176 | 0.38% | | | | | 161,176 | 0.23% | | | | 0.23% | 3,224 |
| B Hoffman | 141,699 | 0.34% | | | | | 141,699 | 0.21% | | | | 0.20% | 2,834 |
| J Fredette | 117,708 | 0.28% | | | | | 117,708 | 0.17% | | | | 0.16% | 2,354 |
| J Brown | 115,754 | 0.27% | | | | | 115,754 | 0.17% | | | | 0.16% | 2,315 |
| T Veltman | 115,353 | 0.27% | | | | | 115,353 | 0.17% | | | | 0.16% | 2,303 |
| Karl Shafer | 115,000 | 0.27% | | | | | 115,000 | 0.17% | | | | 0.16% | 2,300 |
| C Zara | 114,552 | 0.27% | | | | | 114,552 | 0.17% | | | | 0.16% | 2,791 |
| Grant Ferrier | 111,076 | 0.26% | | | | | 111,076 | 0.16% | | | | 0.16% | 2,227 |
| Sheryll Res-Brunk | 110,682 | 0.26% | | | | | 110,682 | 0.16% | | | | 0.15% | 2,214 |
| Steve Hollstien | 110,193 | 0.26% | | | | | 110,193 | 0.16% | | | | 0.15% | 2,204 |
| Caravela Coffee LLC | 108,559 | 0.26% | | | | | 108,559 | 0.16% | | | | 0.15% | 2,171 |
| Michael Dubin (Other Stuff LLC) | 106,229 | 0.25% | | | | | 106,229 | 0.15% | | | | 0.15% | 2,125 |
| Marc Schaberg & Robin Maguire | 104,294 | 0.25% | | | | | 104,294 | 0.15% | | | | 0.15% | 2,086 |
| Subramanyeswara Arekapudi | 96,648 | 0.23% | | | | | 96,648 | 0.14% | | | | 0.14% | 1,933 |
| Scott Krantz | 95,989 | 0.23% | | | | | 95,989 | 0.14% | | | | 0.13% | 1,920 |
| Todd D'Alessio | 84,007 | 0.20% | | | | | 84,007 | 0.12% | | | | 0.12% | 1,680 |
| William Ristenport | 55,707 | 0.13% | | | | | 55,707 | 0.08% | | | | 0.08% | 1,114 |
| Ben Myers | 55,000 | 0.13% | | | | | 55,000 | 0.08% | | | | 0.08% | 1,100 |
| Allen Van Deynze | 55,000 | 0.13% | | | | | 55,000 | 0.08% | | | | 0.08% | 1,100 |
| Roger H Laverty III | 53,697 | 0.13% | | | | | 53,697 | 0.08% | | | | 0.08% | 1,074 |
| David Bubenheim - and Consultant | 45,000 | 0.11% | | | | | 45,000 | 0.07% | | | | 0.06% | 900 |
| Ricardo Koyner | 45,000 | 0.11% | | | | | 45,000 | 0.07% | | | | 0.06% | 900 |
| Cecilia Chiefan | 45,000 | 0.11% | | | | | 45,000 | 0.07% | | | | 0.06% | 900 |
| Christopher Peck | 43,829 | 0.10% | | | | | 43,829 | 0.06% | | | | 0.06% | 877 |
| Kaytin O'Dell | 35,000 | 0.08% | | | | | 35,000 | 0.05% | | | | 0.05% | 700 |
| Marta Matvienko | 35,000 | 0.08% | | | | | 35,000 | 0.05% | | | | 0.05% | 700 |
| Griffin Hall | 35,000 | 0.08% | | | | | 35,000 | 0.05% | | | | 0.05% | 700 |
| Trevor Keith | 32,652 | 0.08% | | | | | 32,652 | 0.05% | | | | 0.05% | 653 |
| Samuel Veneagas | 30,000 | 0.07% | | | | | 30,000 | 0.04% | | | | 0.04% | 600 |
| Dario Cantu | 15,000 | 0.04% | | | | | 15,000 | 0.02% | | | | 0.02% | 300 |
| Alison Olifiore | 13,333 | 0.03% | | | | | 13,333 | 0.02% | | | | 0.02% | 267 |
| Connor McClelland | 10,000 | 0.02% | | | | | 10,000 | 0.01% | | | | 0.01% | 200 |
| Suzanne Plocinski | 10,000 | 0.02% | | | | | 10,000 | 0.01% | | | | 0.01% | 200 |
| Remilynn Ho | 10,000 | 0.02% | | | | | 10,000 | 0.01% | | | | 0.01% | 200 |
| Kristen Ruskey | 10,000 | 0.02% | | | | | 10,000 | 0.01% | | | | 0.01% | 200 |
| Mark Gaskell | 10,000 | 0.02% | | | | | 10,000 | 0.01% | | | | 0.01% | 200 |
| Joan Seavey | 5,000 | 0.01% | | | | | 5,000 | 0.01% | | | | 0.01% | 100 |
| Glenn Stinebaugh | 1,500 | 0.00% | | | | | 1,500 | 0.00% | | | | 0.00% | 30 |
| Omnibus Plan Shares Granted but not vested yet | | | | | | | | | 20,500 | | | 0.0% | 410 |
| Omnibus Shares Available Granted and Fully Vested | | | | | | | | | | 2,435,432 | | 3.1% | 48,709 |
| Total | 42,191,075 | 100.0% | $1,495,000 | ######### | $2,000,000 | 15,328,273 | 68,977,228 | 100.0% | 20,500 | 2,435,432 | 71,433,159 | 100.0% | 1,428,663 |

## SCHEDULE 2-2

See attached

FRINJ COFFEE CAP TABLE POST SERIES A SECOND CLOSING

| Name | TOTAL Common Shares Fully p Fully vested | Percent Ownershi p Fully Vested | SAFE Shares | Series A Shares | TOTAL Shares Post Series A | Post Series A Percent Ownershi p Fully Issued & Vested | Omnibu s Plan Granted but NOT vested | Omnibus Plan Pool Available | Post Series A Total # of Shares Fully p Diluted | Post Series A Percent Ownershi p Fully Diluted | Post Series After 50 to 1 Split |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Series A Investor K. | | | | 22,992,409 | 22,992,409 | 30.0% | | | | 29.1% | 459,848 |
| Jay Ruskey | 19,235,000 | 45.6% | | | 19,235,000 | 25.1% | | | | 24.3% | 384,700 |
| J Mraz | 1,959,564 | 4.6% | 3,218,937 | | 5,178,501 | 8.8% | | | | 6.5% | 103,570 |
| Stephen Doty | 1,536,122 | 3.6% | 2,299,241 | | 3,835,363 | 5.0% | | | | 4.8% | 76,707 |
| Andy Mullins | 3,361,042 | 8.0% | | | 3,361,042 | 4.4% | | | | 4.2% | 67,221 |
| Juan Medrano | 3,065,700 | 7.3% | | | 3,065,700 | 4.0% | | | | 3.9% | 61,314 |
| Susan & Lance Frautschi | 764,890 | 1.8% | 1,916,034 | | 2,680,924 | 3.5% | | | | 3.4% | 53,618 |
| John & Sally Hood | 533,402 | 1.3% | 1,916,034 | | 2,449,436 | 3.2% | | | | 3.1% | 48,989 |
| Paige Gesualdo | 2,355,513 | 5.6% | | | 2,355,513 | 3.1% | | | | 3.0% | 47,110 |
| Lindsey Mesta | 1,225,000 | 2.9% | | | 1,225,000 | 1.6% | | | | 1.5% | 24,500 |
| Brent Herald | 0 | | 1,149,620 | | 1,149,620 | 1.5% | | | | 1.5% | 22,992 |
| Amy Koman | 768,197 | 1.8% | | | 768,197 | 1.0% | | | | 1.0% | 15,364 |
| Madden Family Trust | | | 574,810 | | 574,810 | 0.8% | | | | 0.7% | 11,496 |
| Michael Masino | 505,128 | 1.2% | | | 505,128 | 0.7% | | | | 0.6% | 10,103 |
| Carl Steffens | 112,711 | 0.3% | 383,207 | | 495,918 | 0.6% | | | | 0.6% | 9,918 |
| Julie Klaus | 429,746 | 1.0% | | | 429,746 | 0.6% | | | | 0.5% | 8,595 |
| Valley Heart Ranch | 395,268 | 0.9% | | | 395,268 | 0.5% | | | | 0.5% | 7,905 |
| Northern Farms SB (John & Kari Ellsworth) | 373,630 | 0.9% | | | 373,630 | 0.5% | | | | 0.5% | 7,473 |
| Richard Masino | 353,697 | 0.8% | | | 353,697 | 0.5% | | | | 0.4% | 7,074 |
| Luke McCormack | 317,637 | 0.8% | | | 317,637 | 0.4% | | | | 0.4% | 6,353 |
| D Cox | 285,714 | 0.7% | | | 285,714 | 0.4% | | | | 0.4% | 5,714 |
| R Caird | 241,465 | 0.6% | | | 241,465 | 0.3% | | | | 0.3% | 4,829 |
| Linsdey Bolger | 239,413 | 0.6% | | | 239,413 | 0.3% | | | | 0.3% | 4,788 |
| L Guerra | 234,251 | 0.6% | | | 234,251 | 0.3% | | | | 0.3% | 4,685 |
| J & N Ruskey | 234,251 | 0.6% | | | 234,251 | 0.3% | | | | 0.3% | 4,685 |
| Omid Ashaghi | 223,994 | 0.5% | | | 223,994 | 0.3% | | | | 0.3% | 4,480 |
| Mark Szczerba | 216,668 | 0.5% | | | 216,668 | 0.3% | | | | 0.3% | 4,333 |
| Bill Silva | 210,054 | 0.5% | | | 210,054 | 0.3% | | | | 0.3% | 4,201 |
| Mark Cassani | 209,415 | 0.5% | | | 209,415 | 0.3% | | | | 0.3% | 4,188 |
| D Smargon | 175,068 | 0.4% | | | 175,068 | 0.2% | | | | 0.2% | 3,501 |
| James Pardee Jr Trust | 169,094 | 0.4% | | | 169,094 | 0.2% | | | | 0.2% | 3,382 |
| Bruce Vazzana | 161,176 | 0.4% | | | 161,176 | 0.2% | | | | 0.2% | 3,224 |
| B Hollman | 141,699 | 0.3% | | | 141,699 | 0.2% | | | | 0.2% | 2,834 |
| J Fredette | 117,708 | 0.3% | | | 117,708 | 0.2% | | | | 0.1% | 2,354 |
| J Brown | 115,754 | 0.3% | | | 115,754 | 0.2% | | | | 0.1% | 2,315 |
| T Veltman | 115,153 | 0.3% | | | 115,153 | 0.2% | | | | 0.1% | 2,303 |
| Karl Shafer | 115,000 | 0.3% | | | 115,000 | 0.2% | | | | 0.1% | 2,300 |
| C Zara | 114,552 | 0.3% | | | 114,552 | 0.1% | | | | 0.1% | 2,291 |
| Grant Ferrier | 111,076 | 0.3% | | | 111,076 | 0.1% | | | | 0.1% | 2,222 |
| Sheryl Hes-Brunk | 110,682 | 0.3% | | | 110,682 | 0.1% | | | | 0.1% | 2,214 |
| Steve Hollstien | 110,193 | 0.3% | | | 110,193 | 0.1% | | | | 0.1% | 2,204 |
| Caraveia Coffee LLC | 108,559 | 0.3% | | | 108,559 | 0.1% | | | | 0.1% | 2,171 |
| Michael Dubin (Other Stuff LLC) | 106,229 | 0.3% | | | 106,229 | 0.1% | | | | 0.1% | 2,125 |
| Marc Schaberg & Robin Maguire | 104,294 | 0.2% | | | 104,294 | 0.1% | | | | 0.1% | 2,086 |
| Subramanyeswara Arekapudi | 96,648 | 0.2% | | | 96,648 | 0.1% | | | | 0.1% | 1,933 |
| Scott Kvancz | 95,989 | 0.2% | | | 95,989 | 0.1% | | | | 0.1% | 1,920 |
| Todd D'Alessio | 84,007 | 0.2% | | | 84,007 | 0.1% | | | | 0.1% | 1,680 |
| William Ristenport | 55,707 | 0.1% | | | 55,707 | 0.1% | | | | 0.1% | 1,114 |
| Ben Myers | 55,000 | 0.1% | | | 55,000 | 0.1% | | | | 0.1% | 1,100 |
| Allen Van Deynze | 55,000 | 0.1% | | | 55,000 | 0.1% | | | | 0.1% | 1,100 |
| Roger M Laverty III | 53,697 | 0.1% | | | 53,697 | 0.1% | | | | 0.1% | 1,074 |
| David Bubenheim - and Consultant | 45,000 | 0.1% | | | 45,000 | 0.1% | | | | 0.1% | 900 |
| Ricardo Keyner | 45,000 | 0.1% | | | 45,000 | 0.1% | | | | 0.1% | 900 |
| Cecilia Chi-Ham | 45,000 | 0.1% | | | 45,000 | 0.1% | | | | 0.1% | 900 |
| Christopher Peck | 43,829 | 0.1% | | | 43,829 | 0.1% | | | | 0.1% | 877 |
| Kaytlin O'Dell | 35,000 | 0.1% | | . | 35,000 | 0.0% | | | | 0.0% | 700 |
| Marta Matvienko | 35,000 | 0.1% | | | 35,000 | 0.0% | | | | 0.0% | 700 |
| Griffin Hall | 35,000 | 0.1% | | | 35,000 | 0.0% | | | | 0.0% | 700 |
| Trevor Keith | 32,652 | 0.1% | | | 32,652 | 0.0% | | | | 0.0% | 653 |
| Samuel Veneagas | 30,000 | 0.1% | | | 30,000 | 0.0% | | | | 0.0% | 600 |
| Darlo Cantu | 15,000 | 0.0% | | | 15,000 | 0.0% | | | | 0.0% | 300 |
| Alison DiFiore | 13,333 | 0.0% | | | 13,333 | 0.0% | | | | 0.0% | 267 |
| Connor McClelland | 10,000 | 0.0% | | | 10,000 | 0.0% | | | | 0.0% | 200 |
| Suzanne Plucinski | 10,000 | 0.0% | | | 10,000 | 0.0% | | | | 0.0% | 200 |
| Hemilynn Ho | 10,000 | 0.0% | | | 10,000 | 0.0% | | | | 0.0% | 200 |
| Kristen Ruskey | 10,000 | 0.0% | | | 10,000 | 0.0% | | | | 0.0% | 200 |
| Mark Gaskell | 10,000 | 0.0% | | | 10,000 | 0.0% | | | | 0.0% | 200 |
| Joan Seavey | 5,000 | 0.0% | | | 5,000 | 0.0% | | | | 0.0% | 100 |
| Glenn Stinebaugh | 1,500 | 0.0% | | | 1,500 | 0.0% | | | | 0.0% | 30 |
| Omnibus Plan Shares Granted but not vested yet | | | | | | | 20,500 | | | 0.0% | 410 |
| Omnibus Shares Available Granted and Fully Vested | | | | | | | | 2,435,432 | | 3.1% | 48,709 |
| Total | 42,191,071 | 100.0% | 11,457,884 | 22,992,409 | 76,641,364 | 100.0% | 20,500 | 2,435,432 | 79,097,296 | 100.0% | 1,581,946 |

**EXHIBIT-H**

**(Ballot Form)**

## BALLOT FOR ACCEPTING OR REJECTING AMENDED PLAN

On November 1, 2024, Chapter 11 Debtor and Debtor-in-Possession **Frinj Coffee Incorporated** filed its Amended Subchapter V Plan of Reorganization (the "Amended Plan"). By this ballot you will decide whether to accept or reject this Amended Plan.

The Amended Plan referred to in this ballot can be confirmed by the Court and thereby bind you if it is accepted by the holders of two-thirds in amount and more than one-half in number of claims in each class and the holders of two-thirds in amount of equity security interests in each class voting on the Amended Plan.

If the requisite acceptances are not obtained, the Court may nevertheless confirm the Amended Plan if the Court finds that the Amended Plan accords fair and equitable treatment to the class or classes rejecting it [as defined by § 1191(b)] and otherwise satisfies the requirements of 11 U.S.C.A. § 1129(b) (West 2004 & Supp. 2006).

Check the appropriate line below, which describes your interest:

A. _____ The undersigned, a creditor with an allowed claim in the amount of $_____:

B. _____ The undersigned, the holder of _____ shares of _____ (explain type of stock) stock, with a certificate(s) no. _____:

[ ] Accepts the Amended Plan                    [ ] Rejects the Amended Plan

Print or type name: _____

State which class (by number) you are a member of: _____

Signed: _____

If appropriate, by: _____ as _____

Address: _____
_____

Return this ballot on or before **December 13, 2024** to Michael Berger or Sofya Davtyan via:
**Email:** Michael.Berger@bankruptcypower.com
**Email:** sofya.davtyan@bankruptcypower.com
**Or**
**Facsimile: (310) 271-9805**
**Or**
**Law Offices of Michael Jay Berger**
**Attn: Sofya Davtyan, Esq. or Michael J. Berger, Esq.**
**9454 Wilshire Boulevard, 6th Floor**
**Beverly Hills, California 90212**

**EXHIBIT-I**

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

## SETTLEMENT AGREEMENT AND MUTUAL GENERAL RELEASE

This Settlement Agreement and Mutual General Release (the "Agreement") is made by and between Paige Gesualdo ("Paige") and Ralph Gesualdo ("Ralph") (collectively, the "Gesualdo Parties"), on the one hand, and Frinj Coffee, Incorporated ("Frinj"), John A. "Jay" Ruskey III ("Ruskey"), Kari Shafer ("Shafer"), and Andy Donald Mullins ("Mullins") (collectively, the "Frinj Parties"), on the other hand, as of the date that this Agreement is signed by the last Party to do so.

The Gesualdo Parties and the Frinj Parties are sometimes collectively referred to as the "Parties," and each of the two groups individually referred to as a "Party." The Gesualdo Parties, on the one hand, and the Frinj Parties, on the other hand, intend this Agreement to settle and extinguish any and all of their respective obligations, disputes and differences  between them.

### RECITALS

A.      On or about April 12, 2021, Paige invested $500,000 in Frinj, which was memorialized by a 12% Convertible Promissory Note of even date.

B.      On or about May 1, 2021, Paige became an employee of Frinj.

C.      On or about June 3, 2021, Paige invested $700,000 in Frinj, which was memorialized by a 12% Convertible Promissory Note of even date.

D.      In January 2022, Paige loaned $200,000 to Frinj, which was memorialized by a Loan Agreement and Promissory Note dated January 26, 2022 (the "Paige Note"). On February 20, 2023, Paige assigned her rights under the Paige Note to Ralph. On March 6, 2023, Frinj paid to Paige the interest that had accrued on the loan as of February 20, 2023.

E.      In August 2022, the $1,200,000 that Paige had invested in Frinj, along with the interest accrued pursuant to the Convertible Promissory Notes, was converted to 2,369,050 shares of Frinj common stock.

F.      In or about June 2023, Paige's employment at Frinj ended.

G.      On August 28, 2023, Ralph filed a lawsuit against Frinj entitled *Ralph Gesualdo v. Frinj Coffee, Inc.*, Santa Barbara Superior Court Case No. 23CV03712 (the "Ralph Lawsuit") alleging that Frinj breached the Paige Note by failing to fully repay it. Frinj filed an Answer denying the claim.

H.      On December 1, 2023, Paige filed a lawsuit against the Frinj Parties entitled *Paige Gesualdo v. John A. "Jay" Ruskey III, et al.*, Santa Barbara Superior Court Case No. 23CV05305 (the "Paige Lawsuit") alleging that the Frinj Parties committed various torts, breaches of contract, and other wrongful acts and omissions. Ruskey, Shafer, and Mullins filed an Answer denying the claims.

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

I.      On January 16, 2024, Frinj filed a Voluntary Petition that initiated a Chapter 11, Subchapter V bankruptcy proceeding in the United States Bankruptcy Court for the Central District of California, Northern Division (the "Bankruptcy Court"), Case No. 9:24-bk-10044-RC (the "Frinj Bankruptcy"). In the Frinj Bankruptcy, (i) Paige filed (a) a Proof of Interest with respect to her common stock in Frinj (the "Paige Proof of Interest"), and (b) a Proof of Claim in the amount of $7,067,261.46 (the "Paige Proof of Claim") and (ii) Ralph filed a Proof of Claim in the amount of $239,874.23 (the "Ralph Proof of Claim"). Frinj has objected to the Paige Proof of Claim and has not objected to the Ralph Proof of Claim.

J.      On September 20, 2024, all Parties attended a mediation held before retired Los Angeles Superior Court Judge Craig D. Karlan of ADR Services, Inc. and, shortly thereafter, reached an agreement among them concerning their respective claims, rights and obligations.

K.      On or about June 10, 2024 Frinj entered into an Amended and Restated Series A Preferred Stock Investment Agreement under which Frinj would receive an investment in the amount of approximately $3,000,000 (the "SIA").The SIA is awaiting approval by the Bankruptcy Court.

L.      As a result of the mediation, the Gesualdo Parties, on the one hand, and the Frinj Parties, on the other hand, now desire to settle and extinguish all of their respective claims, obligations, disputes, and differences, including without limitation  the Ralph Lawsuit, Paige Lawsuit, Frinj Bankruptcy, the Paige Proof of Interest, the Paige Proof of Claim, the Ralph Proof of Claim and all claims, causes of action, and defenses that were raised or could have been raised in any of them.

**NOW THEREFORE**, in consideration of the promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## AGREEMENT

1.      **Settlement Terms.**

        a.      **Further Amendment to Frinj's Plan of Reorganization.** As soon as reasonably practicable, Frinj shall file a further amended Plan of Reorganization in the Frinj Bankruptcy that incorporates the terms of this Agreement and provides for a plan "effective date" that is the first business day following the date that is 30 days after the entry by the Bankruptcy Court of the Order confirming such further amended Plan of Reorganization as submitted to the Court (the "Plan Effective Date"). Provided that such further amended Plan of Reorganization complies with the terms of this Agreement, Paige and Ralph agree to vote in favor of, and not in any manner, object to or oppose, such further amended Plan of Reorganization and shall withdraw their existing objections to Frinj's present proposed Plan of Reorganization.

        b.      **Allowance of the Ralph Proof of Claim.** The Parties agree that the Ralph Proof of Claim shall be allowed in full and the pro-rata distribution on such claim shall be paid pursuant to the Amended Plan of Reorganization, and on the Plan Effective Date. The Frinj

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-8AED7444D2AC

Parties shall not object to the Ralph Proof of Claim in any manner or object, oppose or seek to prevent or delay Ralph receiving his distribution from Frinj or its bankruptcy estate on account of the Ralph Proof of Claim.

        c.    **Allowance of the Paige Proof of Claim.** The Parties agree that the Paige Proof of Claim shall be allowed in the sum of $3,618,880.71 (the "Allowed Paige Proof of Claim") and the pro-rata distribution on such claim shall be paid pursuant to the Amended Plan of Reorganization on the Plan Effective Date. Within two (2) business days after the Effective Date (as defined below), Frinj shall file a withdrawal, with prejudice, of its Objection to the Paige Proof of Claim (Docket No. 146). The Frinj Parties shall not object to the Allowed Paige Proof of Claim in any manner or object, oppose or seek to delay Paige receiving her distribution from Frinj or its bankruptcy estate on account of the Allowed Paige Proof of Claim.

        d.    **Settlement Payment.** In full and final settlement of all claims of the Gesualdo Parties, including the Ralph Lawsuit, the Ralph Proof of Claim, the Paige Lawsuit, the Paige Allowed Proof of Claim, and Frinj's redemption and acquisition of all of Paige's common stock in Frinj as set forth more fully in subsections 1(f) and 1(g) below, the Frinj Parties agree to pay to Ralph and Paige, collectively, the total sum of One Million One Hundred Thousand Dollars ($1,100,000) (the "Settlement Amount") payable on the Plan Effective Date as follows: (i) $250,000 paid to Paige by Frinj's insurance company that is providing a defense to the Frinj Parties in the Paige Lawsuit (the "Carrier"), (ii) the distribution amount by Frinj or Frinj's bankruptcy estate to Ralph and Paige on account of the Ralph Proof of Claim and the Allowed Paige Proof of Claim, respectively, which amount shall be no more than $850,000, to be determined based on the Carrier's final contribution, and (iii) the balance owing on the Settlement Amount, if any, by Ruskey, Shafer and Mullins, pursuant to subsection 1(e) jointly and severally. Frinj and the guarantors reserve the right to negotiate with the carrier but no modification of the $250,000 would be effective without the carrier's written consent. The Gesualdo Parties agree to deposit or require their counsel deposit any funds received by check pursuant to this Agreement within one (1) business day after physical receipt of the check.

        e.    **Guaranty of Entire Settlement Amount by Ruskey, Shafer and Mullins, Jointly and Severally.** Notwithstanding anything to the contrary contained herein, Ruskey, Shafer, and Mullins further agree that they are jointly and severally liable and responsible for the payment of the entire Settlement Amount. If the Settlement Amount is not timely paid in full for any reason whatsoever, including for the reason that the ultimate amount paid by Frinj and/or its bankruptcy estate and/or the Carrier, on account of the Ralph Proof of Claim and the Allowed Paige Proof of Claim, is insufficient to allow the full Settlement Amount to be paid to Ralph and Paige, then Ruskey, Shafer, and Mullins, jointly and severally, will immediately fund and pay to Ralph and Paige, collectively, any deficiency in the payment of the Settlement Amount.

        f.    **Return of Paige's Common Stock to Frinj.** Upon payment of the full Settlement Amount to Ralph and Paige, collectively, and upon the Settlement Amount having cleared the Gesualdo Parties' or the Gesualdo Parties' counsel's bank, all shares of Frinj common stock currently owned by Paige will be deemed redeemed and repurchased by Frinj.

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

     g.    **Intended Tax Treatment.** As a material term of this Agreement, the Parties agree that as between them, any and all payments, including the Settlement Amount, contemplated by this agreement: (1) made to Paige shall be characterized for tax purposes as a complete redemption (and/or sale or exchange) of Paige's common stock in Frinj, and (2) made to Ralph shall be characterized for tax purposes as the repayment of principal indebtedness. The Parties shall cooperate with one another as necessary to effectuate the tax treatment required by this Agreement and shall not take any action inconsistent therewith.

     h.    **Dismissal of the Ralph Lawsuit with Prejudice.** Within five (5) business days after payment of the Settlement Amount to Ralph and Paige, collectively, and the Settlement Amount clearing the Gesualdo Parties' or the Gesualdo Parties' bank(s), counsel for Ralph shall file a Request for Dismissal with prejudice in the Ralph Lawsuit.

     i.    **Dismissal of the Paige Lawsuit with Prejudice.** Within five (5) business days after payment of the Settlement Amount to Ralph and Paige, collectively, and the Settlement Amount clearing the Gesualdo Parties' or the Gesualdo Parties' bank(s), counsel for Paige shall file a Request for Dismissal with prejudice in the Paige Lawsuit.

     j.    **Conditions for Settlement.** For clarity, this Settlement Agreement is conditioned upon the Bankruptcy Court's approval of the SIA and of the forthcoming further Amended Plan of Reorganization. In the event that the Bankruptcy Court does not enter an Order approving this Agreement, as executed, the SIA, as executed, and the Amended Plan as submitted by Frinj, this Agreement becomes null and void and of no force or effect and the Parties will return to the positions and retain all rights and claims that they each, respectively, held prior to the execution of this Agreement.

     2.    <u>**No Admission of Liability.**</u> This Agreement is executed by the Parties for the sole purpose of settling all matters disputed among the Parties, and it is expressly understood and agreed, as a condition hereof, that this Agreement shall not constitute nor be construed as an admission of the truth or correctness of any claim made by any Party. Each Party acknowledges that the other Party expressly denies that any of them is in any way liable or obligated to the other, except as expressly set forth in this Agreement.

     3.    <u>**Mutual General Releases.**</u>

     a.    **Release of the Gesualdo Parties by the Frinj Parties.** Effective upon the Effective Date of this Agreement, and other than the obligations of the Gesualdo Parties under this Agreement, the Frinj Parties, on behalf of themselves and each of their past, current and future officers, directors, members, managers, shareholders, investors, principals, partners, employees, attorneys, insurers, agents, representatives, affiliates, trustees, predecessors, successors, heirs, executors, administrators, and assigns (the "Frinj Related Persons") hereby release and discharge the Gesualdo Parties and each of them and their past, current and future partners, employees, attorneys, insurers, agents, representatives, affiliates, predecessors, successors, heirs, executors, administrators, and assigns (the "Gesualdo Released Parties") from any and all claims, cross-claims, counterclaims, demands, causes of action, obligations, charges, damages, liabilities, attorneys' fees, and costs of any nature whatsoever, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, whether or not known, suspected

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

or claimed, which the Frinj Parties or any of the Frinj Related Persons now hold or has at any time held against the Gesualdo Released Parties, or any of them.

        b.    **Release of the Frinj Parties by the Gesualdo Parties.** Effective upon the payment of the full Settlement Amount clearing the Gesualdo Parties' or the Gesualdo Parties' counsel's banks, and other than the obligations of the Frinj Parties under this Agreement, the Gesualdo Parties, on behalf of themselves and each of their past, current and future partners, employees, attorneys, insurers, agents, representatives, affiliates, predecessors, successors, heirs, executors, administrators, and assigns (hereinafter, "Gesualdo Related Persons") hereby release and discharge the Frinj Parties and each of them and their past, current and future officers, directors, members, managers, shareholders, investors, principals, partners, employees, attorneys, insurers, agents, representatives, affiliates, trustees, predecessors, successors, heirs, executors, administrators, and assigns (hereinafter, the "Frinj Released Parties") from any and all claims, cross-claims, counterclaims, demands, causes of action, obligations, charges, damages, liabilities, attorneys' fees, and costs of any nature whatsoever, contingent or non-contingent, matured or unmatured, liquidated or unliquidated, whether or not known, suspected or claimed, which the Gesualdo Parties or any of the Gesualdo Related Persons now hold or has at any time held against the Frinj Released Parties, or any of them.

        c.    **Unknown Claims.** The Parties, and each of them, agree that the releases given above shall be effective as a full and final accord and satisfaction and mutual release of all claims, demands or causes of action released herein. In furtherance of this intention, the Parties, and each of them, acknowledge that they are familiar with and understand California Civil Code section 1542 and that they hereby waive the protection of California Civil Code section 1542, which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

        d.    **Waiver of Rights.** The Parties each waive and relinquish all rights and benefits that they have or may have under Section 1542 of the Civil Code of the State of California, or the law of any other state or jurisdiction to the same or similar effect, to the full extent they may lawfully waive all such rights and benefits pertaining to all claims. The Parties each further acknowledge, understand and agree that there is a risk and possibility that they may incur or suffer some further loss or damage that is in some way caused by or attributable to the occurrences or events released herein, but which are unknown at the time this Agreement is executed. The Parties expressly agree, however, that this Agreement and the releases set forth in this Agreement shall remain in effect notwithstanding the discovery or existence of any such additional or different claims, facts or damages.

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

4.    **Representations and Warranties.**

a.    Each Party represents and warrants to each other Party that neither he, she, or it, nor any of his, her, or its agents, representatives or attorneys, nor any other person or entity, has made any promise, assurance, representation, inducement or warranty of any kind in order to induce any other Party to enter into this Agreement, whether express or implied, which is not specifically set forth in writing in this Agreement. Each Party also acknowledges that this Agreement has not been entered into in reliance upon any promise, assurance, representation, inducement or warranty not expressly set forth in writing in this Agreement.

b.    Each Party represents and warrants to each other Party that he, she, or it has read and understands this Agreement, and that this Agreement is executed voluntarily and without duress or undue influence on the part of or on behalf of any other Party hereto. The Parties further acknowledge that they have been represented or have had the opportunity to be represented in the negotiations and preparation of this Agreement by counsel of their own choosing and that they are fully aware of the contents of this Agreement and of the legal effect of each and every provision herein.

c.    Each person signing this Agreement on behalf of an entity represents and warrants that he or she has the full and complete right and authority to enter into this Agreement on behalf of that entity and the full and complete right and authority to execute this Agreement and any attendant instruments on behalf of that entity and to fully bind said entity Party to the terms and obligations thereof.

d.    Each Party represents and warrants to each other Party that he, she, or it has not assigned, encumbered or in any manner transferred to any other person or entity any portion of the rights, interests or claims covered or released by this Agreement.

5.    **Non-Disparagement.**

a.    Each Party agrees that he, she, or it will not make any derogatory, disparaging, detrimental, and/or critical statements, either orally or in writing, in any medium, to any person or entity, about any other Party or such Party's Related Persons, including, but not limited to, statements about the lawsuits, claims and defenses settled by this Agreement or the personal or business reputations, conduct, practices of, or statements made by, any of the Parties. Each Party agrees that any comment, opinion, analysis, critique, evaluation or editorialization about this Agreement or any of the Parties shall be presumed to be a disparagement except for the language permitted under subsection 5(b), below.

b.    Nothing in this section shall prevent any Party from stating the following: "the Parties reached a settlement of their claims and disagreements. The settlement was approved by the Frinj Bankruptcy court, and as part of that settlement we have agreed not to discuss it further." The foregoing statement shall not constitute a disparagement under subsection 5(a).

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

6.    **Costs of Action.** The Parties agree that they will each bear their own costs and fees incurred relating to or arising out of this Agreement, the Paige Lawsuit, the Ralph Lawsuit, and the Frinj Bankruptcy.

7.    **Further Assurances.** The Parties shall execute any and all other documents and take any and all further steps which may be necessary or appropriate to further implement the terms of this Agreement.

8.    **Construction of Agreement.** The language of this Agreement shall not be construed for or against any particular Party. No Party, nor any of the Parties' respective attorneys, shall be deemed the drafter of this Agreement for purposes of interpreting any provision hereof in any judicial or other proceeding that may arise between or among them.

9.    **Governing Law.** This Agreement is made and entered into in the State of California. The rights and obligations of the Parties hereunder shall in all respects be construed, interpreted, enforced and governed in accordance with the laws of the State of California as applied to contracts entered into by and between residents of California to be wholly performed within California, without regard to conflicts of laws principles. Any action to enforce the terms of this Agreement, or any of them, shall be brought in the Superior Court for the County of Los Angeles or the Bankruptcy Court.

10.    **Severability.** Should any part, term or provision of this Agreement be declared or determined by any court or other tribunal of appropriate jurisdiction to be invalid or unenforceable, any such invalid or unenforceable part, term or provision shall be deemed stricken and severed from this Agreement only to the extent necessary to make this Agreement lawful and enforceable and any and all of the other terms of the Agreement shall remain in full force and effect to the fullest extent permitted by law.

11.    **Successors and Assigns.** This Agreement is binding upon the Parties and their assigns, successors, beneficiaries, representatives, affiliates, principals and agents.

12.    **Headings.** Heading, titles and captions contained in this Agreement are asserted only as a matter of convenience and are for reference purposes only. Such headings, titles and captions are intended in no way to define, limit, expand, or describe the scope of this Agreement or the intent of any other provision hereof.

13.    **Sole Agreement.** Except as otherwise stated in this Agreement, this Agreement represents the sole and entire agreement between the Parties with respect to the subject matters covered hereby, and supersedes all prior agreements, negotiations and discussions between the Parties hereto and/or their respective counsel with respect to the subject matters covered hereby.

14.    **Amendment to Agreement.** Any amendment to this Agreement must be in a writing signed by duly authorized representatives of all of the Parties hereto and stating the intent of the Parties to amend this Agreement.

15.    **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be an original but all of which, together, shall be deemed to constitute a single document. Facsimile, electronically scanned, and electronically created (e.g., DocuSign)

67435000

Docusign Envelope ID: 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

signatures shall be deemed to constitute original signatures. Photographic, PDF, and facsimile copies of such signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

   16. **Bankruptcy Court Approval.** This Agreement, including but not limited to the releases and guaranties contained herein, is not effective until the Bankruptcy Court enters on the docket in the Frinj Bankruptcy an Order approving this Agreement; the date the Bankruptcy Court enters such Order is the "Effective Date" of this Agreement. The Parties will, diligently and in good faith, seek the Bankruptcy Court's approval to this Agreement, and will cooperate to resolve any concerns the Court might have to ensure this Agreement can go into effect as soon as reasonably possible. Frinj shall, by no later than October 23, 2024, file with the Bankruptcy Court in the Frinj Bankruptcy a motion to approve this Agreement and the compromise and settlement contained herein. In the event that the Bankruptcy Court does not enter an Order approving this Agreement, and an Order confirming the further amended Plan of Reorganization referred to in section 1.a above, including the SIA, this Agreement becomes null and void and of no force or effect and the Parties will return to the positions, and retain all rights and claims, that they each, respectively, held immediately prior to the execution of this Agreement.

SIGNATURE PAGE FOLLOWS

Page 8 of 9

67435000

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date(s) set forth below.

Dated: October 11, 2024

TRINJ COFFEE, INCORPORATED

By: John A. "Jay" Ruskey III

Its: President and Chief Executive Officer

Dated: October 11, 2024

JOHN A. "JAY" RUSKEY III

Dated: October 11, 2024

KARI SHAFER

Dated: October 11, 2024

ANDY DONALD MULLINS

Dated: October    . 2024

PAIGE GESUALDO

Dated: October    . 2024

RALPH GESUALDO

Page 9 of 8

u*a*t6cX

Docusign Envelope ID. 1F25C2E6-99F1-48D2-8381-6AED7444D2AC

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date(s) set forth below.

Dated: October ___, 2024                FRINJ COFFEE, INCORPORATED

_____

By: John A. "Jay" Ruskey III

Its: President and Chief Executive Officer

Dated: October ___, 2024          _____
                                   JOHN A. "JAY" RUSKEY III

Dated: October ___, 2024          _____
                                   KARI SHAFER

Dated: October ___, 2024          _____
                                   ANDY DONALD MULLINS

Dated: October 12.00 2024          *Paige Gesualdo*
                                   PAIGE GESUALDO

Dated: October 11.00 2024          *Ralph Mauro*
                                   RALPH GESUALDO

67415000

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
9454 Wilshire Blvd., 6th Fl., Beverly Hills, CA 90212

A true and correct copy of the foregoing document entitled (specify): **Amended Plan of Reorganization for Small Business Under Chapter 11** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) __11/4/2024__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Counsel for Debtor: Michael Jay Berger   michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
U.S. Trustee: Brian David Fittipaldi   brian.fittipaldi@usdoj.gov
Counsel for Paige Gesualdo: Thomas M Geher   tmg@jmbm.com, bt@jmbm.com;tmg@ecf.courtdrive.com
Subchapter V Trustee: Mark M Sharf (TR)   mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
United States Trustee (ND)   ustpregion16.nd.ecf@usdoj.gov
Interested Party: Larry D Webb   Webblaw@gmail.com, larry@rwebblaw.onmicrosoft.com
U.S. SBA: Anne C Manalili   Anne.Manalili@sba.gov
State Compensation Insurance Fund: Andrew Ramos   scif.legal.bk@scif.com
Interested Party: Karen L Grant   kgrant@silcom.com
Counsel for SUN BZL: William C Beall   will@beallandburkhardt.com, carissa@beallandburkhardt.com

☐   Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On __11/4/2024__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Kent Bakke and Moira Kennely (The Investors)
4800 Fremont Avenue N, Apt 222
Seattle, WA 98103

Kent Bakke and Moira Kennely (The Investors)
c/o Stoel Rives LLP
Attn: John S. Kaplan, Esq.
600 University St., Ste. 3600
Seattle, WA 98101

☒   Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**: Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on __11/4/2024__, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Ronald A. Clifford III
United States Bankruptcy Court
Central District of California
1415 State Street, Suite 233 / Courtroom 201
Santa Barbara, California 93101-2511

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 11/4/2024 | Peter Garza | /s/Peter Garza |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-9
Case 9:24-bk-10044-RC
Central District of California
Santa Barbara
Mon Nov  4 15:02:47 PST 2024

FRINJ Coffee, Incorporated.
1362 Farren Road
Goleta, CA 93117-5319

Ruskey Living Trust
Law Offices of Karen L. Grant
924 Anacapa St. Ste 1m
Santa Barbara, CA 93101-2156

UNITED STATES OF AMERICA on behalf of the IN
U.S. Attorney's Office - Tax Divisi
300 N. Los Angeles Street, Room 7211
Attn:  Angela Gill
Los Angeles, CA 90012-3342

Northern Division
1415 State Street,
Santa Barbara, CA 93101-2511

Agricultural Commissioner's Office
Weights and Measures
263 Camino del Remedio
Santa Barbara, CA 93110

Alison DiFiore
50 Summer ST
Gloucester, MA 01930-3653

Allen Van Deynze
3333 Monte Vista
Davis, CA 95618-4928

American Experess Blue Card
c/o Becket and Lee
P.O. Box 0001
Los Angeles, CA 90096-0001

American Express National Bank
c/o Becket and Lee LLP
PO Box 3001
Malvern  PA 19355-0701

Amy Koman
477 N. Lindberg Blvd. Ste. 300
Saint Louis, MO 63141-7856

Andrew Mullins
40225 Parado Del Sol
Temecula, CA 92592-9062

Andrew Mullins
40225 Parado Del Sol Dr.
Temecula, CA 92592-9062

Andy Mullins
40225 Parado Del Sol Dr.
Temecula, CA 92592

Ben Meyers
227 Cereus St.
Encinitas, CA 92024-2106

Bill Silva
15760 Ventura Bl. Ste.
Encino, CA 91436

Brent Herald
12447 Tocchi Dr.
Fort Wayne, IN 46845-8633

Bruce Vazzana
34 Gateview Rd.
Fallbrook, CA 92028-9232

Bryan Hoffman
45591 Sandia Creek Dr.
Temecula, CA 92590-4143

Calvin Zara
4100 Matilija Canyon Rd.
Ojai, CA 93023-9541

Caravela Coffee LLC
601 W Rosemeary St. Ste
Chapel Hill, NC 27516-2354

Carl Steffens
PO Box 173859
Denver, CO 80217-3859

Cecillla Chi-Ham
18010 Ruddy St.
Woodland, CA 95695-6040

Christopher Peck
19720 Winter Wren Loop
Bend, OR 97702-3254

Connor Mcclelland
4820 Tacayme Dr.
Oceanside, CA 92057-5314

Dan Cox
480 Autumn Hill Ln
Shelburne, VT 05482

Darlo Cantu
909 Maswquite Dr.
Davis, CA 95618-2579

David Bubenheim
PO Box 867
El Granada, CA 94018-0867

David Smargon
6271 Westmorland P1
Goleta, CA 93117-1608

Franchise Tax Board
Bankruptcy Section MS A340
PO BOX 2952
Sacramento CA 95812-2952

Gato Fuerte LLC
c/o Dr. Steven Hollstien, CEO
1390 North Fariview
Goleta, CA 93117-1854

Glenn Stinebaugh
2332 Sunrise Meadows Dr.
Las Vegas, NV 89134-6927

Grant Ferrier
4452 Park Bl. Ste. 306
San Diego, CA 92116-4049

Griffin Hall
1133 E. Cota St. Apt. C
Santa Barbara, CA 93103-2564

Hood Family Trust
c/o Sally Hood
100 Stratford Court
Del Mar, CA 92014

INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

Jack & Niekie Ruskey
2240 West Live Oak Dr.
Los Angeles, CA 90068-2528

James Fredette
PO Box 9806
Newport Beach, CA 92658-1806

James Pardee Jr. Trust
7311 Santa Barbara St
Carlsbad, CA 92011-4638

Jason Mraz
11620 Wilshire Blvdw Ste. 580
Los Angeles, CA 90025-1778

Jeff Brown
1320 Barger Canyon Rd.
Somis, CA 93066

Joan Seavey
19015 Bayhill Lane
Huntington Beach, CA 92648-6121

John A. Ruskey III
1362 Farren Road
Santa Barbara, CA 93117-5319

Juan Medrano
PO Box 6884
Vacaville, CA 95696-6884

Julie Klaus
PO Box 634
Rancho Santa Fe, ca 92067-0634

Julie Tafel Klaus Trust
PO Box 634
Rancho Santa Fe, CA 92067-0634

Kari Shafer
925 N Hope Ave
Santa Barbara, CA 93110-1232

Kari Shafer
925 North Hope Ave
Santa Barbara, CA 93110-1232

Kaytlin O'Dell
3877 Sheldon
Ventura, CA 93003-3141

Kristen Ruskey
1362 Farren Rd.
Goleta, CA 93117-5319

Lance Frautschi
4900 Sand Canyon Rd.
Somis, CA 93066-9658

Law Office
PO Box 703
Nemo, TX 76070-0703

Law Office of Nina Yablok
PO Box 703
Nemo, TX 76070-0703

Lindsey Bolger
1402 Maggie's Way
Waterbury Center, VT 05677-8330

Luke Mccormack
10601 Edinburg Dr.
Spotsylvania, VA 22553-1734

Madden Family Trust
301 S. Pointsettia Ave
Manhattan Beach, CA 90266

Marc Schaberg
1030 Acanto Place
Los Angeles, CA 90049-1604

Mark Cassani
1907 Beechwood Ave
Nashville, TN 37212-5403

Mark Gaskell
671 N. Fifth St.
Grover Beach, CA 93433-1317

Mark Szcerba
107 Chambersburg Way
Folsom, CA 95630

Marta Matvienko
2604 Lalamazoo
Davis, CA 95618-2582

Michael & Barbara Masino JTWROS
7035 Gobernador Canyon Road
Carpenteria, CA 93013-3126

Michael Dubin
13335 Maxella Ave
Marina Del Rey, CA 90292-5619

Michael Jay Berger
Law Offices of Michael Jay Berger
9454 Wilshire Boulevard, 6th floor
Beverly Hills, CA 90212-2980

Michael Masino
7035 Gobernador Canyon Rd.
Carpinteria, CA 93013-3126

Mindful Outdoor Retreats
1362 Farren Rd.
Goleta, CA 93117-5319

Mindful Outdoor Retreats
c/o John A. Ruskey III
1362 Farren Rd.
Goleta, CA 93117-5319

Nancy Pedneault
231 Greenbrook Dr.
Danville, CA 94526-5214

Nina Yablok
PO Box 76070
Bryan, TX 77802

Northern Farms SB
c/o John & Kari Ellsworth
6250 S. Airpark Pl.
Anchorage, AK 99502-1865

Omid Asbaghi
5718 Meadows Del Mar
San Diego, CA 92130

Pacific Premier Trust Custodian
c/o Carl H. Steffens IRS
1890 Santa Monica Rd.
Carpinteria, CA 93013

Paige Gesualdo
1155 Dulzura Dr.
Santa Barbara, CA 93108-1925

Paige Gesualdo
c/o Jeffer Mangels Butler & Mitchell LLP
Attn: Thomas M. Geher
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-4301

Paige Gesualdo
c/o Jeffer Mangels Butler Mitchell
Attn: Andrew I. Shadoff, Esq.
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-4301

Por La Mar Nursery
905 S. Patterson Ave.
Goleta, CA 93111-2407

Porlamar Nursey
905 S. Patterson Ave.
Goleta, CA 93111-2407

Ralph Gesualdo
2400 S. 108 St.
Milwaukee, WI 53227

Ralph Gesualdo
2400 S.108 St.
Milwaukee, WI 53227-1904

Ralph Gesualdo
c/o Jeffer Mangels Butler & Mitchell LLP
Attn: Thomas M. Geher
1900 Avenue of the Stars, 7th Fl.
Los Angeles, CA 90067-4301

Ralph Gesualdo
c/o Jeffer Mangels Buttler Mitchell
Attn: Andrew I. Shadoff, Esq.
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-4301

Remilynn Ho
21 E. Los Olivos St.
Santa Barbara, CA 93105-3525

Ricardo Koyner
Palo Alto Rd. 4039
4039 Boquete Chirigui Rep
Panama

Richard Masino
220 West Pine Ave
El Segundo, CA 90245-2226

Roger M. Laverty III
700 The Strand
Manhattan Beach, CA 90266

Ron Caird
PO Box 60307
Santa Barbara, CA 93160-0307

Ruskey Living Trust
c/o Nicole and John A. Ruskey, Trustees
861 Corte Pastoral
Camarillo CA 93010-7418

Ruskey Living Trust c/o
Nicole and John A. Ruskey, Trustees
2240 Live Oak Drive West
Los Angeles, CA 90068-2528

Sally Hood
100 Straford Court
Del Mar, CA 92014-3219

Samuel Veneagas
423 S. Canada St. Apt. D
Santa Barbara, CA 93103-3577

Scott Kvancz
1634 De La Vina St
Santa Barbara, CA 93101-2924

Sheryl Iles-Brunk
835 Sunshine Ct.
Santa Maria, CA 93455-2170

Stephen Doty
7 Crest Rd. E.
Palos Verdes Peninsula, CA 90274-5224

Steven Hollstien
1390 North Fairview
Goleta, CA 93117-1854

Subramanyeswara Arekapudi
924 Truckee Valley Dr.
Reno, NV 89511-7320

Suzanne Plucinkis
21 Linden Rd.
Watsonville, CA 95076-0807

Todd D' Alessio
1128 1/2 W Thorn St.
San Diego, CA 92103

Trevor Veltman
PO Box 2170
Fallbrook, CA 92088-2170

U.S. Small Business Administration
1545 Hawkins Blvd Suite 202
El Paso, TX 79925-2654

U.S. Small Business Administration
300 N. Los Angeles Street
Fed. Blvd Rm 7516
Los Angeles, CA 90012-3308

(p)U S  SMALL BUSINESS ADMINISTRATION
312 N SPRING ST 5TH FLOOR
LOS ANGELES CA 90012-4701

Uline
12575 Uline Dr
Pleasant Prairie WI 53158-3686

United States Trustee (ND)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Valley Heart Ranch
c/o Darrell Becker
PO Box 41459
Santa Barbara 93140-1459

West Lilic Farms I1, LLC
7311 Santa Barbara Street
Carlsbad, CA 92011-4638

West Lilic Farms II, LLC
7311 Santa Barbara Street
Carlsbad, CA 92011-4638

William Ristenport
1631 Tamarack Lane
Davis, CA 95616-1026

Zurich American Insurance Company
ATTN Jessica Melesio
PO Box 68549
Schaumburg, IL 60168-0549

(p)MARK SHARF
6080 CENTER DRIVE SUITE 600
LOS ANGELES CA 90045-1540

Michael Jay Berger
9454 Wilshire Blvd 6th Fl
Beverly Hills, CA 90212-2980

Paige Gesualdo
c/o Jeffer Mangels Butler & Mitchell LLP
Thomas M. Geher
1900 Avenue of the Stars
7th Floor
Los Angeles, CA 90067-4301

Ralph Gesualdo
c/o Jeffer Mangels Butler & Mitchell LLP
Thomas M. Geher
1900 Avenue of the Stars
7th Floor
Los Angeles, CA 90067-4301

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

U.S. Small Business Administration
Office of General Counsel
312 North Spring Street, Floor 5
Los Angeles, CA 90012

(d)US Small Business Administration
312 North Spring St., 5th Fl
Los Angeles, CA 90012

Mark M Sharf (TR)
6080 Center Drive #600
Los Angeles, CA 90045

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Courtesy NEF                      (u)Law Office Larry Webb              (u)SUN BZL, LLC


(d)FRINJ Coffee, Incorporated        (d)John A. Ruskey III                (u)Luis Bakker Guerra
1362 Farren Road                     1362 Farren Road                     Calle Manuel Burbano S/N Puembo
Goleta, CA 93117-5319                Santa Barbara, CA 93117-5319         Quito Equador


(d)U.S. Small Business Administration (u)Kent Bakke                       (u)Moira Kennelly
1545 Hawkins Blvd., Suite 202
El Paso, TX 79925-2654


End of Label Matrix
Mailable recipients   111
Bypassed recipients     9
Total                 120